PHILIP J. IOVIENO
ADAM R. SHAW
ANNE M. NARDACCI
JENNA C. SMITH
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: piovieno@bsfllp.com
        ashaw@bsfllp.com
        anardacci@bsfllp.com
        jsmith@bsfllp.com

NICHOLAS A. GRAVANTE, JR.
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave, 7th Floor
New York, NY 10022
Telephone: (212) 446-2320
Email: ngravante@bsfllp.com

*Counsel for Plaintiff AngioDynamics, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGIODYNAMICS, INC.,<br><br>          Plaintiff,<br><br>vs.<br><br>C.R. BARD, INC.; BARD ACCESS SYSTEMS, INC.,<br><br>          Defendants. | Civil Action No.: 1:17-CV-0598 (BKS/CFH)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff AngioDynamics, Inc. ("AngioDynamics" or "Plaintiff") for its complaint against Defendants C.R. Bard, Inc. and Bard Access Systems, Inc. (collectively, "Bard" or "Defendants") hereby alleges as follows:

## I.  INTRODUCTION

1.      This case is about Bard's illegal and anti-competitive conduct in the market for peripherally inserted central catheters ("PICCs") and the market for tip location systems.  In an effort to drive sales of its PICCS, Bard has illegally tied its market-leading tip location systems to its PICCs, thereby thwarting competition in the market for PICCs and violating the antitrust laws of the United States.  AngioDynamics brings this action against Bard to recover damages and obtain an injunction and other equitable relief for these violations of the U.S. antitrust laws.

2.      A PICC is a central venous catheter placed into a peripheral vein, most commonly the basilic vein in the arm, and passed to the distal superior vena cava, near the junction of the right atrium.  Clinicians use PICCs to administer fluids, medications and nutrients, sample blood, and power inject contrast media.  The PICC itself is a thin, soft, flexible tube.  A PICC can remain in place for an extended period of time so long as no complications develop.

3.      AngioDynamics markets and sells a PICC that uses groundbreaking technology, called the BioFlo PICC.  AngioDynamics' BioFlo PICC can have a significant impact on patient outcomes, potentially avoiding serious complications.  One of the primary benefits of the BioFlo PICC is that it is the first PICC of its kind with Endexo Technology, which drastically reduces thrombus accumulation, or blood clots.  One serious, but common, complication arising from any PICC use is blood clotting known as deep vein thrombosis ("DVT"), which can lead to a pulmonary embolism ("PE").  One recently published study showed that 23% of patients who received a PICC during hospitalization experienced a thromboembolic event.  In fact, DVT-

1

related PE is the most common cause of preventable death in hospitalized patients, with more patients experiencing DVT in a given year than heart attack or stroke.  In the United States, approximately 350,000 to 600,000 cases of DVT occur each year.  DVT and PE combined are responsible for approximately 100,000 deaths annually.  BioFlo PICCs are designed to improve patient outcomes by drastically reducing thrombus accumulation and the likelihood of thromboembolic events like DVT and PE.  BioFlo's incredible efficacy is demonstrated by in-vitro blood loop model test results which show that on average, BioFlo PICCs reduce thrombus accumulation by 87% compared to commonly used PICCs based on platelet count.

4.      BioFlo PICCs also help prevent an additional common catheter complication, intra-luminal catheter occlusion, which is most often caused by the reflux of blood into the catheter shaft and the subsequent clotting of that blood.  In addition to having Endexo Technology to dramatically reduce thrombus accumulation, the BioFlo PICC is available with or without AngioDynamics' proprietary Pressure Activated Safety Valve ("PASV").  PASV is a proximal valve technology that functions to reduce the backflow of blood into the catheter shaft.

5.      Catheter occlusions are commonly treated with tissue plasminogen activator ("tPA"), which has an approximate cost of $124 per dose.  The administration of tPA not only increases the overall cost of care but has also been associated with an increase in the development of central line associated blood stream infections.  The use of BioFlo PICCs has been shown to result in a greater than 60% reduction in the use of tPA.  This is just another way in which BioFlo PICCs can significantly improve patient outcomes, potentially avoiding serious complications.

6.      Bard also manufactures and sells PICCs.  Despite its research and development efforts, Bard has been unable to develop a PICC technology that is effective in reducing

thrombus accumulation.    Bard's PICCs are sold under the brand names PowerPICC®, Provena™, Solo®, SV, Groshong®, Poly Per Q Cath®, and Per Q Cath®.

7.     Essential to the use of any PICC are separate technologies that provide information concerning tip location.  These technologies assist clinicians in navigating the PICC through the venous system so that it reaches the proper place in the body and/or confirming that the tip of the PICC has been positioned in the proper place in the body.  Malpositioned PICCs may cause complications and serious health risks, some of which can be fatal.  Traditionally, a chest x-ray or fluoroscopy was used to determine final PICC location.  Today, clinicians often use tip location systems to confirm proper final PICC placement.

8.     Many tip location systems utilize a patient's electrocardiographic ("ECG") waveform to determine a PICC's final position in relation to the location of the heart.  These tip location systems have revolutionized PICC placement because they serve as a less expensive, less time consuming, and more accurate alternative to chest x-rays or fluoroscopy to determine final PICC position.

9.     If a tip location system includes navigation technology, it can be used to guide the placement of the PICC by ascertaining information regarding the general directionality of the PICC as it moves through the body toward its ultimate destination.  Navigation is another innovative technology that facilitates the placement process and reduces PICC malpositions.

10.     Bard holds a well-established, dominant position in the market for tip location systems.  Bard is the largest player in the tip location system market and holds a substantial share of the market.  Bard's share of this market exceeds 70%.

11.     Currently, Bard's tip location systems are sold under the brand names Sherlock 3CG® Tip Confirmation System ("Sherlock 3CG") and Sherlock® II Tip Location System

("Sherlock II").  Bard was the first company to come to market with navigation technology.  In addition, Bard's Sherlock 3CG system is the first and only tip location system on the market that includes three complementary technologies to facilitate PICC placement—ultrasound technology for PICC insertion, magnetic tracking technology for PICC navigation through the venous system, and ECG technology for PICC tip location within the superior vena cava.  Thus, Bard's Sherlock 3CG system is widely regarded as providing the most advanced technology currently available and the greatest ease of use for clinicians placing PICCs.

12.     Currently, AngioDynamics sells a tip location system under the name Celerity PICC Tip Confirmation System.  This system does not include all of the features and technology offered by Bard's Sherlock 3CG system.  In fact, AngioDynamics' Celerity system only provides ECG technology for final tip location, and does not provide navigation or ultrasound.  In 2016, the manufacturer of Celerity, Nostix, LLC, was acquired by another medical device company.  Following Nostix's acquisition, AngioDynamics announced its intention to discontinue sales of the Celerity system.   AngioDynamics does not sell any other tip location systems.

13.     As described further below, Bard has illegally used its firmly established, dominant position in the market for tip location systems to stifle competition in the market for PICCs.  Bard has done so by illegally tying its market-leading tip location systems to its PICCs.  In sum, Bard will only sell the proprietary stylet necessary to operate its tip location systems preloaded in its PICCs.

14.     Thus, if a customer wants to use one of Bard's market-leading tip location systems, it must also buy Bard's PICCs to obtain the stylet necessary to operate the tip location system, *i.e.*, Bard forces customers to buy its PICCs in order to be able to use its tip location

system.  This illegal tie thus restricts customers' freedom to choose the PICC that best suits their needs.

15.     As such, Bard has leveraged its substantial market power in the tip location market to expand its sales of PICCs by preventing hospitals from using PICCs other than its own with Bard tip location systems.  The effects of this anti-competitive conduct have been substantial.  Even though AngioDynamics' groundbreaking BioFlo PICCs significantly reduce thrombus accumulation and the reflux of blood, and are thus technologically far superior to Bard's PICCs, Bard's anti-competitive conduct has allowed it to capture and maintain a dominant position in the PICC market, exceeding 70% market share.  In contrast, AngioDynamics' market share in the PICC market has continuously decreased in recent years despite the technological superiority of its BioFlo PICCs.

16.     Other than to artificially prevent competition from other companies' PICCs, there is simply no reason, technological or otherwise, for Bard to exclusively tie its market leading tip location systems to its PICCs.  Bard's own actions admit this very fact.  Bard applied for and obtained FDA approval to sell its stylet separately from its PICCs, *i.e.*, "single sterile," which would allow its tip location systems to be used with any company's PICCs.  Bard has sold the stylet in this fashion to one particular large purchaser with significant leverage, the Cleveland Clinic, which allowed the Cleveland Clinic to use a Bard tip location system and AngioDynamics' BioFlo PICCs together.  Notably, though, Bard has not made this option available to any other purchaser.

17.     Despite these facts, and although it continues to have FDA approval to sell these two products separately, to date Bard requires any purchaser interested in utilizing its market-leading tip location systems to also purchase and use Bard's PICCs.

18.     Bard's anti-competitive strategy has been, and continues to be, extremely effective in reducing the competition Bard faces in the market for PICCs.  This has resulted in substantial loss of sales for AngioDynamics because their PICCs cannot be used with Bard's market leading tip location systems, as well as decreased price competition in the PICC market.

## II.     JURISDICTION AND VENUE

19.     Plaintiff AngioDynamics brings this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (28 U.S.C. § 1).

20.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

21.     The medical devices at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this complaint have occurred in, and have substantially affected, interstate commerce.

22.     Defendants are subject to personal jurisdiction in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) because they may be found and transact business in this district.

23.     Venue is proper pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because Defendants transact business in this district, a substantial part of the events giving rise to AngioDynamics' claims occurred in this district, and AngioDynamics resides in this district.

## III.   <u>PARTIES</u>

24.     Plaintiff AngioDynamics, Inc. is a company organized under the laws of Delaware and headquartered at 14 Plaza Drive, Latham, New York 12110.  AngioDynamics is a publicly-traded provider of medical devices used for minimally-invasive treatment of acute and chronic medical conditions requiring vascular access, peripheral vascular or oncology/surgical interventions.

25.     Defendant C.R. Bard, Inc. ("C.R. Bard") is a company organized under the laws of New Jersey and headquartered at 730 Central Avenue, Murray Hill, New Jersey 07974.  C.R. Bard, Inc. is a publicly-traded provider of vascular access, oncological, urological, and surgical medical devices.

26.     Defendant Bard Access Systems, Inc. ("Bard Access") is a company organized under the laws of the State of Utah and headquartered at 605 North 5600 W., Salt Lake City, UT 84116.  Bard Access is a subsidiary of C.R. Bard and is listed on C.R. Bard's website as a "division" of C.R. Bard.  Bard Access is a provider of vascular access medical devices.

27.     On April 23, 2017, Becton, Dickinson & Co. ("BD"), another medical device manufacturer, and Bard announced that they had reached an agreement under which BD would acquire Bard for $24 billion.  In a presentation to investors, the companies stated that together they would have about $16 billion in annual revenue and 65,000 employees with a presence in almost every country around the world.  The deal is expected to close in the fall.

## IV.   <u>TRADE AND COMMERCE</u>

28.     During the relevant period, Bard sold tip location systems and PICCs in the United States in a continuous flow of interstate commerce, including through and into this

judicial district.  During the relevant period, Bard controlled a vast majority of the market for tip location systems in the United States.

29.     Bard's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury by reducing competition in the PICC market and preventing innovative and superior quality PICCs from reaching a large segment of the patient population.

## V.   **FACTUAL BACKGROUND**

### A.     **PICC Usage and Complications**

30.      Both AngioDynamics and Bard manufacture, market, and sell peripherally inserted central catheters ("PICCs").

31.     A PICC is a long thin catheter inserted into the body through a vein, typically in the upper arm, and passed to the superior vena cava.  PICCs are best suited for patients who require intravenous medical treatment over an extended period of time.  PICCs can be used to introduce medications, fluids and nutrients into the body, or to draw blood.

32.     To place a PICC, trained health care providers utilize ultrasound to identify the vessel of choice.  Once identified, they anesthetize a small portion of a patient's arm, then insert a needle into the vessel.  Once access is obtained, a guide wire is passed, followed by an introducer, and then the catheter.  The catheter passes through the venous system to the superior vena cava—the large vein leading to the right atrium of the heart.

33.     PICCs are a widely used method of vascular access, with clinicians placing approximately 2.7 million PICCs every year.  It is anticipated that PICC usage will continue to grow at a steady pace for the foreseeable future.

34.     Despite their popularity, PICC use is associated with a variety of complications, including infection, blood clotting, and line malfunction or blockage.  Blood clotting can result in obstruction of a blood vessel, a condition called venous thrombosis.

35.     Deep vein thrombosis (DVT) occurs when a blood clot blocks a large, essential vein below the surface of the skin.  Pulmonary embolism (PE) occurs when a blood clot originating in another part of the body travels to and obstructs vessels in the lungs.  Both conditions can be life-threatening and require immediate medical attention.

36.     Together, DVT and PE are known as venous thromboembolism (VTE).  In the United States there are more than 900,000 VTE events per year; a rate that has not changed significantly in the past 25 years.  However, since the risk of DVT and PE is closely correlated with aging, the impact of these conditions is expected to increase as the U.S. population ages.

37.      PICC use is strongly associated with upper extremity-deep vein thrombosis ("UEDVT"), based on the fact that PICCs are placed in the upper extremities and can occupy much of the cross-sectional diameter of peripheral veins of the arm; however recent studies have also uncovered a modest association between PICC use and lower extremity-deep vein thrombosis.

38.     PICCs are associated with a 2.5-fold greater risk of thrombosis than non-tunneled central venous catheters.  One recently published study showed that 23% of patients who received a PICC during hospitalization experienced a thromboembolic event.

39.     In the United States, approximately 350,000 to 600,000 cases of DVT occur each year.  DVT and PE combined are responsible for approximately 100,000 deaths annually.  Many of those who survive have complications that have a serious and negative impact on the quality of their lives.  Some studies estimate that each occurrence of DVT or PE incurs a direct cost of

9

$4,000 to $6,000, with annual costs of recurrent episodes and other complications estimated to be between $10,000 and $19,000.  DVT and PE incidence has been shown to double the duration of patient hospital stays.

40.   DVT has a recurrence rate of roughly thirty percent, with the majority of recurrences taking place within twelve months of the initial event.  In addition, research suggests that having a history of DVT is one of the strongest risk factors for recurrent DVT.

41.   DVT-related PE is the most common cause of preventable death in hospitalized patients, with more patients experiencing DVT in a given year than heart attack or stroke.

42.   In 2008, in recognition of the high number of DVT and PE cases in the United States, the acting Surgeon General issued a "call to action" to reduce the number of DVT and PE cases.  The Surgeon General urged all Americans to understand the risk factors and events that can trigger DVT and PE and asked the healthcare community to develop methods for combatting this problem, calling DVT and PE "a major public health problem" that "exact[s] a significant human and economic toll on the Nation."

43.   In conjunction with the Surgeon General's call to action, the Secretary of the U.S. Department of Health and Human Services ("HHS") identified the prevention and treatment of DVT and PE as an aspect of medicine that had not shown improvement in recent years and one that required immediate attention in order to further reduce the mortality rates for cardiovascular disease.

44.   In addition, in 2010, HHS launched its Healthy People 2020 initiative, which set forth its 10-year goals and objectives for health promotion and disease prevention to improve the Nation's health.  In the area of blood safety and blood disorders, one of Healthy People 2020's

key objectives is reducing the number of adults that develop venous thromboembolism during hospitalization, thus making DVT prevention a national objective.

### 1.    AngioDynamics' BioFlo PICCs

45.    AngioDynamics is a relatively new company and it has manufactured and sold PICC products in the United States since 2007.   In 2012, AngioDynamics obtained FDA approval for a groundbreaking new PICC, which it markets as the BioFlo PICC.

46.    AngioDynamics' BioFlo PICC is manufactured using a proprietary material that resists the accumulation of blood components— thus impeding clot formation.  This proprietary material contains Endexo Technology.

47.    The inspiration for the development of the Endexo Technology can be traced back to the placement of the first artificial heart, the Jarvik heart, placed in Barney Clark on December 2, 1982.  Clark died 112 days after becoming the world's first recipient of a permanent artificial heart.  Scientists that develop biocompatible plastic materials followed the case closely and were inspired to create materials that would reduce complications when implanted in the body.

48.    BioFlo's Endexo Technology is a permanent and non-eluting integral polymer. This means that it is not a coating or impregnated into the catheter.   Instead, the Endexo Technology polymer is blended with Carbothane thermoplastic polyurethane during the proprietary manufacturing process.   Thus, unlike a coating or impregnated material, Endexo Technology is present throughout the catheter material, including the outer surface, inner surface and even the cut catheter tip.  The combined material imparts the catheter shaft with protection against thrombus accumulation by creating passive surfaces.

49.     All other things equal, the BioFlo PICC containing Endexo Technology reduces the risk of serious and life-threatening patient complications including DVT, and facilitates higher quality care at a lower cost.

50.     In-vitro blood loop model test results show that on average, the BioFlo PICC with Endexo Technology has 87% less thrombus accumulation on its surface compared to commonly used PICCs based on platelet count.

51.     A number of health care institutions have studied the efficacy of BioFlo PICCs and have independently published or formally presented results in a scientific platform.  These studies demonstrate the dramatic results of the use of BioFlo.  For example, the Cleveland Clinic noted that BioFlo PICCs reduced thrombosis by a factor of 6.2 overall.  Likewise, St. Rita's Medical Center in Lima, Ohio noted a 73% reduction in catheter occlusions, 80% reduction in DVT, and 64% reduction in the cost of tissue plasminogen activator ("tPA").  Additionally, Flagler Hospital in St. Augustine, Florida noted a 74% reduction in catheter occlusions and a 73% reduction in DVT.

52.     The BioFlo PICC is also available with PASV Valve Technology, which is AngioDynamics' patented valve designed to automatically resist backflow and reduce blood reflux on the inside of the catheter.

53.     As such, AngioDynamics' BioFlo PICC with Endexo Technology is a truly disruptive product offering—it is the first PICC of its kind with the ability to significantly reduce thrombus accumulation and, for those PICCs with PASV Valve Technology, to reduce the reflux of blood into the catheter, as well.  It provides a safe, cost-effective, advanced technology designed to significantly improve patient outcomes.

54.     At the time AngioDynamics introduced BioFlo PICCs to the U.S. market, it anticipated rapid adoption of the BioFlo technology, given its groundbreaking anti-thrombogenic properties, and a resulting increased demand for its PICCs.  However, actual adoption of BioFlo PICCs has been limited due to Bard's illegal tying arrangements.

### 2.     Bard's PICCs

55.     Bard sells standard polyurethane PICCs.  Bard's PICCs do not contain any thrombo-resistant material.  Bard has been unable to develop a thrombo-resistant material similar to the Endexo Technology included in AngioDynamics' BioFlo PICCs, despite its efforts to do so.  In addition, Bard catheters exhibit longer taper lengths (4-7cm), creating additional obstruction of blood flow through the vessels, further increasing complication risk.

56.     In sum, Bard's PICCs have none of the technological advancements designed to improve patient outcomes that AngioDynamics' PICCs have and, in addition, have design features that increase the risk of complications.

57.     During an earnings call in October 2013 (not long after BioFlo PICCs received FDA approval and began to gain traction in the market), Bard announced that it was developing a new thrombo-resistant PICC family of products and anticipated launching them in 2014, following FDA clearance.

58.     In subsequent earnings calls in 2014 and 2015, Bard reported that the development of its thrombo-resistant PICCs had been delayed and that it had yet to submit any "new" catheter technology to the FDA for approval.

59.     In a January 2015 earnings call, Bard described the thrombo-resistant PICCs it intended to launch as "coated PICCs."   So-called thrombo-resistant coating has proven ineffective in achieving the reduced thrombus results of Endexo Technology, which is not a

coating but rather a polymer that is added directly to the base polyurethane during the manufacturing process.

60.     Among other things, coatings create an additional step in the manufacturing process and they are ineffective in protecting cut surfaces.  Coatings also elute into the blood stream, exposing patients to chemicals unnecessarily.  Endexo Technology does not suffer from any of these shortcomings.  BioFlo PICCs benefit from a consistent manufacturing process, and the Endexo Technology in BioFlo PICCs cannot wear off, given that it is an integral part of the catheter itself, not a coating.  This also means that it is present on the cut catheter tip and protects that surface.

61.     In addition, in more recent earnings calls, Bard has not made any further reference to its efforts to develop a thrombo-resistant PICC family of products.  Thus, Bard currently does not have any PICC products on the market that provide the type of reduced thrombus accumulation that AngioDynamics' BioFlo PICCs provide and it does not appear that it is close to introducing any such PICCs into the market.

**B.      Tip Location Systems**

62.     As described above, it is important to confirm that the PICC has been properly placed to avoid patient complications.  Traditionally, clinicians confirmed the final location of the PICC by x-ray or fluoroscopy (imaging using continuous x-rays for real time monitoring).

63.     More recently, additional technologies have been developed to confirm proper final PICC placement and/or guide the placement of the PICC.  These technologies improve the accuracy of PICC placement and reduce the need to perform an x-ray or fluoroscopy to confirm the location of the PICC after placement.

64.     Many tip location systems utilize ECG technology to determine a PICC's position in relation to the location of the heart.  ECG technology does not convey information about the location of the tip of the PICC as it travels through the venous system during insertion, but it does assist with proper placement of the PICC once it enters the superior vena cava.

65.     Some tip location systems utilize PICC navigation technology, which collects and conveys information regarding the general directionality of the PICC as it travels within the venous system during insertion, to assist clinicians in guiding the PICC through the venous system.  Modern navigation technologies include magnetic tracking technology and Doppler technology, and they have proven to be effective in reducing improper PICC placement and the incidence of re-placing improperly placed PICCs.

### 1.     Bard's Tip Location Systems

66.     Bard holds a dominant position in the market for tip location systems.  Currently, Bard markets and sells two tip location systems, the Sherlock 3CG system and the Sherlock II system.

67.     While ECG technology for use in tip location has been in existence for some time, Bard was the first company to come to market with navigation technology.  Bard's Sherlock system was revolutionary when it was introduced because it was the first system to provide navigational guidance in PICC placement.

68.     In 2012, Bard introduced its next generation tip location system, the Sherlock 3CG system, which is the first and only tip location system to come to market that combines three complementary technologies for PICC placement—ultrasound technology for PICC insertion, magnetic tracking technology for PICC navigation through the venous system, and ECG technology for PICC tip location within the superior vena cava.  Due to this combination of

the three technologies, Bard's Sherlock 3CG system is widely regarded as superior to other tip location systems on the market.  Indeed, Bard's Sherlock 3CG system is indisputably the market leading tip location system and is preferred by clinicians in a substantial share of the market.

69.     Bard's Sherlock 3CG tip location system provides an ease of use for clinicians that is unmatched by other tip location systems.  The Sherlock 3CG system uses a single external monitoring and display device paired with its proprietary stylet.  Bard's magnetic tracking navigation system uses an external sensor that measures tip orientation and direction.  The proprietary stylet relays orientation and direction information, as well as ECG-based tip location information, to a single display.

70.     The navigation system allows medical personnel to ascertain the direction of the PICC.  The nurse or doctor inserting the PICC can "watch" and "steer" toward the proper placement area and then use ECG tip location to place the PICC.

71.     Both Bard's Sherlock 3CG system and its Sherlock II system cannot be utilized without Bard's proprietary stylet.  Bard only sells this proprietary stylet preloaded in its PICCs.  Thus, in order to use one of Bard's tip location systems, one must also purchase its PICCs to obtain the stylets necessary to operate the system.

72.     There is no legitimate reason, technological, business or otherwise, that Bard must tie the sale of these two separate products, the tip location systems and the PICCs.  Bard does so solely to drive sales of its PICCs, thereby injuring competition in the market for PICCs.  Indeed, any justification Bard has for tying its tip location systems and PICCs together is far outweighed by the anti-competitive effects in the market for PICCs.

73.     Bard itself has acknowledged that there is no reason that its tip location systems and its PICCs cannot be sold separately such that Bard's market leading tip location system could be used with AngioDynamics' innovative, best-in-class BioFlo PICCs.

74.     In fact, Bard sought FDA approval to sell its proprietary stylets single sterile and the FDA granted 510(k) clearance for such sales.  In the 510(k) clearance letter, the FDA specifically stated that Bard's stylet "may now be used with specific Bard catheters as well as any open-ended, non-valved, polyurethane peripherally inserted central catheter that meets the dimensional specifications of the stylet (0.020 in minimum lumen diameter)."

75.      Bard has previously sold its stylets single sterile to one of the leading medical centers in the United States and indeed the world, the Cleveland Clinic.  Given its prominence, the Cleveland Clinic has significant purchasing leverage.  The Cleveland Clinic had trialed BioFlo PICCs and noted a significant reduction in UEDVT in patients using BioFlo PICCs versus polyurethane PICCs.  It requested to purchase Bard's stylets single sterile specifically so that it could use AngioDynamics' BioFlo PICCs with the Bard Sherlock 3CG tip location system.

76.     This is the only time that Bard has ever sold its stylets single sterile in order to allow its tip location systems to be used with another company's PICCs.  Other institutions have requested that Bard sell its stylets single sterile to them and Bard has refused their requests. Aside from the one exception of its sales to the Cleveland Clinic, Bard has always refused to sell its stylet single sterile, despite having the FDA approval to do so.

77.     As evidenced by its sales to the Cleveland Clinic, Bard's stylet is compatible with AngioDynamics' BioFlo PICCs.  In fact, its sales to the Cleveland Clinic demonstrate how the tip location system and PICC markets would operate in a competitive marketplace absent an

artificial tie—buyers would have the freedom to choose AngioDynamics' leading technology in PICCs without having to sacrifice Bard's leading technology in tip location systems, if that is the combination of products they desired to use.   Instead, because of Bard's illegal tying arrangement, purchasers are unable to use Bard's tip location systems with AngioDynamics' BioFlo PICCs because Bard refuses to sell the stylet necessary to operate their systems single sterile.   Bard's large market share in the tip location system market means that this tie has a substantial impact on the PICC sales of AngioDynamics and other competitors.

### 2.   AngioDynamics' Celerity PICC Tip Location System

78.   AngioDynamics currently markets and sells a tip location system, as well.   As with other tip location systems on the market, AngioDynamics' Celerity-branded tip location system uses electrocardiographic (ECG) waveform to confirm PICC placement.

79.   Although the Celerity system provides ECG technology for tip location, it does not provide navigation.   AngioDynamics does not have a PICC tip location system that includes navigation that is approved for sale in the United States.   In addition, the Celerity tip location system does not provide ultrasound.

80.   AngioDynamics sells its Celerity tip location system separately from its BioFlo PICCs.   The clip necessary to operate Celerity is sold single sterile and is not artificially tied to AngioDynamics' PICCs.

81.   In fact, Bard is and always has been the only seller of tip location systems that has a "closed" system, *i.e.*, one in which the tip location system is illegally tied to its PICCs.   No other seller of tip location systems ties its tip location systems to its PICCs.   Instead, they all have "open" systems in which they sell their tip location systems separately and thus allow them to be used with any manufacturer's PICCs.

82.     In 2016, the manufacturer of Celerity, Nostix, LLC, was acquired by another medical device company.   Following Nostix's acquisition, AngioDynamics announced its intention to discontinue sales of the Celerity tip location system.   AngioDynamics does not sell any other tip location systems.

## VI.   <u>RELEVANT MARKETS</u>

83.     The product markets relevant to this action are the market for PICC tip location systems and the market for PICCs.  The relevant geographic market is the United States.

### A.     The Tip Location System Market

84.     Tip location systems comprise a distinct product market.   While tip location systems are designed to be used with PICCs, they perform a different function from PICCs and are not substitutable with PICCs.   Rather, tip location systems and PICCs are complementary products.

85.     Many tip location systems utilize ECG technology to confirm the final location of the PICC tip after placement.  The use of ECG obviates the need for an x-ray or fluoroscopy to confirm proper PICC placement.  Certain tip location systems provide navigation, either based on magnetic tracking technology or Doppler technology, which assists in the placement of the PICC by allowing clinicians to observe the general directionality of the PICC as it is inserted and guide it to the correct position.  Bard's Sherlock 3CG system provides both ECG and navigation technologies, as well as ultrasound technology for PICC insertion.  The various tip location systems on the market differ in certain respects but they may all be used reasonably interchangeably.

86.     Since their inception, the use of tip location systems has continued to grow and has now largely supplanted the use of blind insertion of PICCs followed by x-rays or fluoroscopy

to confirm PICC placement.   Indeed, industry organizations that set standards of care recommend the use of tip location during PICC placement.   One such organization, the Infusion Nurses Society, states that tip location should be used for greater accuracy, more rapid initiation of infusion therapy, and reduced costs.   In comparison to the use of tip location systems, the use of x-rays or fluoroscopy to confirm placement was time-consuming and expensive and sometimes less accurate.   As a result, x-rays and fluoroscopy are not good substitutes for tip location systems.

87.   Bard has market power in the market for tip location systems.   Bard was the first company to market with navigation technology.   Tip location systems have become the industry standard of care in PICC placement and at least one recent survey suggests that approximately 75% of tip location purchasers would not buy a tip location system that lacked navigation.   In addition, currently, Bard is the only company on the market with a tip location system that provides ECG tip location technology, navigation technology, and ultrasound technology.   This combination of technologies indisputably provides the highest quality in PICC placement, thus providing the greatest ease of use for clinicians.

88.   As a result, Bard has a substantial share of the market for tip location systems and has continuously maintained a significant share for some time.   Currently, Bard's share of the tip location market exceeds 70%.

89.   There are high barriers to entry in the market for tip location systems.   These include both technological and regulatory barriers.   Entry in the market for tip location systems would require significant research and development, including hardware and software design, as well as clinical testing, market research and FDA approval, prior to any sales.   As a result, the time to market would be lengthy.   Additionally, the level of investment required would be high.

As one would expect given such conditions, very few players have entered the tip location system market and Bard has always maintained a dominant share of the market.

**B.      The PICC Market**

90.      PICCs comprise a distinct product market.   As described above, tip location systems are designed to be used with PICCs, but PICCs and tip location systems perform different functions and are not substitutable.   Rather, PICCs and tip location systems are complementary products.

91.      All PICCs are thin, soft, flexible tubes inserted into the body through a vein, typically in the upper arm, and passed to the superior vena cava.   PICCs are used to administer fluids, medications and nutrients, sample blood, and power inject contrast media.   They all perform the same function.   Generally speaking, PICCs are manufactured from polyurethane. AngioDynamics' BioFlo PICCs are manufactured with both polyurethane and a proprietary polymer that provides them with anti-thrombogenic properties.   Likewise, certain PICCs have anti-microbial properties.   Thus, while the various PICCs on the market differ in certain important respects like anti-thrombogenic properties, they all serve the same basic function.

92.      Additionally, generally speaking, PICCs are only substitutable with other types of catheters or vascular access devices in limited circumstances.   In selecting the appropriate vascular access device, clinicians consider the type of the treatment, the patient's condition and vascular access integrity, the duration of the treatment, and the design of the device, among other things.   For example, PICCs are typically used for treatments that are set to last more than 6 days but less than long term.   By contrast, short peripheral intravenous venous catheters (PIVCs) are typically used in place of needle sticks, *i.e.*, for very short term treatments, and implantable ports are typically used for long term treatments.   The various features of the devices thus drive their

selection for particular treatments and most often PICCs are not a good substitute for another type of catheter or vascular access device.

93.     As a result of Bard's anti-competitive and illegal conduct, Bard's share of the PICC market has increased dramatically over the relevant period.

## VII.   BARD'S ILLEGAL CONDUCT IN VIOLATION OF THE ANTITRUST LAWS

94.     Even after the advent of AngioDynamics' revolutionary BioFlo PICCs, Bard has maintained and expanded its dominant position in the market for PICCs through illegal means. As a consequence, AngioDynamics, a product innovator, has been effectively shut out of a substantial portion of the market for PICCs and price competition in the market for PICCs has decreased.

### A.     Bard's Illegal Tying of Its PICC Tip Location Systems to Its PICCs

95.     Bard has market power in the nationwide market for PICC tip location systems. By tying the purchase of its proprietary stylet—without which its tip location systems are inoperable—to the purchase of its PICCs, Bard has violated and continues to violate Section 1 of the Sherman Act, under which tying products is *per se* illegal.

96.     The tying products are Bard's tip location systems.  A Bard tip location system includes the proprietary stylet necessary to operate the system as a component.  A tip location system and stylet comprise one product because they are designed to function together and one cannot function without the other.

97.     The tied products are Bard's PICCs.  Bard has FDA approval to sell its tip location systems' stylets separately from its PICCs.  These stylets are compatible with AngioDynamics' BioFlo PICCs.  Yet Bard refuses to sell the stylets separately from its PICCs.

98.     The stylet is not a component of the PICC.  This is evidenced by the fact that Bard sought, and received, approval from the FDA to sell its stylets separately from its PICCs, *i.e.*, single sterile.  This is further evidenced by the fact that Bard actually sold its stylets single sterile to the Cleveland Clinic, a world renowned medical center, for use with AngioDynamics' PICCs. Thus, it is clear that it is not necessary to use the stylet with a Bard PICC; both function individually.

99.     Bard's tying scheme has caused anti-competitive effects in the market for PICCs. Bard has economically coerced purchasers of its PICC tip location systems into purchasing its PICCs, as well.  Unless they purchase Bard's PICCs, they are unable to obtain Bard's proprietary stylet to operate its PICC tip location systems.   The only economically viable option for purchasers who want one of Bard's tip location systems is to purchase their PICCs from Bard in order to obtain the stylet necessary to operate its tip location system.  Purchasing Bard's stylet preloaded in a Bard PICC and additionally purchasing AngioDynamics' BioFlo PICC is not an economically viable option.  The purchaser would pay for two sets of PICCs when only one set was needed.

100.    Bard's tying scheme thus harms competition in the market, patient welfare, and AngioDynamics' business.   AngioDynamics' BioFlo PICCs are an innovative product and Bard's tying scheme prevents AngioDynamics from selling them to a substantial portion of the PICC market.  A significant percentage of the ultimate consumers—patients—suffer additional unnecessary and sometimes severe complications stemming from PICC usage and an innovator in the market, AngioDynamics, is unable to grow its business.  In addition, Bard's tying scheme has decreased price competition in the PICC market.

101.    There is no legitimate business or other reason that Bard must tie its tip location systems to its PICCs.   This is evidenced by the fact that Bard sought and received FDA approval to sell its stylets single sterile and by the fact that its tip location systems have been used successfully with BioFlo PICCs by medical personnel at the Cleveland Clinic.  In fact, Bard ties its tip location systems to its PICCs for the sole purpose of eliminating competition in the sale of PICCs.  Indeed, any justification Bard has for tying its tip location systems to its PICCs is far outweighed by the anti-competitive effects in the market for PICCs.

102.    Thus, Bard's tying the sale of its PICC tip location systems to the sale of its PICCs violates Section 1 of the Sherman Act.

## VIII.   CLAIM FOR VIOLATION OF THE SHERMAN ACT

### First Claim for Relief

### Illegal Tying in Violation of Section 1 of the Sherman Act

**A.    Bard Has Imposed a *Per Se* Illegal Tying Arrangement**

103.    Plaintiff incorporates by reference all the above allegations.  Bard's tying of its PICC tip location systems to its PICCs during the relevant period is a *per se* violation of Section 1 of the Sherman Act.

**1.    Bard Ties Its PICC Tip Location Systems to its PICCs**

104.    Bard's tip location systems are the tying products.  Bard's PICCs are the tied products.

105.    The tip location systems, including stylet, and the PICCs are two separate products.  The FDA has approved Bard's sale of the stylet single sterile.  Bard sold the stylet single sterile on only one occasion, when the Cleveland Clinic demanded it.  Bard has otherwise refused to sell the stylet single sterile.

24

### 2.      Bard Uses Actual Coercion to Force Purchasers to Buy its PICCs

106.    Bard leverages its proprietary stylet—which is necessary to operate its tip location systems—to coerce purchases of its PICCs by refusing to sell the stylet separately from the PICC.

107.    By refusing to sell its proprietary stylet single sterile, Bard has conditioned the purchase of its tip location systems upon the purchase of its PICCs, thereby depriving purchasers of its tip location systems of the option of buying AngioDynamics' BioFlo PICCs.

### 3.      Bard Possesses Power in the Market for Tip Location Systems

108.    At all times relevant to this action, Bard has had substantial market power in the nationwide market for PICC tip location systems.  Bard's Sherlock 3CG system is the only one on the market that provides ECG tip location technology, navigation technology, and ultrasound technology.  This combination of technologies indisputably provides the highest quality in PICC placement, thus providing the greatest ease of use for clinicians.

109.    As a result, Bard has a substantial share of the market for tip location systems and has had a significant share for some time.  Currently, Bard's share of the tip location system market exceeds 70%.

110.    There are high barriers to entry in the market for tip location systems, including both technological and regulatory barriers.  As one would expect given such conditions, there has been little entry in the market.

111.    Given its dominant position in the market for tip location systems, Bard possesses market power sufficient to coerce customers into purchasing the tied products—its PICCs.

### 4.      Bard's Conduct has Anticompetitive Effects in the Tied Market

112.    Bard's refusal to sell the stylet necessary to operate its tip location systems single sterile has foreclosed purchasers who prefer AngioDynamics' BioFlo PICCs from pairing Bard's tip location systems with BioFlo PICCs.  Instead, purchasers that want a Bard tip location system must purchase Bard PICCs in order to obtain the stylet necessary to operate the tip location system.  This hampers competition in the PICC market to the detriment of purchasers and, ultimately, consumers.

113.    Although BioFlo PICCs are far superior to Bard PICCs and provide significant health benefits to patients, Bard's anticompetitive tying arrangement has stifled—and continues to stifle—sales of BioFlo PICCs, and consumers by and large have not realized the health benefits of BioFlo PICCs.  Moreover, Bard's anticompetitive tying arrangement has decreased price competition in the PICC market.

114.    For all of these reasons, Bard's conduct has had anticompetitive effects in the market for PICCs.

### 5.    Bard's Tying Impacts a Substantial Amount of Interstate Commerce

115.    PICC sales in the United States total approximately $400 million per year.  Bard accounts for the vast majority of sales in the PICC market.  PICCs are widely used in hospitals and other medical care facilities across the United States to administer medicines to thousands of patients.  Thus, Bard's manipulations of the PICC market impact a substantial amount of interstate commerce.

### B.    Bard's Tying Arrangement is also Illegal under the Rule of Reason

116.    Even if Bard's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

117.    There is no legitimate business or other pro-competitive justification for Bard's tying of its PICC tip location systems to its PICCs.  Bard has FDA approval to sell its stylets separately from its PICCs and Bard has sold its stylets separately on at least one occasion, to the Cleveland Clinic.  Its refusal to do so otherwise is designed to eliminate competition in the PICC market.  Indeed, any justification Bard has for tying its tip location systems to its PICCs is far outweighed by the anti-competitive effects in the market for PICCs.

118.    Bard's tying arrangement is thus a Rule of Reason violation of Section 1 of the Sherman Act.

**C.    Bard's Tying Arrangement Harms AngioDynamics, Competition and Consumers**

119.    Bard's illegal tying arrangement has substantially lessened competition in the PICC market, financially coercing hospitals and other purchasers into buying all or nearly all of their PICCs from Bard and reducing price competition in the market for PICCs.  Bard's tying arrangement stifles innovation and harms patient welfare, as well, preventing a large segment of the population from obtaining access to BioFlo PICCs, which have been proven to reduce thrombus accumulation, and reduce the reflux of blood into the catheter for valved PICCs, thereby reducing the risk of further complications.  It also harms AngioDynamics' business, preventing it from selling BioFlo PICCs to a substantial portion of the PICC market.

## IX.    PRAYER FOR RELIEF

Plaintiff AngioDynamics respectfully prays that the Court enter judgment on its behalf against Defendants C.R. Bard, Inc. and Bard Access Systems, Inc., adjudging and decreeing as follows:

1.      Defendants engaged in conduct in violation of Section 1 of the Sherman Act and Plaintiff was injured in its business or property as a result of Defendants' violations;

2.      Plaintiff shall recover damages sustained by it, as provided by the federal antitrust laws, and a judgment in favor of Plaintiff shall be entered against Defendants, in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

3.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing the illegal conduct alleged herein;

4.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

5.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

6.      Plaintiff shall receive such other or further relief as may be just and proper.

## X.      **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff AngioDynamics demands trial by jury for all of the claims in this Complaint so triable.

Dated: May 30, 2017

Respectfully Submitted,

_____
PHILIP J. IOVIENO
ADAM R. SHAW
ANNE M. NARDACCI
JENNA C. SMITH
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: piovieno@bsfllp.com
       ashaw@bsfllp.com
       anardacci@bsfllp.com
       jsmith@bsfllp.com

NICHOLAS A. GRAVANTE, JR.
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave, 7th Floor
New York, NY 10022
Telephone: (212) 446-2320
Email: ngravante@bsfllp.com

*Counsel for Plaintiff AngioDynamics, Inc.*