**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ANGIODYNAMICS, INC.,

                                            Plaintiff,                1:17-cv-00598 (BKS/CFH)

v.

C.R. BARD, INC. and BARD ACCESS SYSTEMS, INC.,

                                            Defendants.

---

**APPEARANCES:**

*For Plaintiff:*

**Boies Schiller Flexner LLP**
Philip J. Iovieno
Adam R. Shaw
Anne M. Nardacci
Jenna C. Smith
30 South Pearl Street, 11th Floor
Albany, NY 12207

Nicholas A. Gravante, Jr.
575 Lexington Avenue, 7th Floor
New York, NY 10022

*For Defendants:*

**O'Melveny & Myers LLP**
Andrew J. Frackman
Edward N. Moss
7 Times Square
New York, NY 10036

**Harris Beach PLLC**
James P. Nonkes
Philip G. Spellane
99 Garnsey Road
Pittsford, NY 14534

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

Plaintiff AngioDynamics, Inc. ("AngioDynamics") brings this antitrust action against Defendants C.R. Bard, Inc. and Bard Access Systems, Inc. (collectively, "Bard"), asserting a claim of illegal tying in violation of section 1 of the Sherman Act (codified at 15 U.S.C. § 1) under "per se" and "rule of reason" theories of liability. (*See generally* Dkt. No. 1). AngioDynamics seeks treble damages, a permanent injunction, and declaratory relief. (*See id.* at 29). Bard now moves to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 14). For the reasons set forth below, Bard's motion is denied.

**II.    FACTS**[1]

**A.    Peripherally Inserted Central Catheters**

AngioDynamics manufactures medical devices used for minimally invasive treatment of medical conditions requiring vascular access, peripheral vascular, oncology, or surgical interventions. (Dkt. No. ¶ 24). Similarly, Bard manufactures vascular access, oncological, urological, and surgical medical devices. (*Id.* ¶¶ 25, 26). More specifically, both AngioDynamics and Bard manufacture, market, and sell peripherally inserted central catheters ("PICCs"). (*Id.* ¶ 30). PICCs are long, thin catheters inserted into the body through a vein, most commonly the basilic vein in the upper arm, and passed to the distal superior vena cava, the large vein leading to the right atrium of the heart. (*Id.* ¶¶ 2, 31–32). PICCs are generally suited for patients

---

[1] The allegations are taken from the Complaint and assumed to be true for purposes of this motion. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

requiring long-term intravenous medical treatment; clinicians use PICCs to deliver medications, fluids, and nutrients into the body, sample blood, and power-inject contrast media. (*Id.* ¶¶ 2, 31).

Nevertheless, PICC have associated risks, including infection, blood clotting, and catheter occlusion. (*Id.* ¶ 34). Blood clotting is a "serious, but common, complication arising from any PICC use." (*Id.*). It may cause life-threatening thromboembolic events, such as deep vein thrombosis ("DVT")—when a blood clot blocks a large, essential vein—or pulmonary embolism ("PE")—when a blood clot travels to and obstructs vessels in the lungs. (*Id.* ¶ 35). There is a strong association between PICC use and upper extremity deep vein thrombosis, as "PICCs are placed in the upper extremities and can occupy much of the cross-sectional diameter of peripheral veins of the arm." (*Id.* ¶ 37). A recent study indicated that "23% of patients who received a PICC during hospitalization experienced a thromboembolic event."[2] (*Id.* ¶ 38). Another common problem is "intra-luminal catheter occlusion, which is most often caused by the reflux of blood into the catheter shaft and the subsequent clotting of that blood." (*Id.* ¶ 4). A tissue plasminogen activator ("tPA") is commonly used to clear catheter occlusions, but a dose of tPA can cost approximately $124, and the administration of the drug has been tied to an "increase in the development of central line associated blood stream infections." (*Id.* ¶ 5).

AngioDynamics markets and sells PICCs that address both the problems of blood clots and catheter occlusions. (*Id.* ¶¶ 3, 4). In 2012, the company obtained FDA approval for its BioFlo PICC, which is made of a material containing Endexo Technology, "a permanent and non-eluting integral polymer." (*Id.* ¶¶ 3, 45–46, 48). Because the polymer is "blended with Carbothane thermoplastic polyurethane" as part of the manufacturing process, it is "present throughout the catheter material, including the outer surface, inner surface and even the cut

---

[2] According to the Complaint, reducing the incidence of DVT and PE cases has been a priority for national health authorities in recent years. (*See id.* ¶¶ 40–44).

catheter tip." (*Id.* ¶ 48). The combined material protects against blood clot formation "by creating passive surfaces" and thereby reduces the risk of life-threatening DVT and PE. (*Id.* ¶¶ 3, 48, 49). According to in-vitro tests, on average, BioFlo PICCs using Endexo Technology decrease blood clot accumulation by 87%, as measured by platelet count, compared to commonly used PICCs. (*Id.* ¶¶ 3, 50). BioFlo PICCs are "also available with [Pressure Activated Safety Valve ("PASV")] Technology, which is AngioDynamics' patented valve designed to automatically resist backflow and reduce blood reflux on the inside of the catheter." (*Id.* ¶ 52). PASV-equipped BioFlo PICCs can therefore lower the usage of tPA, with its attendant risks, to treat catheter occlusion. (*See id.* ¶ 5).

By contrast, Bard sells standard polyurethane PICCS that "do not contain any thrombo-resistant material," as "Bard has been unable to develop a thrombo-resistant material similar to the Endexo Technology . . . despite its efforts to do so."[3] (*Id.* ¶ 55; *see also id.* ¶¶ 57–61). Further, Bard's catheters have longer taper length, which increases the risk of complications from additional obstruction of blood flow. (*Id.* ¶ 55).

The market for PICCs in the United States amounts to approximately $400 million per year in annual sales, with Bard accounting for "the vast majority of sales in the PICC market." (*Id.* ¶ 115). Despite differing "in certain important respects," PICCs "all serve the same basic function"—they "administer fluids, medications and nutrients, sample blood, and power inject contrast media." (*Id.* ¶ 91). Other types of catheters or vascular access devices are generally not good substitutes for PICCs, except "in limited circumstances." (*Id.* ¶ 92). One distinguishing consideration is the treatment's duration; PICCs are for medium-term treatments (more than six

---

[3] The Complaint states that in January 2015 Bard announced its plan to launch "coated PICCs" but that Bard later dropped "any further reference to its efforts to develop a thrombo-resistant PICC family of products." (*Id.* ¶¶ 59, 61). Further, "thrombo-resistant coating" is allegedly inferior to AngioDynamics' integrated Endexo Technology in terms of "reduced thrombus results" and "protecting cut surfaces"; AngioDynamics also asserts that coatings "elute into the blood stream, exposing patients to chemicals unnecessarily." (*Id.* ¶¶ 59, 60).

4

days), whereas short peripheral intravenous venous catheters are for short-term treatments and implantable ports are for long-term treatments. (*Id.*).

B.     **Tip Location Systems**

As catheter misplacement can cause serious complications, clinicians must ascertain a PICC's location within the patient's body. (*See id.* ¶ 7). Traditionally, medical personnel used a chest x-ray or fluoroscopy to confirm a PICC's final location, but clinicians now often rely on technologies known as tip location systems, which are less expensive, less time consuming, and more accurate. (*Id.* ¶¶ 7–8, 62–63). Many such technologies use a patient's electrocardiographic ("ECG") waveform to determine the final location of the PICC's tip in relation to the heart. (*Id.* ¶ 8). ECG technology, however, cannot convey information about the tip's location as it travels through the venous system before entering the superior vena cava. (*Id.* ¶ 64). Therefore, some tip location systems also provide navigation assistance, using magnetic tracking or Doppler technology, to help clinicians steer the PICC through the venous system. (*Id.* ¶¶ 7, 9, 65, 85).

Bard sells tip location systems under the brand names Sherlock 3CG Tip Confirmation System ("Sherlock 3CG") and Sherlock II Tip Location System ("Sherlock II"). (*Id.* ¶ 11). It was the first company to provide navigation technology, and its Sherlock 3CG system is the first and only tip location system to combine three technologies, (*id.* ¶ 11): (i) ultrasound technology to identify a suitable vein for inserting the PICC, (*id.* ¶¶ 32, 68); (ii) magnetic tracking navigation technology to monitor and guide the PICC through the venous system, using an external sensor and display device paired with a "proprietary stylet," (*id.* ¶¶ 68–70); and (iii) ECG technology to confirm the final location of the PICC's tip in the superior vena cava, (*id.* ¶ 64, 68). Thanks to these combined technologies, "Bard's Sherlock 3CG system is widely regarded as superior to other tip location systems," (*id.* ¶ 68), and "indisputably provides the highest quality in PICC placement, thus providing the greatest ease of use for clinicians," (*id.* ¶ 87). According to a

5

recent survey, "approximately 75% of tip location purchasers would not buy a tip location system that lacked navigation." (*Id.* ¶ 87). Given its technological edge, Bard sells more than 70% of tip location systems in the United States. (*Id.* ¶¶ 28, 83, 88).

AngioDynamics also sells a tip location system, marketed under the brand name Celerity and manufactured by Nostix, LLC. (*Id.* ¶¶ 78, 82). This system uses ECG technology to confirm PICC placement but does not include navigation or ultrasound technology. (*Id.* ¶ 78–79). Following Nostix's acquisition by another medical device company in 2016, AngioDynamics announced that it would stop selling the Celerity tip location system. (*Id.* ¶¶ 12, 82).

Although "tip location systems on the market differ in certain respects," they can "all be used reasonably interchangeably." (*Id.* ¶ 85). On the other hand, x-rays and fluoroscopy, which are comparatively more time consuming, more expensive, and less accurate, are "not good substitutes for tip location system." (*Id.* ¶ 86). Industry organizations have recommended using tip location systems over traditional methods of confirming PICC placement, thus making tip location systems "the industry standard of care in PICC placement." (*Id.* ¶¶ 86–87). The use of tip location systems has continued to grow and has now largely displaced the use of x-rays and fluoroscopy to confirm PICC placement. (*Id.* ¶ 86). According to the Complaint, "very few players have entered the tip location system market" because of high regulatory and technological barriers to entry, including the "significant research and development" effort required, the high level of investment needed, and the lengthy time to market. (*Id.* ¶ 89).

### C. Bard's Selling Practices

Bard's Sherlock 3CG and Sherlock II tip location systems require Bard's proprietary stylets to operate, but Bard only sells the stylets preloaded in its own PICCs, despite having approval from the U.S. Food and Drug Administration (the "FDA") to sell its stylets separately from its PICCs—i.e., "single sterile." (*Id.* ¶¶ 16, 71, 74). In approving the sale of Bard's stylets

6

single sterile, the FDA stated that Bard's stylets "may now be used with specific Bard catheters as well as any open-ended, non-valved, polyurethane peripherally inserted central catheter that meets the dimensional specifications of the stylet (0.020 in minimum lumen diameter)." (*Id.* ¶ 74). Bard's stylet is compatible with AngioDynamics' BioFlo PICC. (*Id.* ¶ 77). Bard has sold its stylets single sterile only once—to Cleveland Clinic, "one of the leading medical centers in the United States," which has "significant purchasing leverage." (*Id.* ¶¶ 16, 75). Having seen a significant reduction in upper-extremity DVT in patients using AngioDynamics' BioFlo PICCs, Cleveland Clinic "requested to purchase Bard's stylets single sterile specifically so that it could use AngioDynamics' BioFlo PICCs with the Bard Sherlock 3CG tip location system."[4] (*Id.* ¶ 75).

With the exception of Cleveland Clinic, however, "Bard refuses to sell the stylets separately from its PICCs." (*Id.* ¶ 97). "Other institutions have requested that Bard sell its stylets single sterile to them and Bard has refused their requests." (*Id.* ¶ 76). In contrast to Bard, AngioDynamics sells its Celerity-branded tip location system with the clip necessary to operate it separately from its BioFlo PICCs. (*Id.* ¶ 80). All sellers of tip location systems, except for Bard, allow their tip location systems to be sold separately from their PICCs.[5] (*Id.* ¶ 81).

---

[4] Bard notes in their motion that "Bard originally obtained FDA approval to sell its stylets preloaded in its PICCs and applied for FDA approval to sell the stylets separately *only in response to, and in order to accommodate, Cleveland Clinic's request*." (Dkt. No. 14-1, at 16 n.6). Bard also states that "Cleveland Clinic ultimately switched to purchasing [the stylets] together with PICCs as an integrated product." (*Id.* at 16 n.5). These factual assertions, however, are outside the pleadings and thus not properly considered on a Rule 12(b)(6) motion. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013).

[5] In their moving papers, Bard asserts that another seller of tip location systems, Teleflex, preloads its stylets in its PICCs. (Dkt. No. 14-1, at 10 n.2; *see also* Dkt. Nos. 14-2, 14-3). AngioDynamics responds that Teleflex also sells its stylets separately. (Dkt. No. 18, at 19 & n.5). The Court has not considered either party's factual assertions on this issue because they are outside of the pleadings. (*See supra* note 4). As AngioDynamics correctly notes, on a motion to dismiss, the Court cannot consider the contents of documents filed with the Securities and Exchange Commission for the truth asserted therein; instead, the Court must confine itself to the four corners of the Complaint. *See Staehr v. Hartford Fin. Serv. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

### D. Alleged Effects

By refusing to sell its tip location system stylet single sterile, Bard has "foreclosed purchasers who prefer AngioDynamics BioFlo PICCs from pairing Bard's tip location system with BioFlo PICCs," and instead Bard has forced purchasers who want a Bard tip location system to purchase Bard PICCs. (*Id.* ¶ 112). That conduct has caused three types of harm: (i) harm to competition, including price competition, (*id.* ¶ 119 (alleging that Bard "substantially lessened competition in the PICC market [by] financially coercing hospitals and other purchasers into buying all or nearly all of their PICCs from Bard and reducing price competition in the market for PICCs"); *see also id.* ¶¶ 112–113); (ii) harm to consumers and patients, (*id.* (alleging that Bard's conduct "stifles innovation and harms patient welfare, as well, preventing a large segment of the population from obtaining access to BioFlo PICCs")); and (iii) harm to AngioDynamics (*id.* (stating that Bard's selling practice "harms AngioDynamics' business, preventing it from selling BioFlo PICCs to a substantial portion of the PICC market")). As a result, Bard has been able to "capture and maintain a dominant position in the PICC market, exceeding 70% market share." (*Id.* ¶ 15). AngioDynamics, on the other hand, has lost "market share in the PICC market," (*id.*), and suffered a "substantial loss of sales," (*id.* ¶ 18), despite BioFlo PICCs being "a truly disruptive product offering," (*id.* ¶ 53). Although AngioDynamics "anticipated rapid adoption of the BioFlo technology," "actual adoption of BioFlo PICCs has been limited" due to Bard's practices. (*Id.* ¶ 54).

The Complaint asserts that there is no procompetitive reason (technological, business, or otherwise) for Bard's selling of its tip location systems exclusively with its PICCs. (*Id.* ¶¶ 16, 72, 101, 117). Bard has "acknowledged" as much, according to the Complaint, because it sought FDA approval for selling its stylets single sterile. (*Id.* ¶ 73). Even if there were a reason for selling tip location systems together with PICCs, the Complaint adds, "any justification Bard has

8

for tying its tip location systems and PICCs together is far outweighed by the anti-competitive effects in the market for PICCs." (*Id.* ¶ 72).

### III. STANDARD OF REVIEW

To survive a pre-answer motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" *See Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). As is well established, "there is no heightened pleading standard in antitrust cases, and the facts alleged are subject to Federal Rule of Civil Procedure 8(a)'s general requirement of a 'short plain statement'

of facts supporting a plausible claim." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).

IV. **DISCUSSION**

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 374 (2d Cir. 2011) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)). To state a tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (1) "the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product)"; (2) "the seller uses actual coercion to force buyers to purchase the tied product"; (3) "the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product"; (4) "the tie-in has anticompetitive effects in the tied market"; and (5) "a not insubstantial amount of interstate commerce is involved in the tied market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (citing *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006)).[6]

---

[6] Citing *Kaufman* and *E&L Consulting*, Bard argues that "pleading anticompetitive effects is a requirement even when a plaintiff purports to allege a *per se* tying claim." (Dkt. No. 14-1, at 17 & n.8). AngioDynamics demurs, noting that the court in these two cases did "not state whether it [was] analyzing a *per se* or Rule of Reason claim." (Dkt. No. 18, at 21 n.6). Further, as AngioDynamics points out, (*id.* at 20–21), the Second Circuit in *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.* (*In re Visa Check/MasterMoney Antitrust Litigation*) did not include a required showing of anticompetitive effects when listing out the four "substantive elements of [an] illegal per se tying claim," as opposed to "tying claims under a rule of reason theory," which require proof that "the challenged action had an adverse effect on competition as a whole in the relevant market and, if the defendant shows a pro-competitive redeeming virtue of the action, that the same pro-competitive effect could be achieved though [sic] an alternative means that is less restrictive of competition." 280 F.3d 124, 134 n.5 (2d Cir. 2001), *overruled on other grounds by Miles v. Merrill Lynch & Co., Inc.* (*In re Initial Pub. Offerings Sec. Litig.*), 471 F.3d 24 (2d Cir. 2006), *and superseded by statute on other grounds as stated in Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006). Here, AngioDynamics advances a single tying claim under both per se and rule-of-reason theories. Since Bard moves to dismiss the Complaint for failure to allege anticompetitive effects, the Court must review the anticompetitive effects allegations to determine, at the very least, whether AngioDynamics has stated a rule-of-reason tying claim.

AngioDynamics alleges that Bard has violated section 1 of the Sherman Act by unlawfully tying the purchase of Bard tip location system stylets to the purchase of Bard PICCs. (Dkt. No. 1, ¶ 95). The "tying products"—the products over which Bard allegedly has market power—are Bard's tip location systems, and the "tied products"—the products that Bard allegedly coerces buyers to purchase—are Bard's PICCs. (*See id.* ¶¶ 96–96, 104). Bard moves to dismiss the Complaint under Rule 12(b)(6) on the grounds that AngioDynamics failed to sufficiently allege the elements of coercion, separate products, and anticompetitive effects. (*See generally* Dkt. No. 14-1). The Court considers the parties' arguments with regard to each of these three issues below.

### A. Coercion

"Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation." *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982). Indeed, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* A seller's "use of strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [a buyer] to buy its full line of products does not . . . amount to actual coercion," which is present only if the seller "goes beyond persuasion and condition its [buyer's] purchase of one product on the purchase of another product." *Unijax*, 683 F.2d at 685 (internal quotation marks omitted).

Bard argues that AngioDynamics fails to sufficiently allege coercion because the Complaint merely describes permissible bundling of PICCs with tip location systems. (*See* Dkt. No. 14-1, at 12 ("AngioDynamics' *sole* basis for pleading 'coercion' is its allegation that Bard preloads its stylets in its PICCs . . . . That is insufficient, because neither the Supreme Court nor Second Circuit has ever held that mere bundling in and of itself constitutes 'coercion.'")). AngioDynamics objects to the characterization of Bard's conduct as mere "bundling," explaining that "[u]nlike a tying arrangement, a bundling arrangement offers discounted prices or rebates for the purchase of multiple products, but the buyer is under no obligation to purchase more than one item," and the products "are also available for purchase separately." (Dkt. No. 18, at 12–13).

The distinction between tying and bundling is well established. *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere. In contrast, a bundling arrangement offers discounted prices or rebates for the purchase of multiple products, although the buyer is under no obligation to purchase more than one item." (citation omitted)). Taking the allegations in the Complaint as true and drawing all reasonable inferences in AngioDynamics' favor, the Court reads the pleading as describing a tying, not a bundling, arrangement. AngioDynamics alleges that Bard only sells its tip location systems preloaded in its own PICCs, (Dkt. No. 1, ¶ 71), and that Bard made a one-time exception for Cleveland Clinic, given that institution's "significant purchasing leverage," (*id.* ¶ 75). The Complaint further states that Bard has refused to sell the stylets single sterile despite other institutions' requests. (*Id.* ¶ 76). Despite Bard's contention that it "sells the allegedly tied products separately as well as bundled," (Dkt. No. 14-1, at 13), these allegations instead make out a policy of selling the products together.

The cases on which Bard relies are factually distinguishable. In *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litigation*, cable television subscribers alleged that the cable company tied premium cable services to the rental of its cable box, but the subscribers acknowledged that premium cable services were also available through the use of a "CableCARD" sold or rented by a third party. *See* No. 08-cv-7616, 2010 WL 882989, at *1, 2010 U.S. Dist. LEXIS 22369, at *6–7 (S.D.N.Y. Mar. 5, 2010). Because customers could choose not to lease the cable box and still receive premium cable services, even though the cable company's "promotion of cable boxes . . . may have persuaded most customers to choose to lease a cable box," the court determined that customers "were not actually coerced." 2010 WL 882989, at *5–6, 2010 U.S. Dist. LEXIS 22369, at *20. In *Synergetics USA, Inc. v. Alcon Labs., Inc.*, a manufacturer of light sources and light pipes for eye surgery alleged that its competitor, Alcon, tied the sale of light pipes to the sale of cassettes used in Alcon's market-leading vitrectomy machines (which only Alcon could make). *See* No. 08-cv-3669, 2009 WL 435299, at *1, 2009 U.S. Dist. LEXIS 13868, at *1–3 (S.D.N.Y. Feb. 23, 2009). Alcon sold the cassettes with the light pipes in one of the packages it marketed, but the plaintiff acknowledged that Alcon also sold the cassettes separately from the light pipes. 2009 WL 435299, at *4, 2009 U.S. Dist. LEXIS 13868, at *10. The court concluded that the plaintiff had "fail[ed] to allege coercion." *Id.* Here, by contrast, AngioDynamics has alleged that Bard does not sell its tip location systems separately from its PICCs, and Bard has refused requests from purchasers, other than Cleveland Clinic, to do so. An "unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion . . . given foreclosure of a not insubstantial volume of interstate commerce." *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976).

Bard also contends that the coercion allegations are insufficiently specific because AngioDynamics has not identified which purchasers requested to buy the tip location system stylets single sterile. (Dkt. No. 14-1, at 14–15; Dkt. No. 22, at 8). Plausibility generally requires that a plaintiff provide "some specificity" as to "the customers who would have purchased a product elsewhere but for the coercion." *E&L Consulting*, 472 F.3d at 32; *Synergetics*, 2009 WL 435299, at *4, 2009 U.S. Dist. LEXIS 13868, at *10 ("Where the pleading recognizes that the defendant also sells the allegedly tied items separately, general claims that [the seller] has refused to sell two supposedly tied products individually do not allege actual coercion of the buyer."). But when the seller has "a policy of never offering the [tying product] separately from the [tied product]," *Hill*, 535 F.2d at 1355, allegations of individual coercion are unnecessary. *See Park v. Thomson Corp.*, No. 05-cv-2931, 2007 WL 119461, at *4, 2007 U.S. Dist. LEXIS 2001, at *11–12 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary."); *cf. Reisner v. Gen. Motors Corp.*, 511 F. Supp. 1167, 1177 n.21 (S.D.N.Y. 1981) ("The 'unremitting policy of tie-in,' which under some circumstances can substitute for coercion, is appropriate only in a situation . . . where the policy was applied to all buyers." (citation omitted)), *aff'd*, 671 F.2d 91 (2d Cir. 1982). Here, AngioDynamics has alleged that all purchasers currently have to buy Bard PICCs and stylets together because Bard only sells these two items as a package. Given Bard's policy of selling the PICCs and stylets together—and since Bard does not challenge the allegations' sufficiency with regard to its market power or the amount of commerce affected—AngioDynamics need not identify customers who would have purchased a product elsewhere but for the coercion for coercion to be plausible under these circumstances. *See Hill*, 535 F.2d at 1355. Thus, the Court concludes that AngioDynamics has adequately alleged coercion.

## B. Separate Products

Bard seeks dismissal on the ground that the Complaint fails to sufficiently allege that PICCs and tip location systems are two separate products. (Dkt. No. 14-1, at 15). "The 'separate product' element requires that the alleged tying product and tied product be separate, *i.e.*, they must exist in separate and distinct product markets." *Kaufman*, 836 F.3d at 141. "This is because if there is no separate market for the allegedly tied product, there can be no fear of leveraging a monopoly in one market to harm competition in a second market." *Id.* at 142. Courts apply a "consumer demand test" to determine whether two products are separate for antitrust law purposes. *Id.* Two products are separate only if "there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the former] separately from [the latter]." *Jefferson Parish*, 466 U.S. at 21–22. Separateness "turns not on the functional relation between [the products], but rather on the character of the demand for the two items." *Id.* at 19. Factors relevant to whether there is "separate and distinct consumer demand" for the two products include, among others, "the history of the products being, or not being, sold separately" and "the sale of the products separately in similar markets." *Kaufman*, 836 F.3d at 142.

According to Bard, the Complaint "alleges next to nothing" concerning the character of the demand for PICCs and tip location systems. (Dkt. No. 14-1, at 15). Bard characterizes the allegation that Cleveland Clinic requested to purchase the stylets separately as an "isolated example of one hospital . . . out of thousands in this country," and faults AngioDynamics for not including "any facts to support that customers *in general* actually wish to purchase PICCs and tip location systems separately." (*Id.* at 15–16). Further, Bard contends that the allegation that it applied for FDA approval to sell stylets single sterile is irrelevant because it goes to "supply-side considerations rather than the character of consumer demand." (*Id.* at 16 (quoting *Kaufman*, 836

15

F.3d at 144)). Lastly, Bard asserts that the allegation that other suppliers sell tip location systems separately is "not sufficiently specific" because the Complaint does not detail how many competitors there are and whether their products are similar to Bard's. (*Id.* at 16–17).

Bard, however, overlooks a number of allegations that, if assumed to be true and read together with the rest of the Complaint, make it plausible that PICCs and tip location systems are separate products. The Complaint describes the distinct characteristics of the market for PICCs and the market for tip location systems. (*Compare* Dkt. No. 1, ¶¶ 84–89, *with id.* ¶¶ 90–93). Additionally, AngioDynamics alleges that Cleveland Clinic and other institutions have asked to purchase Bard's stylets separately from its PICCs, and that customers can purchase its competitors' tip location systems single sterile. (Dkt. No. 1, ¶¶ 75, 76). Drawing all reasonable inferences in AngioDynamics' favor, the Court reads the Complaint as indicating that PICCs were historically sold on a standalone basis. (*Id.* ¶¶ 7, 62–63, 86). These allegations plausibly show that there is separate consumer demand for PICCs and tip location systems.

Likewise, the Complaint sufficiently describes Bard's competitors and their products. The Complaint provides a great deal of detail about the tip location systems offered by Bard and its competitors. (*Id.* ¶¶ 62–82). Although the Complaint describes Bard's Sherlock systems as superior to others on the market, it also states that all tip locations systems serve to locate a PICC's tip in relation to the heart—obviating the need for less accurate and more expensive x-rays or fluoroscopy. (*Id.* ¶¶ 63–64, 69). At this stage, these allegations suffice to show that other tip location systems compete on the same market as Bard's, and since Bard's competitors sell their tip location systems separately, "the sale of the [competing tip location systems] separately" plausibly suggests a "separate and distinct consumer demand" for tip location systems and

16

PICCs. *Kaufman*, 836 F.3d at 142. Therefore, AngioDynamics has sufficiently pled the element of separate products.

## C. Anticompetitive Effects

The third basis for dismissal asserted by Bard is that "AngioDynamics fails to plead 'some specificity' as to 'the anticompetitive effects in a specified market." (Dkt. No. 14-1, at 17 (quoting *E&L Consulting*, 472 F.3d at 32)). To plead anticompetitive effects, a plaintiff must allege that "competitors were foreclosed from selling to [buyers] because of [the defendant's] policies." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980). Bard argues that: (i) the Complaint's allegations of diminished competition, harm to patients, and harm to Plaintiffs are "generalized and conclusory"; (2) AngioDynamics' allegations that competitors lost market share to Bard are insufficient because antitrust law protects competition, not competitors; and (3) the Complaint merely alleges harm to AngioDynamics, not harm to competition or the competitive process. (Dkt. No. 14-1, at 18–19).

Bard's arguments do not stand up to scrutiny.[7] The Complaint alleges that, as a result of its selling practices, Bard has been able to "capture and maintain a dominant position in the PICC market, exceeding 70% market share," causing competitors to lose PICC sales and market share, despite the technological superiority of AngioDynamics' BioFlo PICCs (which allegedly reduces blood clotting and catheter obstruction), and reducing price competition. (Dkt. No. 1, ¶¶ 15, 18, 94, 100). These circumstances, if true, plausibly suggest substantial foreclosure of a specified market (the PICC product market) and resulting restraints on innovation by a dominant market player—i.e., not just harm to competitors but harm to the competitive environment itself. Furthermore, the Complaint states that Cleveland Clinic was able to buy Bard's stylets separately

---

[7] As AngioDynamics correctly points out, (*see* Dkt. No. 18, at 24), the cases cited by Bard are distinguishable, involving conclusory allegations of anticompetitive effects, in sharp contrast to the details alleged here.

in order to combine them with AngioDynamics' BioFlo PICCs, but that Bard denied similar requests from other institutions. (*See id.* ¶ 77). If, as alleged, BioFlo PICCs are superior to Bard's PICCs, and BioFlo PICCs are unavailable to patients because of Bard's practices, then Bard's conduct will have harmed patients. In sum, AngioDynamics has stated enough factual allegations rendering its claim of anticompetitive effects plausible at this early stage of the case. Therefore, Bard's motion to dismiss must be denied.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 14) is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: August 6, 2018
       Syracuse, New York

_____
Brenda K. Sannes
U.S. District Judge