**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGIODYNAMICS, INC., | |
| Plaintiff, | No. 1:17-CV-0598 (BKS/CFH) |
| vs. | Judge Brenda K. Sannes |
| C.R. BARD, INC.; BARD ACCESS SYSTEMS, INC., | Mag. Judge Christian F. Hummel |
| Defendants. | Return Date: October 2, 2020 |

**PLAINTIFF ANGIODYNAMICS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

   I.  AngioDynamics Is Entitled to Summary Judgment on Each Element of Liability. .............. 2

      A.  PICCs and TLS Are Separate Products. ........................................................................... 2

      B.  Bard's Unremitting Tie Coerces Customers into Purchasing Its PICCs. ........................ 4

      C.  Bard Has Market Power in the TLS Market. ................................................................... 5

      D.  A Not Insubstantial Amount of Commerce Is Involved in the PICC Market. ................. 7

      E.  Bard's Tie Caused Anti-Competitive Effects in the PICC Market. ................................. 9

   II.  AngioDynamics Is Entitled to Summary Judgment on Antitrust Injury. ........................... 10

      A.  Bard Mischaracterizes the Standard for Proving Antitrust Injury ................................. 10

      B.  The Evidence of Antitrust Injury Far Surpasses the Relevant Standard. ....................... 12

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
  2018 WL 3730165 (N.D.N.Y. Aug. 6, 2018)...................................................................*passim*

*B.F. Goodrich v. Betkoski*,
  99 F.3d 505 (2d Cir. 1996) ...................................................................................................... 2

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
  215 F.3d 219 (2d Cir. 2000) .................................................................................................... 4

*Cancall PCS, LLC v. v. Omnipoint*,
  2001 WL 293981 (S.D.N.Y. Mar. 26, 2001) .......................................................................... 9

*Complete Entm't Res. v. Live Nation Entm't, Inc.*,
  2017 WL 6512223 (C.D. Cal. Oct. 16, 2017) ....................................................................... 15

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*,
  2012 WL 3544771 (E.D.N.Y. Aug. 16, 2012) ................................................................ 10, 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................................................................ 3, 6

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969) ............................................................................................................... 8

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................................... 9

*Gazarkiewicz v. Town of Kingsford Heights, Indiana*,
  359 F.3d 933 (7th Cir. 2004) ................................................................................................ 15

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*,
  880 F.2d 1514 (2d Cir. 1989) ................................................................................................. 9

*Hack v. President & Fellows of Yale Coll.*,
  237 F.3d 81 (2d Cir. 2000) ..................................................................................................... 9

*Harris v. Provident Life & Acc. Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002) ..................................................................................................... 2

*Hill v. A-T-O, Inc.*,
  535 F.2d 1349 (2d Cir. 1976) ................................................................................................. 5

*Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.,*
   138 F. Supp. 2d 482 (S.D.N.Y. 2001) ............................................................... 2

*Hydrolevel Corp. v. Am. Soc. of Mech. Engineers, Inc.,*
   635 F.2d 118 (2d Cir. 1980) ........................................................................... 15

*Hygrade Milk & Cream Co. v. Tropicana Prod., Inc.,*
   1996 WL 257581 (S.D.N.Y. May 16, 1996) ..................................................... 11

*In re Data Gen. Corp. Antitrust Litig.,*
   490 F. Supp. 1089 (N.D. Cal. 1980) ........................................................... 8, 11

*In re K-Dur Antitrust Litig.,*
   2008 WL 2660776 (D.N.J. Feb. 21, 2008) ....................................................... 11

*In re Publ'n Paper Antitrust Litig.,*
   690 F.3d 51 (2d Cir. 2012) ............................................................................. 10

*In re Visa Check/Mastermoney Antitrust Litig.,*
   2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ............................................ 2, 3, 5, 8

*In re Vivendi Universal, S.A. Sec. Litig.,*
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) .............................................................. 15

*In re Wireless Tel. Servs. Antitrust Litig.,* 02-CV-2637,
   2003 WL 21912603 (S.D.N.Y. Aug. 12, 2003) ................................................... 9

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
   451 U.S. 557 (1981) ....................................................................................... 10

*Kaufman v. Time Warner,*
   836 F.3d 137 (2d Cir. 2016) ........................................................................ 6, 7

*LLC v. Corton Corp.,*
   833 F.3d 172 (2d Cir. 2016) ............................................................................. 9

*Park v. Thomson Corp.,*
   2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ............................................... *passim*

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.,*
   851 F.3d 1029 (10th Cir. 2017) ....................................................................... 11

*Unijax, Inc. v. Champion Int'l, Inc.,*
   683 F.2d 678 (2d Cir. 1982) ........................................................................ 4, 5

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   280 F.3d 124 (2d Cir. 2001) ........................................................................................... 9

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980) ............................................................................................. 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ...................................................................................................... 10

**Other Authorities**

Clayton Act § 4 .................................................................................................................. 10

**INTRODUCTION**

The material facts sufficient to establish Bard's liability are not in dispute.  Bard concedes that it "does not sell its stylet separately and any hospital that wants to use AngioDynamics' PICCs with a TLS therefore must choose Teleflex's" and that, absent Bard's policy, "some hospitals that currently use Teleflex's TLS to pair with AngioDynamics' PICCs could, *and logically would*, have shifted to the superior Bard TLS."  Bard MIL Br. (ECF 132-1) at 3 (emphasis in original).  Because it cannot dispute the facts, Bard resorts to disingenuous legal arguments.  Bard argues, relying on environmental contamination cases, that its expert's *ipse dixit* is sufficient to raise a question of fact on the separate products element of liability despite contemporaneous evidence showing separate demand for PICCs and TLS; the coercion element of a tying claim somehow means something different when a plaintiff moves for summary judgment; and AngioDynamics must establish anti-competitive effects—a discrete element of liability—to meet the commerce element.  Bard's blatant overreaching does not withstand summary judgment as to any liability element.

Bard also mischaracterizes both the law and the evidence with respect to antitrust injury.  Critically, Bard misrepresents the standard for proving antitrust injury.  It is a low bar and Bard cites no credible authority to the contrary, instead relying on Robinson Patman Act cases out of context.  Plaintiff need only show (i) injury in any quantum; and (ii) that the defendant's conduct was a materially contributing factor to the plaintiff's injury, not the sole cause.  Bard spends much energy arguing that AngioDynamics' evidence of antitrust injury relies on "strained interpretation" of documents.  This is categorically untrue.  The contemporaneous documentary evidence speaks for itself and it clearly and unequivocally shows that Bard's illegal tie was a materially contributing factor to AngioDynamics' injury, *i.e.*, its lost sales.  That is all that the law requires and the evidence undoubtedly surpasses this low bar; summary judgment is appropriate.

1

**ARGUMENT**

**I.  AngioDynamics Is Entitled to Summary Judgment on Each Element of Liability.**

　　**A.  PICCs and TLS Are Separate Products.**

"Courts apply a 'consumer demand test' to determine whether two products are separate for antitrust law purposes." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-CV-00598 (BKS) (CFH), 2018 WL 3730165, at *6 (N.D.N.Y. Aug. 6, 2018).  Applying this test, the Court held allegations that (1) the Cleveland Clinic and other institutions have asked to purchase Bard's TLS stylets separately from its PICCs, and (2) Bard's competitors sell their TLS stylets separately from their PICCs, "make it plausible that PICCs and tip location systems are separate products." *Id.* at *7.  AngioDynamics has therefore presented actual evidence of consumer demand and Bard's primary competitor, Teleflex's, selling practices.  Mot. at 11-13 (describing evidence).

Faced with this evidence, Bard attempts to pivot from the consumer demand test in several ways: *First*, Bard frames the issue of separate products as a battle of the experts.  It is not.  Bard overreaches by relying on inapposite cases regarding environmental contamination in support of its claim that Dr. Scott Morton's testimony is sufficient to preclude summary judgment.[1]  Expert conclusions do not trump actual evidence of consumer demand, and Bard cites no cases to the contrary.  *See, e.g.*, *Park v. Thomson Corp.*, No. 05-CV-2931 (WHP), 2007 WL 119461, at *3-4 (S.D.N.Y. Jan. 11, 2007) (granting summary judgment in favor of plaintiff where the products have been sold separately); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (JG),

---

[1] *See, e.g.*, *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526–27 (2d Cir. 1996) ("Expert testimony was essential in this complex environmental litigation to help comprehend scientific data and determine whether the chemicals covered by CERCLA as hazardous substances were contained in appellees' waste."); *Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482, 488 (S.D.N.Y. 2001) ("summary judgment on a [Resource Conservation and Recovery Act] claim is infrequently granted.  In fact, plaintiffs cite only one case in this Circuit granting summary judgment in the last decade."); *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 78–79 (2d Cir. 2002) (concerning physicians' opinions "that [plaintiff] was totally disabled due to latex-induced asthma").

2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (granting summary judgment in favor of plaintiff where the products have been sold separately and there was evidence customers would purchase one product separately if given the choice to do so). Bard attempts to distinguish *Park* and *Visa* on the ground that they involved situations in which *multiple* competitors sold products separately. But the logic of those opinions does not turn on the number of competitors in a given field. Rather, "[w]here the items have been sold separately, distinct products exist." *Park.*, 2007 WL 119461, at *3 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992)).[2]

Here, Bard's primary competitor in TLS, Teleflex, has always sold its TLS stylets separately from its PICCs. Ex. 20 (Hay Report) at ¶ 35 & n.83; Ex. 21 (Frankel Report) at ¶ 29 & n.24. ████████████████████████████████████████████████

██████████████████████. Ex. 21 (Frankel Report) at ¶ 66 & n.61. Besides Bard, Teleflex is the only other TLS competitor to sell navigation-enabled TLS, and Bard and Teleflex together account for ████████████ of TLS sales. Moreover, *all* of Bard's PICC competitors, including AngioDynamics and Medcomp, sell their PICCs to customers as a separate and distinct product. Thus, there is separate demand for PICCs and TLS. *See AngioDynamics*, 2018 WL 3730165, at *6.

*Second*, in any event, Dr. Scott Morton's conclusion that there is low demand for PICCs separate from TLS relies on the misleading premise that "only about ███ of all TLS stylets were sold separately in 2018." Opp. at 8. As AngioDynamics' liability expert, Dr. George Hay, Professor of Law and Economics at Cornell University, has pointed out, "[t]he obvious reason that only ██ of stylets are sold separately is that Bard does not give its customers a choice. And since Bard represents by far the vast majority of stylet sales, the tie is directly responsible for the ███

---

[2] Bard's reliance on *Kodak* is misplaced. There, the Court only found that the separate products question was one for the jury *in the context of denying defendant's motion for summary judgment*. Plaintiffs did not move for summary judgment on that element.

figure and tells us nothing about what customers actually prefer or what they would do in the absence of a tie."  Ex. 22 (Hay Rebuttal Report) at ¶ 10.[3]

*Third*, Bard does not dispute that it tried to suppress demand for Bard's standalone stylet. Instead, it circularly claims that "Bard witnesses explained that it did not want to mislead customers into thinking that the product was available to the market broadly when in fact it was not."  The only reason, however, that the standalone stylet was not available to the market broadly was because—despite FDA approval—Bard has a policy of tying its TLS and PICC products.

*Fourth*, Bard argues that demand was lacking because it allegedly "never received a request for proposal for a standalone stylet from any hospital and none of the discussions to which AngioDynamics points address the price that hospitals would have to pay."  Opp. at 6 (emphasis removed).  But that is no surprise.  Rather, that only establishes that Bard was largely successful in its efforts to keep its standalone stylet "top secret," Ex. 13 (Bard_AD_00029582), and to "squash" customers' requests for a standalone stylet, Ex. 5 (Bard_AD_00167743).

*Finally*, the fact that Cleveland Clinic ultimately decided to switch to Bard does not somehow prove that PICCs and TLS are one product.  Rather, it shows that, in the one instance in which Bard was willing to sell its TLS stylet separately, the customer chose to pair two distinct products for at least two years, resulting in additional PICC sales to AngioDynamics.

## B.  Bard's Unremitting Tie Coerces Customers into Purchasing Its PICCs.

As this Court and the Second Circuit have recognized, "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation."  *AngioDynamics*, 2018 WL 3730165, at *5 (quoting *Unijax, Inc. v. Champion Int'l*,

---

[3] Because Bard raised this argument regarding Dr. Scott Morton's opinion, AngioDynamics may respond on reply.  *See Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226–27 (2d Cir. 2000).

*Inc.*, 683 F.2d 678, 685 (2d Cir. 1982)).  One way of showing actual coercion is by proving an unremitting tying policy:  "An 'unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion . . . given foreclosure of a not insubstantial volume of interstate commerce.'"  *Id.* at *6 (quoting *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976)).

Bard concedes that it has an unremitting policy of refusing to sell TLS products separately from its PICC products.  *See, e.g.*, Bard MIL Br. at 3 (conceding that "the current world" is one "in which Bard does not sell it stylet separately and any hospital that wants to use AngioDynamics' PICCs with a TLS therefore must choose Teleflex's").  *See also, e.g.*, Ex. 23 (Blaber Dep.) at 216:11-17; Ex. 15 (Bard 30(b)(6) Dep.) at 282:14-21.  Faced with these undisputed facts, Bard distorts the legal standard by claiming that a completely different legal standard applies when a plaintiff is moving for, rather than opposing, summary judgment.  No case draws such a distinction—including Bard's cited authority, all of which simply recite the elements of a tying claim and none of which concern unremitting tying policies.  By contrast, the court in *Park* clearly applied the unremitting policy standard on a plaintiff's motion for summary judgment.  2007 WL 119461, at *4 ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary.").  Similarly, in *In re Visa*, the court held on a plaintiff's motion for summary judgment that defendants "indisputably" engaged in a tie because defendants' "rules require merchants who accept [the tying product] to also accept [the tied product]" and "Defendants do not claim otherwise."  2003 WL 1712568 at *2.

### C.  Bard Has Market Power in the TLS Market.

To show that a tying arrangement is illegal, a plaintiff must stablish that "the seller has appreciable market power ***in the tying market***."  *In re Visa*, 2003 WL 1712568, at *2 (emphasis

added).  AngioDynamics asserts that there are two relevant markets—the market for TLS and the market for PICCs—and that Bard uses its massive market power in the tying market (the market for TLS) to coerce customers to also purchase its PICCs.

Relying on its expert, Bard asserts that there is *only one* relevant antitrust market—the market for "differentiated PICCs."  This is just a re-hash of Bard's argument that PICCs and TLS are not separate products.  *See, e.g.*, Opp. at 13.  Bard's relevant market argument thus fails for all the same reasons as its argument regarding separate products.[4]

The basis for Dr. Scott Morton's opinion is also contrary to law.  Specifically, Dr. Scott Morton opines that there is only one market on the ground that "[c]ustomers do not consider the prices of TLSs in a vacuum because there is no separate use for TLSs beyond their use with PICCs . . . ."  Ex. 82 (FMS Report) at ¶ 47.  The Supreme Court and courts in this Circuit have repeatedly held, however, that it does not matter whether "there is no separate use" for the tying product.  *Park*, 2007 WL 119461, at *4 (rejecting the argument that there are not separate products because one "would be ineffective absent integration of" the other) (collecting cases).  *See also Kodak*, 504 U.S. at 463 (rejecting the argument "that because there is no demand for parts separate from service, there cannot be separate markets for service and parts").

With respect to the TLS market, Bard's share is well above ▮▮▮—far, far greater than the minimum threshold identified in the law.  Given its overwhelming market share, Bard seeks to turn the legal presumption on its head.  The law is clear that high market share is a sufficient proxy for market power, absent other findings.  *See, e.g.*, *Kaufman v. Time Warner*, 836 F.3d 137, 143

---

[4] Bard also argues market definition is fact-intensive, citing cases in which the scope of the relevant market was at issue.  While that may often be the case, none of the cited cases were tying cases in which the only question was whether one product or two was at issue; they are thus distinguishable.

(2d Cir. 2016) ("***Market share is a proxy for market power***.  A high market share alone, however, is insufficient to infer a seller's market power ***if*** other characteristics of the product market, such as ***low*** barriers to entry, ***high*** cross elasticity of demand, or technological developments in the industry, interfere with the seller's control of prices.") (emphasis added).

Bard has failed to meet its burden to rebut the natural presumption to be drawn from its massive market share.  The TLS market features significant barriers to entry, including high development costs, the requirement for FDA clearance, and Bard's patents on TLS technology:

- **Development Costs**.  Bard has already conceded that it spent  and "a lot of money" developing the navigation component of its TLS, Ex. 26 (Powers Fact. Dep. at 84-85), and that it believes Teleflex spent ▮▮▮▮ to acquire TLS with navigation.  While Bard points to a handful of other companies that have developed TLS without navigation, these comparisons are inapt because non-navigation enabled TLS ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.  Ex. 20 (Hay Report) at Exhibit 2, n.107.

- **Patents**.  Bard has already admitted that it tried to make its TLS patents "encompassing as widely as possible" and "as strong as possible."  Ex. 26 (Powers Fact. Dep.) at 34, 45, 49-50.  Bard understood that "the barriers to entry into tip location technology are significant, including . . . intellectual property constraints." Ex. 28 (Bard_AD_00210338) at -341.[5]

### D.  A Not Insubstantial Amount of Commerce Is Involved in the PICC Market.

The data produced by Bard in the litigation shows that Bard sold over ▮▮▮▮ PICCs pre-loaded with TLS, valued at over ▮▮▮▮, during the period 2013-2018.  Ex. 20 (Hay Report) at ¶¶ 108-109, Exhibit 5.  This amount is clearly not insubstantial.

Because Bard cannot dispute these massive figures, it argues that AngioDynamics must prove actual lost sales to establish that Bard's conduct affected a not insubstantial amount of commerce.  That conflates the commerce element with another liability element applicable to a

---

[5] Thus, Bard's reliance on *Park* with respect to this element is misplaced.  In that case, there were "numerous sellers" that offered fundamentally identical products (bar exam preparation courses), entry into the field did not require new entrants to spend many millions of dollars on R&D, and the field was not highly regulated or subject to patents.  2007 WL 119461, at *1.

rule of reason theory—anti-competitive effects. However, in *Fortner*—the leading case on this element—"the Supreme Court looked solely at the total volume of the defendant's tied sales. Proof of actual foreclosure has never been required in order to satisfy the effect on commerce test." *In re Data Gen. Corp. Antitrust Litig.*, 490 F. Supp. 1089, 1117 (N.D. Cal. 1980).[6] Moreover, courts in this Circuit have rejected the same argument raised by Bard. *See In re Visa*, 2003 WL 1712568, at *2 ("In 1999 alone, merchants processed over [150] billion dollars in sales through the defendants' off-line debit cards. This figure is 'not insubstantial.' To the extent that the defendants contend that this element incorporates the need for a showing of 'foreclosure' or 'anticompetitive effect' in the tied product market, I disagree.") (quoting *Fortner*, 394 U.S. at 501).

Bard's cited authority is not to the contrary. The two decisions on which Bard relies stand for the general proposition that a company's total revenues are not a specific enough metric. For example, in *Park*, the court rejected plaintiff's argument that defendants' "total revenues" should be considered because it would overstate the tie's effect. 2007 WL 119461, at *9. Similarly, in *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, the court remanded for further consideration, because the plaintiffs' estimated figure of affected commerce—just $330,000— consisted of "the ***total annual meal charges*** collected," even though the alleged tie only "require[d] residents of the facility to purchase ***a*** meal per day." 880 F.2d 1514, 1515 (2d Cir. 1989) (emphasis added). Finally, although the court found that a competitor's lost sales could be

---

[6] Bard attempts to waive *In re Data* away, but the Supreme Court's decisions speak for themselves. *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("In International Salt the $500,000 total represented ***the volume of tied sales to all purchasers*** . . . . In the present case, ***the annual sales*** allegedly foreclosed by respondents' tying arrangements throughout the country totaled . . . amounts [that] could scarcely be regarded as insubstantial.") (emphasis added).

relevant, it did not hold that lost sales is the *only* way to prove this element. *See id.* at 1519 ("If the district court can ascertain such lost sales, it may use that as the relevant figure.").[7]

### E.  Bard's Tie Caused Anti-Competitive Effects in the PICC Market.

Bard first argues that AngioDynamics must establish anti-competitive effects to prevail on its *per se* theory. In this Circuit, however, "plaintiffs who allege a *per se* violation need not allege facts addressed to the [anti-competitive effects] element." *In re Wireless Tel. Servs. Antitrust Litig.*, 02-CV-2637, 2003 WL 21912603, at *4 (S.D.N.Y. Aug. 12, 2003). *See also AngioDynamics*, 2018 WL 3730165, at *4 n.6 (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 280 F.3d 124, 134 n.5 (2d Cir. 2001)); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 137 (S.D.N.Y. 2006).[8]

On the merits, Bard simply asserts that there can be no anti-competitive effects because Bard's PICCs are allegedly superior and cheaper. Although AngioDynamics disputes those assertions, it is not necessary to resolve that dispute. Rather, the question is whether "'competitors were foreclosed from selling to [buyers] because of [the defendant's] policies.'" 2018 WL 3730165 at *7 (quoting *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980)).[9] Here, Bard has already conceded foreclosure and the data it has produced in the litigation demonstrates it. *See*

---

[7] Even if AngioDynamics did need to show actual lost sales to establish this element, the Court should still grant summary judgment because, unlike in *Park* and *Gonzalez* where the plaintiffs were customers and there was no evidence that competitors lost sales, here AngioDynamics has proffered substantial evidence of lost sales and its expert has opined that AngioDynamics has lost millions of dollars because of Bard's tie. *See* Ex. 21 (Frankel Report) at Exhibit 14.

[8] The only decision cited by Bard in which a court applied all five elements in the context of a *per se* claim is premised on a misreading of the Second Circuit's decision in *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000). *See Cancall PCS, LLC v. v. Omnipoint*, No. 99-CV-3395, 2001 WL 293981, at *4 n.1 (S.D.N.Y. Mar. 26, 2001). *Hack* merely recited the five elements applicable to a rule of reason claim without stating whether it was analyzing a *per se* or rule of reason claim. 237 F.3d at 86. In any event, the Second Circuit's more recent instruction in *Wal-Mart* clearly holds that anti-competitive effects is not an element of a *per se* tying claim.

[9] Bard's reliance on *MacDermid Printing Sols. LLC v. Corton Corp.*, 833 F.3d 172 (2d Cir. 2016), is misplaced, because it is not a tying case. Rather, that case concerned an alleged conspiracy among competitors and, therefore, did not analyze foreclosure of competitors.

Bard MIL Br. at 3.  As a result of Bard's tie and its overwhelming market share in the TLS market—well over ███—Bard has almost entirely foreclosed competition in ████████ of the PICC market (PICCs used with TLS), resulting in the foreclosure of ███████ of PICC sales by Bard's competitors.  *See, e.g.*, Ex. 20 (Hay Report) at ¶ 13.

## II.   AngioDynamics Is Entitled to Summary Judgment on Antitrust Injury.

### A.   Bard Mischaracterizes the Standard for Proving Antitrust Injury.

Although Bard relegates its discussion of the legal standard for showing antitrust injury to the very end of its opposition, Opp. at 28-30, the standard determines how the Court will assess the evidence and is, therefore, a prerequisite to a discussion of the evidence.  Bard attempts to create an artificially high bar for AngioDynamics to meet in showing antitrust injury, but no less authority than the Supreme Court has set forth the low burden on antitrust plaintiffs in showing antitrust injury.  It is black letter law.  *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.  It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4."); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (same).  Thus, an antitrust plaintiff must only show "some damage," *i.e.*, damage in any quantum, and that the defendant's illegal act was a "material cause" of that damage.  Indeed, the Supreme Court has recognized that its "traditional rule excus[es] antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury."  *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981).

The cases that Bard cites in support of a higher standard are inapposite.  For example, *Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*, No. 93-CV-5148 (ILG), 2012 WL 3544771

(E.D.N.Y. Aug. 16, 2012), is a Robinson Patman Act case in which the court applied a standard specific to price discrimination claims. Under that standard, in order to show that "the price discrimination . . . was the cause of the plaintiffs' injury, the plaintiffs should be able to match up their losses with gains to the favored competitors." *Id*. at *14. There is no such requirement in a tying case. *Hygrade Milk & Cream Co. v. Tropicana Prod., Inc*., Civ. No. 88-2861 (SAS), 1996 WL 257581 (S.D.N.Y. May 16, 1996), is the same. Bard thus cites **no authority outside of the Robinson Patman Act context** that applies the high standard for which it advocates, nor is there any credible argument that such a standard should apply here.

Bard's critiques of *In re Data* and *In re K-Dur Antitrust Litig.*, Civ. No. 01-1652 (JAG), 2008 WL 2660776 (D.N.J. Feb. 21, 2008), Opp. at 28, are also without merit. With respect to *In re Data*, the defendant conceded that the plaintiffs had lost sales, but it disputed that its illegal tie was the cause of the plaintiffs' lost sales, instead pointing to other factors, exactly as Bard does here. The court concluded that the tie was a material cause of the plaintiffs' injury and thus the antitrust injury element was satisfied. 490 F. Supp. at 1119 ("Data General's evidence, viewed in the most favorable light, shows that factors other than the tie-in may have contributed to plaintiffs' injury. It neither negates nor raises a genuine dispute regarding the undisputed fact that the tie-in was a material cause of plaintiffs' injury."). Similarly, Bard's quotation from *In re K-Dur* is not inconsistent with the relevant standard. While the plaintiff need only show "a trifle of injury," it may not be "hypothetical" injury. 2008 WL 2660776, at *4.[10]

---

[10] In addition, Bard's continued reliance on *Suture Express, Inc. v. Owens & Minor Distribution, Inc.* 851 F.3d 1029 (10th Cir. 2017), is puzzling. That case is entirely inapposite—it is not a tying case in which the defendant has an over ███ market share in the tying market; rather, it concerns the potential pro-competitive effects of bundled discounts in a case where the defendant *lacked* market power. 851 F.3d at 1042, 1045. *See* Angio SJ Opp. (ECF 144) at 28.

**B.  The Evidence of Antitrust Injury Far Surpasses the Relevant Standard.**

Bard does its best to muddy the waters with respect to the evidence showing antitrust injury, but, as shown below, none of Bard's arguments negate the fact that the evidence shows that Bard's tie was a materially contributing factor to AngioDynamics' injury.  At best, Bard shows that there may have been *other* contributing factors for some hospitals, but this is typically the case and why the law only requires that Bard's conduct be a materially contributing factor.

1. Hillcrest Medical Center

- Hillcrest made an entirely unambiguous statement that Bard's TLS, 3CG, was the driving factor in its decision to switch from AngioDynamics PICCs to Bard PICCs: "we will be standardizing to BARD PICC Lines and *3CG technology* . . . . I know you cannot be surprised by the decision, as currently Angiodynamics does not have *similar technology*." Ex. 34 (ANGIO-00547851) at -851-52.

- Bard's own documentation confirms that TLS was the impetus for the change: "Hillcrest . . . ***They are going to move to tip confirmation*** and are having Angio, Teleflex and us present to committee . . . ." Ex. 32 (Bard_AD_00027562).

2. Christus St. Patrick

- The evidence is again clear that Bard's TLS was the driving factor in the hospital's decision-making.  Bard personnel reported: "***The PICC nurse really disliked [AngioDynamics' TLS] Celerity.  She said it felt like she was using 10 year old technology*** . . . .  She really felt like this slowed her down ***and she missed [Bard's] real-time navigation***." Ex. 36 (Bard_AD_00004448) at -448.

- AngioDynamics personnel reported: "***Maquita gave us outstanding reviews on the overall performance of BioFlo.  Maquita also stated the data should reflect a switch to BioFlo . . . . [O]ne of the Executives brought up the fact that we do not have Navigation with Celerity [and] stated that Christus should look into converting once we have Navigation.***" Ex. 37 (ANGIO-00332072) at -076.

- Because of the tie, the hospital chose Bard for PICCs and TLS, despite having excellent results with BioFlo: "***As expected, Maquita's feedback has been terrific regarding the performance of BioFlo.  I've been advised that when we can eliminate [chest x-ray], then we can move to the next step with St Patrick as well as with Christus as a whole.***  So, upon completion of this BioFlo evaluation, the Bard PICC package will be repurchased." *Id.* at -074.

12

3.  McLaren Hospital

- Bard personnel reported that eliminating chest x-ray to confirm tip location is the motivation behind switching to Bard TLS and PICCs: "We have finalized a $120,000 PICC conversion starting May 5th. This conversion will knock Angio D and Bioflo out of its only account in this system and gives us *full compliance with Bard and 3CG. They are planning on eliminating X-Ray on day one of placements*." Ex. 38 (Bard_AD_00064007) at -009.

- "This account was a Bioflo account that will pad Freiburger's pockets with 630 competitive 3CG PICC's and roughly $130,000 in new business at the expense of our friends from Angio D! *The biggest reasons for this conversion are clinical buy-in and McLaren's Corporate initiative to eliminate Chest X-Ray.*" Ex. 39 (Bard_AD_00026442) at -442.[11]

4.  St. Vincent's Hospital

- Bard personnel reported that Bard's TLS, 3CG, was the reason for the conversion from AngioDynamics to Bard: "Excellent job of converting this account from Angio D *to 3CG* in the first quarter. *The team seems very satisfied with 3CG.*" Ex. 40 (Bard_AD_00481132) at -132. *See also* Ex. 83 (Bard_AD_00003203) at -206 (stating that St. Vincent's nurses "showed a lot of interest in 3CG").

- Bard's "conversion" of St. Vincent's "to Bard 3CG from Angio" was part of Bard's overall strategy to "convert every PICC to 3CG." Ex. 84 (Bard_AD_00048607) at -607.

5.  Summerlin Hospital

- The hospital CNO reports: "As you know Phil has many concerns about the AngioDynamic catheters. *His main concern is the inability to do tip navigation to prevent malpositions* and the lack of some size catheters he uses." Ex. 42 (ANGIO-01477935) at -936.

- Unrebutted testimony establishes that Summerlin moved to Bard despite its preference for AngioDynamics' PICCs. Ex. 85 (Centea 30(b)(6) Dep. Tr.) at 323:7-325:3 (testifying, based on conversations with the local representative, that "Summerlin t[old] AngioDynamics that it wanted to purchase an AngioDynamics PICC with Bard's tip location system").

6.  Universal Health Systems (UHS) of Delaware

- Bard's TLS again drives the hospital's decision making regarding PICC selection. Bard personnel reports: "I met with one of my PICC nurses who is currently evaluating the BioFlo PICC and Celerity. Here are some of the main takeaways ... • *Sherlock is irreplaceable - by*

---

[11] Bard argues that the reference to "clinical buy in" is ambiguous. Regardless, it is undisputed that "eliminat[ing] chest x-ray" can only refer to the use of Bard's TLS.

*far this is our #1 competitive advantage - Celerity doesn't have a way to address malpositions . . . • Celerity experience is very cumbersome and adds extra steps to the procedure* . . ." Ex. 41 (Bard_AD_00017137) at -138.

- Bard personnel also reported: "As you are aware UHS launched a multi site trial of AngioDynamics BioFlo and Celerity.  Below we received the good news *that the decision has been made to stay with Bard* . . . . *Once again the significance of getting our facilities to 3CG played an important role here*." Ex. 43 (Bard_AD_00078643) at -643.

- "*This is a perfect example of why we need all of our customers using 3CG technology. The proprietary technology including 3CG, HF, FT and PowerGlide help lockdown our business as our competition cannot offer these products.*" Ex. 44 (Bard_AD_00026376).

7. Baycare Health Systems

- AngioDyamics' Bill Millar reported: "Baycare $850,000 Loss *due to no Tip Location / Confirmation system*." Ex. 45 (ANGIO-01623589) at -589.

- As Millar explained, he knew based on his "conversations with [Baycare personnel] . . . BayCare was interested in moving to a navigation tip location system.  We conducted a trial head-to-head against Bard, our midlines versus their midlines, because at the time that was also an interest . . . *they had clinical data outcomes proving that we had better outcomes with the BioFlo midline versus the Bard device, yet . . . they wanted tip location 3CG and they could not use our PICC lines with the Bard system, so they made the business decision to move [to] Bard PICCs and midlines from AngioDynamics because of the requirement of not being able to get provided that solution*." Ex. 46 (Millar Dep.) at 62:14-79:24.

- As Mr. Millar further explained at deposition, the driver for the move was the hospital's need for Bard's TLS.  Bard attempted to make the switch as price neutral as possible, but pricing was not the impetus; TLS was.  *Id.*

As all of this contemporaneous evidence and deposition testimony makes clear, Bard's illegal tie was a material cause of AngioDynamics' lost sales.  The fact that there may have been other factors that also played into the hospitals' decision making does not negate the fact that obtaining Bard's TLS was their primary motivation to purchase Bard PICCs.

Because it has no real substantive response to this evidence, Bard instead argues that it is hearsay.  However, Bard cites *no authority whatsoever* to support its position.  In truth, this evidence regarding customers' statements is admissible under the "state of mind" exception when

submitted to show customer motive, such as a customer's reason for ceasing to do business with AngioDynamics. *See, e.g., Hydrolevel Corp. v. Am. Soc. of Mech. Engineers, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980), *aff'd* 456 U.S. 556 (1982); *Complete Entm't Res. v. Live Nation Entm't, Inc.*, No. 15-CV-9814, 2017 WL 6512223 at *4 n.9 (C.D. Cal. Oct. 16, 2017) (collecting cases).

Likewise, despite Bard's fixation on hospital witnesses, AngioDynamics need not have a hospital witness to prove antitrust injury. Antitrust injury is often proven without live customer testimony; in fact, contemporaneous documents or statements are the best evidence because they are untainted by litigation. *See, e.g.*, *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 946 (7th Cir. 2004); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 549 (S.D.N.Y. 2011) *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).[12]

Finally, this record evidence is further buttressed by the economic evidence. Among other things, Bard's ███████ market share in TLS and AngioDynamics' much greater success in selling PICCs in non-TLS segments of the market also supports the common sense conclusion that Bard would not have engaged in an illegal tie for so long if it had not increased Bard's PICC sales to the detriment of competitors like AngioDynamics. *See* Mot. at 27-28. Bard has no response to this evidence—which is undisputed—only baseless attacks on AngioDynamics' damages expert.[13]

## CONCLUSION

For all the foregoing reasons, AngioDynamics respectfully requests that the Court grant its summary judgment motion in full, i.e., with respect to each liability element and antitrust injury.

---

[12] *See also* Angio SJ Opp. (ECF 144) at 12-14 and 23-24 for a fuller discussion of these evidentiary issues.

[13] AngioDynamics has already debunked these various attacks in its opposition to Bard's *Daubert* motion. *See* Angio *Daubert* Opp. (ECF 143). Inexplicably, Bard now claims that AngioDynamics' damages expert's analysis is "junk science." Opp. at 27. Bard cites no support for this claim, nor is there any, and Bard did not even make this assertion in its *Daubert* motion.

Dated: October 2, 2020

By: */s/ Philip J. Iovieno*

Philip J. Iovieno
Adam R. Shaw
Anne M. Nardacci
Mark A. Singer
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: piovieno@bsfllp.com
ashaw@bsfllp.com
anardacci@bsfllp.com
msinger@bsfllp.com

Nicholas A. Gravante, Jr.
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave, 7th Floor
New York, New York 10022
Telephone: (212) 446-2320
Email: ngravante@bsfllp.com

*Counsel for Plaintiff AngioDynamics, Inc.*

16