**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANGIODYNAMICS, INC.,

     Plaintiff,

  -against-

C. R. BARD, INC.; BARD ACCESS
SYSTEMS, INC.,

     Defendants.

No. 1:17-CV-0598 (BKS/CFH)

Judge Brenda K. Sannes

Magistrate Judge Christian F. Hummel

**MEMORANDUM OF LAW IN SUPPORT OF C. R. BARD, INC.'S AND**
**BARD ACCESS SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ....................................................................................................... 6

    I.     AngioDynamics Has Failed to Present Evidence Sufficient to Create a
           Triable Issue as to Antitrust Injury. ........................................................ 6

          A.    AngioDynamics Has Presented No Evidence of Any Lost Sales. ............ 6

                1.    No hospital will testify on AngioDynamics' behalf. .................... 7

                2.    AngioDynamics' own witnesses provide mere speculation. ......... 8

                3.    The say-so of AngioDynamics' economist is not a
                      substitute for missing fact evidence of injury. ............................ 11

                4.    Speculative hospital anecdotes are no substitute for a
                      hospital witness and do not establish injury. .............................. 12

                5.    Speculative comments in Bard emails and documents do
                      not show injury either. ................................................................ 16

          B.    AngioDynamics Has Failed to Present Evidence Demonstrating
              that the TLS Policy Was a Material Cause of Any Lost Sales. ............... 19

          C.    The Antitrust Laws Do Not Provide a Vehicle for AngioDynamics
              to Shift Its Competitive Losses to Bard. .................................................. 26

    II.    AngioDynamics Offers No Basis on Which a Jury Could Make a
           Reasonable and Non-Speculative Damages Estimate ............................. 29

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Argus Inc. v. Eastman Kodak Co.*,
  801 F.2d 38 (2d Cir. 1986) ........................................................................ 6, 9, 10

*Arista Records LLC v. Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007) ..................................................................... 6

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ......................................................................................... 27

*Billy Baxter, Inc. v. Coca-Cola Co.*,
  431 F.2d 183 (2d Cir. 1970) ................................................................................ 19

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004) .................................................................................. 1

*Bowen v. New York News, Inc.*,
  522 F.2d 1242 (2d Cir. 1975) ............................................................................... 24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ................................................................................... 11, 17

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ............................................................................... 28

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
  799 F.3d 202 (2d Cir. 2015) ......................................................................... 13, 19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................... 6

*Chrysler Credit Corp. v. J. Truett Payne Co.*,
  670 F.2d 575 (5th Cir. 1982) ......................................................................... 10, 18

*City of Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998) ............................................................................... 26

*Coleman Motor Co. v. Chrysler Corp.*,
  525 F.2d 1338 (3d Cir. 1975) .............................................................................. 30

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) ............................................................................. 2, 5

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ............................................................................... 28

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*,
  2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) ........................................................ 19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*,
  2012 WL 3544771 (E.D.N.Y. Aug. 16, 2012), *aff'd sub nom.*, *Cash &
  Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015)..........13

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*,
  472 F. Supp. 2d 385 (E.D.N.Y. 2007), *amended*, 2007 WL 4526618 (E.D.N.Y.
  Dec. 20, 2007)...........................................................................................................19

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*,
  213 F.3d 198 (5th Cir. 2000)......................................................................................18

*Erie Conduit Corp. v. Mapa*,
  102 F.R.D. 877 (E.D.N.Y. 1984), *aff'd*, 765 F.2d 135 (2d Cir. 1985)..................6, 7

*Fresenius Kabi USA, LLC v. Par Sterile Prod., LLC*,
  2020 WL 901967 (D. N.J. Feb. 25, 2020) ..................................................................26

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013) ...........................................................................................6

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.*,
  297 F.2d 906 (2d Cir. 1962) .......................................................................23, 24, 25

*Hutchinson v. Groskin*,
  927 F.2d 722 (2d Cir. 1991)........................................................................................11

*Hygrade Milk & Cream Co. v. Tropicana Prod., Inc.*,
  1996 WL 257581 (S.D.N.Y. May 16, 1996)............................................................8, 18

*In re Actos End-Payor Antitrust Litig.*,
  848 F.3d 89 (2d Cir. 2017)..........................................................................................19

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) ........................................................................26

*In re Optical Disk Drive Antitrust Litig.*,
  2017 WL 6503743 (N.D. Cal. Dec. 18, 2017), *aff'd sub nom.*, *In re Optical
  Disk Drive Prod. Antitrust Litig.*, 785 F. App'x 406 (9th Cir. 2019) ......................16

*In re SSA Bonds Antitrust Litig.*,
  2020 WL 1445783 (S.D.N.Y. Mar. 25, 2020) ..............................................................6

*In re Wellbutrin XL Antitrust Litig.*,
  868 F.3d 132 (3d Cir. 2017).........................................................................................25

*Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*,
  2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003).........................................................19

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016)........................................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Maddaloni Jewelers, Inc. v. Rolex Watch USA, Inc.*,
354 F. Supp. 2d 293 (S.D.N.Y. 2004) ........................................................................ 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................ 5, 17

*MCI Communications Corp. v. A T & T Co.*,
708 F.2d 1081 (7th Cir. 1983) ................................................................................... 30

*Ortho Diagnostic Systems, Inc. v. Abbott Labs., Inc.*,
920 F. Supp. 455 (S.D.N.Y. 1996) ............................................................................ 16

*Quarles v. General Motors Corp.*,
758 F.2d 839 (2d Cir. 1985) ........................................................................................ 5

*Quiles v. Bradford-White Corp.*,
2012 WL 1355262 (N.D.N.Y. Apr. 18, 2012) ........................................................... 11

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ......................................................................................... 17

*Rotman v. Progressive Ins. Co.*,
955 F. Supp. 2d 272 (D. Vt. 2013) ............................................................................ 11

*Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning
Contractors Ass'n, Inc. v. Local Union 38 of Sheet Metal Workers Int'l Ass'n*,
63 F. Supp. 2d 211 (N.D.N.Y. 1999) ........................................................................ 13

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ................................................................................................... 27

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*,
154 F.3d 851 (8th Cir. 1998) ..................................................................................... 24

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.*,
851 F.3d 1029 (10th Cir. 2017) ..................................................................... 27, 28, 29

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988) ................................................................................. 3, 30

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
454 F. Supp. 2d 62 (E.D.N.Y. 2006) ......................................................................... 29

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd*, 257 F.3d 256 (2d Cir. 2001) ............... 16

**Statutes**

15 U.S.C. § 15(a) ............................................................................................................. 13

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* § 1726c (2020 Supp., ed.) .................................................. 27

## INTRODUCTION

This is an antitrust tying case. AngioDynamics claims that Bard's policy of selling the stylet part of its market-leading Tip Location System ("TLS") only preloaded into its peripherally inserted central catheters ("PICCs")   and not offering the stylet as a separate product   forced hospitals to purchase its PICCs rather than AngioDynamics' competing PICCs. Antitrust injury is an essential element of a tying claim. To establish antirust injury, AngioDynamics must present evidence proving that (1) it actually lost sales of PICCs that it otherwise would have made; (2) Bard's TLS policy caused it to lose those sales; and (3) the loss of sales to Bard is the type of injury for which the antitrust laws provide a remedy. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004). AngioDynamics has failed to create a triable issue as to antitrust injury for three principal reasons.

*First*, AngioDynamics has no evidence that it suffered any lost sales. According to AngioDynamics' theory of the world, thousands of hospitals would have purchased its PICCs and combined them with Bard's TLS stylets had Bard sold its stylets separately. In fact, AngioDynamics has the audacity to assert that ███ of Bard's hospital customers would have done so. Given the enormous breadth of this claim of injury, one would expect AngioDynamics to validate its theory by calling as trial witnesses at least one of the hospitals whose purchases it allegedly lost. But AngioDynamics will call, and has deposed, ***none***. The record contains testimony from only a single hospital   Cleveland Clinic. That renowned institution testified that it tested AngioDynamics' PICCs with Bard's TLS (exactly what AngioDynamics says would happen in its "but-for" world), but switched to purchasing ***Bard's*** preloaded PICCs because it found they were more effective, safer, and less costly. Thus, the ***only*** hospital representative to testify under oath squarely ***rejected*** AngioDynamics' core theory of injury. There is no

admissible evidence that Bard's policy of selling its stylet only preloaded in its PICCs forced ***any*** hospital to purchase Bard's PICCs rather than AngioDynamics'.

*Second*, AngioDynamics has no admissible evidence that ***but for*** Bard's sales policy, any hospital would choose the cumbersome and more expensive combination of Bard's stylet and AngioDynamics' PICC over Bard's preloaded PICC. On the contrary, the record evidence shows that hospitals chose Bard's preloaded PICCs over AngioDynamics' PICCs for many other reasons: price, quality, service, and a well-founded skepticism that AngioDynamics' overhyped PICCs would live up to their billing. AngioDynamics cannot paper over this failure of proof with inadmissible hearsay or groundless opinion testimony by economists. Not only has AngioDynamics failed to adduce "some hard evidence showing that its version of the events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998),[1] it has produced no evidence in support of its theory of causation at all. This dog simply will not hunt.

*Third*, AngioDynamics did not even attempt to answer the threshold question whether Bard's conduct was "competition-reducing." AngioDynamics cannot point to ***any*** evidence that Bard's TLS policy resulted in supra-competitive PICC prices, restricted PICC output, or any quantifiable reduction in PICC quality, much less evidence demonstrating that those effects flow from Bard's TLS policy.

In addition to its failure to create a triable issue as to antitrust injury, AngioDynamics has failed to provide a reasonable and non-speculative way to measure its alleged lost profits. Since there is no evidence that it actually lost any sales, AngioDynamics relies on the opinion of its hired-gun economist, Dr. Alan Frankel, to try to make the required showing. But an economist cannot substitute for lack of fact evidence, and because Dr. Frankel's testimony on damages is

---

[1] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

inadmissible for several reasons (*see* accompanying motion in limine), it is insufficient to create a triable issue as to damages. Moreover, Dr. Frankel did not even attempt to isolate lost sales and profits attributable to the TLS policy   as opposed to some other cause   as the Second Circuit requires. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988).

## STATEMENT OF FACTS

Bard and AngioDynamics both manufacture, market, and sell PICCs   thin, soft, flexible tubes that clinicians use to, among other things, administer fluids and provide medications and nutrients to patients. (SOF ¶¶ 2-3.)[2] Bard has been selling PICCs for decades. (SOF ¶ 22.) AngioDynamics' line of PICCs, called "Morpheus," had to be recalled because of safety issues. (SOF ¶¶ 45-47.) In 2012, AngioDynamics began selling its BioFlo PICC, which it sells at a premium, in part because its former CEO believed that "customers should pay more for BioFlo than the other PICCs on the market." (SOF ¶¶ 33, 39-40.) AngioDynamics claims that BioFlo reduces a complication known as deep vein thrombosis (or "DVT"), but the FDA prohibits AngioDynamics from marketing BioFlo based on that claim. (SOF ¶¶ 34-36.) Teleflex competes with Bard and AngioDynamics for PICC sales. (SOF ¶¶ 63-64.)

To place a PICC, the clinician inserts a PICC into a vein in the upper arm and navigates it to the superior vena cava, a location near the heart. (SOF ¶ 4.) During placement, clinicians often use a guidewire (also known as a "stylet") inside the PICC to stiffen it so that it can be threaded through the veins. (SOF ¶ 5.) After placement, the clinician removes the stylet from the PICC and discards it. (*Id.*) Clinicians sometimes route PICCs incorrectly, and sometimes they get the final placement incorrect. (SOF ¶¶ 6-7.) To assist clinicians with PICC placement, Bard

---

[2] Cites to "SOF ¶ _" are to Bard's Rule 56.1 Statement of Undisputed Material Facts, cites to "Moss Decl. Ex. _" are to exhibits to the Declaration of Edward N. Moss, and cites to "MIL" are to Bard's Memorandum of Law in support of its Motion *in Limine* to Preclude at Trial Expert Testimony of Dr. Alan Frankel, each filed concurrently with this Memorandum of Law.

developed a TLS that pinpoints the PICC's location as it moves through the body (a "navigation" component), and confirm that the PICC's final location is correct once it has been placed (a "confirmation" component). (SOF ¶ 8.) Some hospitals place PICCs with the aid of a TLS; others continue to place PICCs without a TLS. (SOF ¶¶ 8-12.)

In 2006, Bard became the first company to develop a TLS with navigation, and in 2012, it launched Sherlock 3CG, a TLS that combines navigation and confirmation. (SOF ¶ 24.) Bard's TLS works only with Bard's proprietary stylet, which it preloads into its PICCs. (SOF ¶¶ 25-26.) If the stylet were not preloaded, a nurse would have to load the stylet into the PICC at the patient's bedside, which increases the risk of stylet breakage, patient injury, and infection. (SOF ¶¶ 27-29.) Bard has sold its stylets preloaded in its PICCs and not on a standalone basis with a single exception   Cleveland Clinic. (SOF ¶ 30.)

Like Bard, Teleflex currently has a TLS product that combines navigation and confirmation. (SOF ¶ 63.) Teleflex sells its TLS stylets both preloaded into its PICCs and also as separate, standalone products. (SOF ¶ 64.) Teleflex's TLS (and stylet) is compatible with third-party PICCs. (SOF ¶¶ 64-66.) Hospitals that want to use AngioDynamics' BioFlo PICCs with a TLS can use two different TLS products from Teleflex. (SOF ¶¶ 65-66.) At least 27 hospitals do (or have done) precisely that. (SOF ¶ 66.)

AngioDynamics has tried to develop or acquire its own TLS since 2011. (SOF ¶ 48.) AngioDynamics never has offered a TLS that combines both navigation and confirmation. (SOF ¶ 50.)

Hospitals consider several factors when purchasing PICCs, including PICC price, quality and features, the manufacturer (e.g., its clinical team, training capabilities, and breath of product portfolio), and many others. (SOF ¶ 17.) As a result, a hospital representative would be the "best

person to explain why a particular hospital purchases or does not purchase a PICC from a given

supplier." (SOF ¶ 18.) AngioDynamics has stipulated that, except for Cleveland Clinic (whom

Bard is calling), it will not call at trial "**any** witnesses from third party hospitals or hospital

groups or representatives." (SOF ¶ 19.)

In December 2014, Bard agreed to sell standalone stylets to Cleveland Clinic so the

hospital could trial Sherlock 3CG with BioFlo. (SOF ¶¶ 68-70.) After using Bard's TLS (and its

standalone stylet) with BioFlo, Cleveland Clinic decided to trial Bard's FT PICC preloaded with

Bard's stylet. (SOF ¶ 76.) After a three-month trial, Cleveland Clinic decided to switch from

BioFlo with Bard's standalone stylet to Bard's preloaded FT PICC. (SOF ¶ 77.) Cleveland Clinic

made that decision because: (i) "Bard's integrated product was less expensive" than the

combination of a BioFlo PICC and a Bard TLS stylet; (ii) DVT rates at the hospital were lower

with Bard's FT PICCs than with BioFlo; (iii) the fact that Bard's PICCs were preloaded

"reduced the risk of infection" versus having to load the stylet at the bedside (which "weighed

heavy in the decision") to switch to Bard; and (iv) Cleveland Clinic preferred Bard's kits over

AngioDynamics'. (*Id.*)

## LEGAL STANDARD

At summary judgment, a non-moving party with the burden of proof cannot "rest upon . .

. mere allegations" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see*

*also Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[M]ere conjecture or

speculation by the party resisting summary judgment does not provide a basis upon which to

deny the motion."). Instead, that party must present "some hard evidence showing that its version

of the events is not wholly fanciful." *D'Amico*, 132 F.3d at 149. If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which . . . [it bears] the burden of proof[,]" then the moving party is entitled to judgment

as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ARGUMENT

**I.   AngioDynamics Has Failed to Present Evidence Sufficient to Create a Triable Issue as to Antitrust Injury.**

As discussed in detail below, the Court should grant summary judgment for Bard because

AngioDynamics lacks competent evidence to support an "essential element" of its claim: that

"the injuries alleged would not have occurred but for [Bard's alleged] antitrust violation." *See*

*Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986).

### A.   AngioDynamics Has Presented No Evidence of Any Lost Sales.

AngioDynamics must show to a reasonable certainty that it actually suffered the injury

for which it seeks relief. *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir.

2013) (courts must identify the "actual injury the plaintiff alleges," and "look to the ways in

which the plaintiff claims it is in a worse position as a consequence of the defendant's

conduct").[3] Courts applying the injury-in-fact factor look for evidence of ***actual*** transactions or

instances that demonstrate an injury giving rise to a right to relief under the antitrust laws. *E.g.*,

*In re SSA Bonds Antitrust Litig.*, 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) ("Plaintiffs

have not p[ointed] to a single transaction that leads to a plausible inference that they suffered

antitrust harm. . . . [They] can only bring a civil action for injuries that they establish they

themselves suffered."); *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 568-69

(S.D.N.Y. 2007) (holding that plaintiff did not establish injury-in-fact because it did not allege

---

[3] *See also Erie Conduit Corp. v. Mapa*, 102 F.R.D. 877, 879 (E.D.N.Y. 1984), *aff'd*, 765 F.2d 135 (2d Cir. 1985) ("Th[e] fact of injury must be demonstrated with reasonable certainty and may not be speculative. . . . Indeed, failure to satisfactorily prove that a plaintiff is injured by reason of the defendant's alleged antitrust violations is sufficient to defeat the antitrust claims.").

that it actually purchased the allegedly price-fixed license). It is undisputed that there are no such actual transactions or instances here.

### 1.    No hospital will testify on AngioDynamics' behalf.

Despite claiming that as much as ▮▮ of Bard's PICC sales would have flipped to AngioDynamics but for Bard's preloading policy, Moss Decl. Ex. 5 (Opening Expert Report of Alan S. Frankel) ¶¶ 64, 67-68, AngioDynamics cannot point to a *single* Bard customer whose sales AngioDynamics would have captured, much less admissible record evidence that "demonstrate[s] [those losses] with reasonable certainty." *See Erie Conduit Corp.*, 102 F.R.D. at 879. We start with the basics:

1. AngioDynamics is not calling a single hospital witness at trial.

2. Nor did it depose a single hospital witness so that it could present that evidence by admissible means, through sworn testimony. It chose not to test its speculative theory with actual, admissible hospital testimony.

3. Nor did it seek documents from hospitals that would support its claim. It chose not to serve a single subpoena on any hospital.

4. Not only did it not depose a single hospital, it chose not to conduct a survey of hospitals to test its theory.

5. And not only did it choose not to survey hospitals, its economists   who claim that hospitals were coerced into purchasing Bard PICCs resulting in hundreds of millions of dollars of damages to AngioDynamics   were either directed, or chose, not to interview a single hospital to validate that wild theory. (SOF ¶¶ 102-03.)

6. The *only* hospital offering testimony at trial will be Cleveland Clinic, whose key witness testified that it *voluntarily* chose to purchase Bard PICCs over AngioDynamics PICCs, even though Bard was willing to and did sell its stylet to that hospital separately. Cleveland

- 7 -

Clinic opted for Bard's preloaded PICC because it was less expensive, more effective, and safer for patients than combining the AngioDynamics PICC with the Bard stylet at the bedside. (SOF ¶ 77.)

7. Recognizing its failure of proof, AngioDynamics fought to conceal from the Court and from Bard that it could not find, and therefore was not calling, any hospital to support its theory. It finally admitted that it would not call any hospital witnesses only after Magistrate Judge Hummel invited Bard to file a motion to compel that information, years after Bard first sought it in discovery. (SOF ¶ 19.)

It is therefore undisputed that *no* hospital will testify that it wanted to purchase an AngioDynamics PICC but Bard's TLS policy caused it to buy Bard's instead. *No* hospital will testify that it would have paid the premium that AngioDynamics demanded for its BioFlo PICC in order to combine it with Bard's TLS rather than use Bard's preloaded PICC.[4] *No* hospital will testify that it would have switched from Bard's PICCs to AngioDynamics' BioFlo had Bard sold its stylet separately.

### 2.    AngioDynamics' own witnesses provide mere speculation.

Bard naturally asked AngioDynamics to identify which sales it claims it lost, but would have won, but for the TLS policy. In response to an interrogatory, AngioDynamics presented a list of 31 hospitals and GPOs[5] "from which [it] *potentially* lost sales as a result of [Bard's] conduct." (SOF ¶ 87.) "[P]otentially lost" is not but-for causation to a reasonable certainty. *See Hygrade Milk & Cream Co. v. Tropicana Prod., Inc.*, 1996 WL 257581, at *18 (S.D.N.Y. May

---

[4] BioFlo sold at a premium to Bard's PICCs, so the combined price of the Bard stylet and BioFlo PICC would have been greater than the price of the integrated Bard product. (SOF ¶¶ 39-41.)

[5] Group Purchasing Organizations do not purchase medical products and merely negotiate price for their member hospitals. Even so, AngioDynamics cannot identify which accounts or even how many accounts from these GPOs — each of which count thousands of members — it lost. (SOF ¶ 87).

16, 1996) ("Plaintiffs must show that they actually suffered an injury, not merely that there is a reasonable likelihood of injury."). It is speculation. That is why courts require plaintiffs to conduct discovery and present *admissible* evidence, which AngioDynamics has refused to do. *Cf. Argus Inc.*, 801 F.2d at 41 ("[L]ack of causation in fact is fatal to the merits of any antitrust claim.").

The testimony of AngioDynamics' witnesses cannot fill this gap. Any testimony by an AngioDynamics witness about what a hospital *hypothetically* would have done had Bard made standalone stylets available will be hearsay and speculation, not competent evidence.

AngioDynamics' former Head of Sales, Tom Aldrich, could only name one account that AngioDynamics *potentially* lost, and lacked knowledge of lost opportunities for *any* of the 31 entities on AngioDynamics' list. (SOF ¶ 88.) Chad Campbell, General Manager of AngioDynamics' Vascular Access division, could not name *a single customer* from whom AngioDynamics lost business as a result of Bard's TLS policy, nor could his sales team. (SOF ¶ 89.)

The testimony of AngioDynamics' employees who did claim some knowledge of lost sales quickly fell apart   and is inadmissible in any event. For example, AngioDynamics' 30(b)(6) witness, Scott Centea, claimed that he had personal knowledge that AngioDynamics lost sales for 21 of the 31 entities on AngioDynamics' list. (SOF ¶ 90.) Yet he could recall conversations with *only two* of these entities, explaining that he had trouble remembering conversations with customers because "they all seem to run together." (SOF ¶ 91.) AngioDynamics' documents confirm the unreliability of Centea's recollection: he claimed that AngioDynamics lost sales at University of Colorado, an assertion that the record flatly undercuts: the University of Colorado purchased *AngioDynamics* PICCs and paired them with Teleflex's

- 9 -

TLS, as described *infra* at pp. 14-15. Hearsay and speculation will not substitute for an actual hospital witness. *Cf. Argus Inc.*, 801 F.2d at 45 (holding that plaintiff's "causality claims are . . . thoroughly implausible and cannot survive a motion for summary judgment" where "[t]he testimony in support of the [injury-in-fact] theory consist[ed] largely of conclusory statements by plaintiffs' officers and employees").

Moreover, upon questioning, Centea conceded that two hospitals on AngioDynamics' list with whom he did remember discussing the TLS policy (and what they allegedly told him is also hearsay) did ***not*** indicate they would purchase AngioDynamics PICCs if Bard made standalone stylets available. (SOF ¶ 92.) Those hospitals merely told Centea that, if Bard sold its stylet separately, then they would first have to ***evaluate*** the efficacy of the BioFlo PICC, which they had not yet done, and then would need to compare the pricing of the BioFlo and standalone Bard stylet with other options, which they had not done. (*Id.*) The testimony of AngioDynamics' Regional Business Manager William Millar is similar. His knowledge about claimed lost sales is likewise limited to hearsay, "assumption[s]," and "hypotheses" from AngioDynamics' salespeople or hospital personnel. (SOF ¶ 95.)

Second-hand, self-serving, and speculative assertions from AngioDynamics' executives and employees are no substitute for reliable evidence from actual customers. *See Argus Inc.*, 801 F.2d at 42 ("When the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely.") (alteration omitted); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581-82 (5th Cir. 1982) ("Conclusory statements by the plaintiff, without evidentiary support, as to the fact of damage caused by the alleged antitrust violation are not sufficient. . . . *The plaintiff must put forth substantial evidence.*"). Even assuming hospitals did make such vague statements to

AngioDynamics, they are inherently unreliable. AngioDynamics knows this; its former Head of Sales Mr. Aldrich testified that hospital representatives will tell manufacturers that "[w]e love you" and "[w]e will use everything you have," but they "don't do that"; rather, they "just don't like confrontation," and so they say those things because they "just kind of want to placate you and move you along." (SOF ¶ 20.)

### 3. The say-so of AngioDynamics' economist is not a substitute for missing fact evidence of injury.

Faced with this complete lack of admissible evidence, AngioDynamics unsurprisingly wants to rely on the testimony of its economist, Dr. Alan Frankel. But Dr. Frankel's opinion testimony must spring from reliable record evidence of causal injury, not substitute for it. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."). And the cases are legion that a party cannot launder into evidence inadmissible hearsay and speculation through an expert. *E.g.*, *Quiles v. Bradford-White Corp.*, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."); *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 283 (D. Vt. 2013) ("[I]t is improper to use an expert 'as a conduit for hearsay testimony. . . . It is equally improper to permit an expert to merely speculate as to a cause. . . . This poses the risk of confusing and misleading the jury as it lends the imprimatur of the expert's qualifications and a stamp of credibility to what is otherwise rank speculation.") (quoting *Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991) (emphasis omitted)).

Dr. Frankel attempted to fill his client's proof vacuum by opining that "Bard's refusal to sell stylets separately from its PICCs harmed AngioDynamics by preventing it from selling

PICCs to Bard TLS customers that otherwise would have preferred to use AngioDynamics PICCs for some or all of their bedside PICC placements." (SOF ¶ 100.) This non-economic opinion as to what PICCs hospitals in fact would have purchased but for Bard's TLS policy is devoid of factual support. Frankel did not even speak to any hospital to test his spin of the facts. (SOF ¶ 102.) He has no factual predicate for any opinion as to how hospitals make their PICC purchasing decisions, much less their preferences. *See generally* MIL.

### 4. Speculative hospital anecdotes are no substitute for a hospital witness and do not establish injury.

Dr. Frankel relied on a handful of "anecdotal examples" of hospitals that inquired whether Bard sold its stylet on a standalone basis. Moss Decl. Ex. 5 ¶ 42. AngioDynamics will undoubtedly try to rely on them as well. Bard identified many of these hospitals in its interrogatory responses merely as those with whom "the topic of whether [it] sells Stylets separately from its PICCs and/or whether [it] would do so" arose. (SOF ¶ 84.) The mere fact that a hospital might have asked whether Bard would sell stylets separately from its PICCs says nothing about whether the hospital in fact wanted to purchase, let alone would have purchased, BioFlo with a standalone Bard stylet rather than Bard's less expensive integrated option. At a minimum, such an inference would require corroborating evidence from the hospital. Dr. Frankel conceded that he did nothing to determine whether the people who made the inquiries were decision-makers or were acting on behalf of the decision-makers, "did not investigate who individually at those hospitals make[s] [purchasing] decisions," and "d[id not] know specifically for any hospital what actually drove the decisions of that hospital." Moss Decl. Ex. 18 (Transcript of Deposition of Dr. Alan S. Frankel) at 204:5-12. As a result, Dr. Frankel admitted, ***"I can't tell you any specific hospital that would, in fact, have made a different decision about its purchasing in any particular year for any particular reason."*** *Id*. at 206:6-15. A handful of

vague expressions of interest by non-decision-makers at hospitals does not amount to substantial evidence of actual injury. *See Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*, 2012 WL 3544771, at \*14 (E.D.N.Y. Aug. 16, 2012) (granting summary judgment on price discrimination claims under sections 4 and 16 of the Clayton Act and holding that "a trivial effect on a claimant's sales is insufficient to demonstrate antitrust injury"), *aff'd sub nom.*, *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015).

Given his lost-sales theory of injury, Dr. Frankel should have been looking for Bard customers who wanted to buy AngioDynamics' PICCs, but chose to purchase or continue purchasing Bard's PICCs **because** of its TLS policy. Mere inquiries divorced from evidence of what the hospital ultimately did or the reasons for the hospital's choice are not evidence of actual but-for injury. If a buyer did **not** choose to purchase Bard's PICCs, or purchased them for reasons that had nothing to do with the TLS policy, then AngioDynamics did not lose those sales to Bard "by reason of" the alleged antitrust violation as Section 4 of the Clayton Act requires. 15 U.S.C. § 15(a); *see Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning Contractors Ass'n, Inc. v. Local Union 38 of Sheet Metal Workers Int'l Ass'n*, 63 F. Supp. 2d 211, 213 (N.D.N.Y. 1999) ("[P]laintiffs have not demonstrated any injury to their business or property by reason of anything forbidden in the antitrust laws.").

Dr. Frankel did no investigation of any sort. He "thought about it and rejected the idea of trying to talk to hospitals to get information about this issue," and agreed that he "rejected the idea of speaking to even a single hospital," even those he identified as "anecdotal examples" in his report. (SOF ¶ 102.) As noted above, AngioDynamics chose not to depose any of those hospitals to elicit the actual decision-making facts. Dr. Frankel further testified that speaking to hospitals to obtain real-world evidence about whether or not they, in fact, would have bought

AngioDynamics PICCs but for the TLS policy was not "a fruitful line of inquiry" for his analysis. Moss Decl. Ex. 18 at 13:17-14:6. Dr. Frankel dismissed as not "necessary" the notion of conducting a survey of hospitals or hospital purchasing personnel about their actual PICC preferences after "consider[ing] the idea momentarily," even though survey evidence is regularly admitted in trials. *Id.* at 14:21-15:8. Ultimately, he was forced on cross-examination to concede that his analysis "assum[ed] a conclusion by the fact-finder that Bard coerced some hospitals to purchase its PICCs where -- when otherwise they would have purchased Angio[Dynamics]'s PICCs," *id.* at 142:19-143:1. In other words, ***he assumed the validity of the very opinion he claimed to be offering***.

The anecdotes Dr. Frankel cites in his report do not even support his speculation. For example, he testified at his deposition that the documents he reviewed "conveyed the impression to [him] that [Torrance Hospital's] preference would have been to marry what they consider to be the best TLS device, which is Bard's, with what they thought was the best PICC, which they thought was BioFlo." *Id.* at 171:3-8. Yet, as AngioDynamics' own documents show, Torrance did ***not*** place great stock in the antithrombotic properties that AngioDynamics claimed its BioFlo PICCs offered; achieved "a tremendous savings of over 15%" by switching to Bard PICCs; and was "***never open*** to paying any type of premium for [AngioDynamics' BioFlo PICCs]." (SOF ¶ 82.) Contrary to Dr. Frankel's "impression," the evidence shows that Torrance Hospital had no interest whatsoever in paying the required premium to pair BioFlo PICCs with Bard's or any other TLS, and Bard's TLS policy had nothing to do with that complete lack of interest.

Similarly, Dr. Frankel presented the University of Colorado Hospital as another user of Bard TLS devices that "[s]ought Bard [s]tylets to [u]se with AngioDynamics PICCs." Moss Decl. Ex. 5 ¶ 38. Not so. In fact, the University of Colorado ***purchased*** AngioDynamics PICCs

after inquiring about the availability of Bard's stylets on a standalone basis    the TLS policy did not prevent Colorado Hospital from purchasing whatever PICCs it wanted to purchase and did not prevent AngioDynamics from capturing those sales. (SOF ¶¶ 78-80.) Like any hospital that truly wanted to use BioFlo, the University of Colorado Hospital paired AngioDynamics PICCs with Teleflex's TLS. (SOF ¶¶ 65, 79.) Dozens and dozens of hospitals that want to use BioFlo do exactly that: combine it with the alternative TLS in the market. (SOF ¶¶ 65-67.) No hospital that wants to use BioFlo is prevented from doing so, much less doing so with a TLS, because Teleflex is always an available option. (*Id.*) University of Colorado Hospital ultimately switched back to Bard PICCs. (SOF ¶ 80.) It did so not because of any alleged coercion, but because the hospital's "clinical champion for BioFlo ha[d] been disappointed in the . . . results for the past few years" and could no longer justify paying a premium for AngioDynamics' BioFlo PICCs. *Id.*; Moss Decl. Ex. 18 at 218:4-226:12.

The facts as to Torrance and the University of Colorado Hospitals are undisputed. Dr. Frankel just did not bother to read all of the relevant documents before relying on mere inquiries by hospitals as evidence of but-for injury. Moss Decl. Ex. 18 at 176:9-178:2; 225:19-226:12. Neither they nor Dr. Frankel's other "anecdotal examples" support AngioDynamics' or Dr. Frankel's claims, if they are even admissible. They instead demonstrate the dangers of trying to litigate a case by proxy evidence offered by an economist as opposed to admissible evidence offered by percipient witnesses. If anything, they show that Bard's TLS policy did ***not*** prevent hospitals that wanted to purchase AngioDynamics PICCs from doing so, and did ***not*** cause AngioDynamics to lose sales. *Id.* at 221:22-223:17.[6] The same holds true for the even more

---

[6] Dr. Frankel's speculation about lost midline catheter sales    an injury that is derivative of his claim of lost PICC sales    fares no better. As stated above, there is no evidence of the predicate lost PICC sales, so the derivative lost midline sales cannot be connected with Bard's sales policy

speculative hospital inquiries and communications to which AngioDynamics likely will try to

point (even though they were too weak even for Dr. Frankel to rely on).

> **5.     Speculative comments in Bard emails and documents do not show injury either.**

Dr. Frankel also cites a potpourri of internal Bard emails and documents, most of which

do not even address the question whether any Bard PICC customers would switch to

AngioDynamics if Bard made standalone stylets available. Moss Decl. Ex. 5 ¶¶ 43-47.

AngioDynamics will surely try to do the same. But Frankel's (or AngioDynamics' counsel's)

self-described "supposition[s] and inference[s]" from those documents (Moss Decl. Ex. 18 at

262:2-22) cannot substitute for admissible evidence of injury-in-fact. *See* MIL at 7-13; *Virgin*

*Atlantic Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999), *aff'd*,

257 F.3d 256 (2d Cir. 2001) (summary judgment appropriate on Sherman Act Section 1 and 2

claims because "an expert's opinion is not a substitute for a plaintiff's obligation to provide

evidence of facts that support the applicability of the expert's opinion to the case"); *Ortho*

*Diagnostic Systems, Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996) ("In order

to defeat a properly supported motion for summary judgment, a party may not rest on economic

theories that may or may not apply to the facts of the case or on conclusory or incomplete expert

analyses any more than it may rest on unsubstantiated allegations of its pleadings."); *In re*

---

either. Moss Decl. Ex. 5 ¶ 26 ("Bard's PICC tying policy harmed AngioDynamics and, absent that policy, AngioDynamics would have sold . . . additional midline catheters."). No hospital is testifying to the alleged link between PICCs and midlines catheters advanced by Frankel, and Frankel conceded that his analysis on this topic comprised a "thought experiment" in which he simply assumed (1) that hospitals made joint purchasing decisions for both PICCs and midlines, and (2) that "all new midline purchases . . . that came within 90 days of new PICC sales were jointly made and would not have occurred but for the PICC sales." Moss Decl. Ex. 18 at 307:22-308:17. When asked whether and how he tested his sweeping and unsubstantiated "thought experiment" about hospital purchasing practices, Dr. Frankel reiterated his and AngioDynamics' policy of "not speak[ing] to hospitals in this case." *Id.*

*Optical Disk Drive Antitrust Litig.*, 2017 WL 6503743, at *9 (N.D. Cal. Dec. 18, 2017), *aff'd sub nom.*, *In re Optical Disk Drive Prod. Antitrust Litig.*, 785 F. App'x 406 (9th Cir. 2019) (denying motion to exclude expert's testimony on antitrust injury and damages, but granting summary judgment because expert "display[ed] in theory" how plaintiffs might have been injured but "d[id] not identify and c[ould not] substitute the necessary record evidence to support that it actually occurred in this case").[7]

 For instance, Dr. Frankel interpreted an email, quoting from another email that a former Bard salesperson sent in April 2015, as evidence of injury-in-fact. (SOF ¶ 101). The Bard salesperson who sent the email in question, Ben Juen, wrote that he "th[ought] [AngioDynamics'] strategy [wa]s to pressure the market to pressure [Bard] into launching [the standalone stylet], so it will open the door for them to go after special patient populations in our 3CG [TLS] accounts and pick off 5-10%, which is better than the 0% they are getting at 3CG accounts now." (*Id.*) This email is hardly evidence of injury-in-fact, putting aside that Dr. Frankel's non-economic interpretation of it is inadmissible. Juen was reporting on ***AngioDynamics'*** strategy, and appears to be speculating about what ***AngioDynamics***, not Bard, thought would happen if AngioDynamics pursued that strategy. Furthermore, the email does not define "special patient populations" or the basis for Juen's figures. Dr. Frankel himself admitted that he did not know "with specificity exactly what [Mr. Juen] was referring to" and was relying on "inferences" to interpret Mr. Juen's email. Moss Decl. Ex. 18 at 58:6-61:16. And

---

[7] *See also Brooke Grp.*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986)); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66-67 (2d Cir. 1997) ("The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment.");

AngioDynamics chose not to depose Mr. Juen to find out. Reading the tealeaves as to a competitor's strategy is inadequate to demonstrate an injury-in-fact. *See Chrysler Credit Corp.*, 670 F.2d at 581-82 ("The plaintiff must put forth substantial evidence" as to injury-in-fact).

\*     \*     \*

Mere speculation by AngioDynamics, or mere musings or inquiry from someone at a hospital, is not evidence of a lost sale resulting from Bard's TLS policy. Hospitals choose to purchase Bard['s] PICCs for a wide variety of reasons: price, advantages of preloading, breadth of product offerings, training, unique features, convenient kits, and product quality, among others. (SOF ¶ 17.) AngioDyanamics, therefore, needs actual evidence that, notwithstanding Bard's advantages, hospitals in fact would have paid a premium to combine the AngioDynamics PICCs with Bard TLS instead of buying Bard's integrated PICC. And the sole evidence of any hospital in fact going through that complicated decision-making process, Cleveland Clinic, refutes AngioDynamics' speculation as to injury.[8]

\*     \*     \*

AngioDynamics has not offered sufficient evidence of any lost sales, much less evidence tracing those losses to Bard's TLS policy. *See Hygrade*, 1996 WL 257581, at \*18 (holding that the plaintiffs did not raise a genuine issue as to antitrust injury where, *inter alia*, they "d[id] not name any significant accounts that they lost" and "offer[ed] no direct evidence of lost profits"); *see also Maddaloni Jewelers, Inc. v. Rolex Watch USA, Inc.*, 354 F. Supp. 2d 293, 308-10 (S.D.N.Y. 2004) (same); *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000) ("This opinion will not dwell on whether the 'fact' of antitrust injury has

---

[8] Dr. Frankel also relies on the general market observations that Bard has a high market share and some customers prefer AngioDynamics' PICCs. Moss Decl. Ex. 5 ¶¶ 28-34. As discussed in Bard's motion to exclude his testimony, those are insufficient to show injury-in-fact or causation. MIL at 12-13.

been proved, because [the plaintiff's] evidence of actual injury impermissibly consists of estimates based on assumptions that are based on estimates and assumptions.").

That failure of proof infects its claim for injunctive relief under Section 16 of the Clayton Act, in addition to its claim for damages under Section 4. Where, as here, the challenged conduct has been in place long enough for potential effects to manifest themselves and there is no evidence of injury, the difference between Clayton Act Section 4's requirement of actual injury and Section 16's requirement of threatened injury disappears. *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 2007 WL 4526618, at *13 (E.D.N.Y. Dec. 20, 2007) (gathering and analyzing cases). AngioDynamics "ha[s] offered no argument that future conditions will change in such a way as to make the injuries [it] claim[s] to have suffered more pronounced than currently alleged." *Cash & Henderson Drugs*, 799 F.3d at 215.

### B.   AngioDynamics Has Failed to Present Evidence Demonstrating that the TLS Policy Was a Material Cause of Any Lost Sales.

There is no question that many hospitals (in fact, most) choose to purchase Bard's integrated PICC rather than the Rube-Goldberg option of purchasing a separate TLS and loading the stylet into an AngioDynamics PICC at the patient's bedside. AngioDynamics' burden is to prove that Bard's TLS policy was a material or substantial cause of those hospitals' decisions.[9] AngioDynamics may not just assume that causal connection. *See Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*, 472 F. Supp. 2d 385, 431 (E.D.N.Y. 2007), *amended*, 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) (granting summary judgment on plaintiffs' antitrust claims and describing experts' "assum[ption] that the principal cause of the [alleged injury] was defendants' illegal conduct" as "patently improper") (emphasis omitted); *Intimate Bookshop, Inc. v. Barnes*

---

[9] *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970); *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017).

*& Noble, Inc.*, 2003 WL 22251312, at * 7 (S.D.N.Y. Sept. 30, 2003) (granting summary judgment on antitrust claims where plaintiffs' experts "were each asked to assume that the entirety of [the plaintiff's] loss is attributable to the defendants' allegedly unlawful conduct"). AngioDynamics staked its entire causation case on Dr. Frankel's deficient assumptions and suppositions, and failed to present the type of factual support that courts require at summary judgment in antitrust cases.

On the basis of the very same "supposition[s] and inference[s]" that comprise his injury-in-fact opinion, (Moss Decl. Ex. 18 at 262:2-22), Dr. Frankel "stitch[ed] together [a] . . . chain of reasoning that leads to damages and injury," (*id.* at 144:2-5). Rather than analyze the role of the TLS policy within the broader set of causal factors that could have caused AngioDynamics to lose sales, Dr. Frankel took a shortcut. He pointed to his ***damages*** analysis    so-called "benchmarks" that apply AngioDynamics' share of sales in different market segments to Bard's nursing PICC sales    as support for the conclusion that the TLS policy caused AngioDynamics to lose sales. *Id.* at 75:22-78:10; 144:2-14. In other words, Dr. Frankel constructed damages estimates on the assumption that AngioDynamics would have captured a certain portion of Bard's sales, and then invoked those estimates as the basis for his opinion that the TLS policy caused those losses.

Dr. Frankel made very clear at his deposition that he would not permit market facts to interfere with this circular "chain of reasoning" that he "stitch[ed] together" to try to supply AngioDynamics with the evidence it needs to show material causation. *Id.* at 144:2-5. He testified that he would come to the same conclusion    that the TLS policy was a key causal driver of AngioDynamics' allegedly lost sales    even if AngioDynamics had never marketed its touted BioFlo PICC. *Id.* at 83:12-18 ("In my view, even if there were no BioFlo PICCs ever

- 20 -

made by AngioDynamics, having access to the [Bard] stylets by their customer, having their customers have access or Angio[Dynamics] having access to the Bard stylets would enable [AngioDynamics] to sell more PICCs for use with the [Bard] 3CG or Sherlock II technology."). That is, Dr. Frankel's approach was so untethered to facts that he would have reached the same foreordained outcome on causation, regardless of the benefits or drawbacks of AngioDynamics PICCs. That AngioDynamics offered *any* PICCs for sale was apparently sufficient for Dr. Frankel to opine that the TLS policy caused AngioDynamics to lose sales.

At the very least, determining whether the TLS policy was a "material" or "substantial" cause of any lost sales required Dr. Frankel to perform *some* analysis of its impact relative to other causes.[10] After all, AngioDynamics' executives admitted that it lost PICC business because of price, contracts, quality issues, product recalls, competing technologies, incomplete product lines, customer relationships, and product backorders. (SOF ¶ 38.) Dr. Frankel did not take into account any factors that affect hospital purchasing decisions, including:

1. The lack of FDA approval for use of Bard's standalone stylet with other companies' *valved* PICCs. (SOF ¶ 71.) Valved PICCs constituted ██████ of Bard's TLS-enabled PICC sales and ██████ of AngioDynamics PICC sales. (SOF ¶¶ 73-74.) Dr. Frankel assumed that hospitals using Bard's preloaded valved PICCs would nevertheless switch to AngioDynamics' valved PICCs. But one cannot just assume that hospitals would have engaged in off-label use of the standalone stylet with AngioDynamics' valved PICCs, especially since no hospital testified that it would, and AngioDynamics' General Manager of Vascular Access testified that he would not

---

[10] Dr. Frankel conceded at his deposition that he did not perform any analysis of (1) customer switching between AngioDynamics and Bard PICCs or (2) the extent to which customers were "locked in" to a certain PICC provider    critical questions for an expert opining on the causes underpinning PICC purchasing decisions. Moss Decl. Ex. 18 at 151:15-152:9.

recommend such off-label use. (SOF ¶ 72.)

2. Hospital preference for specific Bard PICCs that AngioDynamics did not manufacture, such as Bard's FT or small diameter PICCs. Moss Decl. Ex. 18 at 140:2-142:5; (SOF ¶¶ 17, 38.). Absent any supporting evidence, one cannot just assume that hospitals using unique Bard PICC products would forgo them in order to combine the Bard standalone stylet with AngioDynamics' different PICCs.

3. Pricing, and the willingness of hospitals to pay a premium for the BioFlo PICC. Moss Decl. Ex. 18 at 28:10-17; *see also* (SOF ¶ 39 (Maria Kertesz testifying that Bard's preloaded PICCs were less costly than the AngioDynamics/Bard combination).). No hospital testified that it would pay the acknowledged premium in order to switch from Bard's preloaded PICCs to bedside loading of Bard's stylets with AngioDynamics' PICCs. One cannot just assume that hospitals would do so but for Bard's TLS policy.

4. AngioDynamics' ongoing inability to prove the superiority of BioFlo through peer-reviewed clinical trials. (SOF ¶ 38 ("Since BioFlo has been on the market one could argue we haven't had data to prove superiority - enough information for consumers to make the 'right' catheter choice - because of our inadequacy in proving superiority consumers had no other choice.").) AngioDynamics' assertion that its product reduces thrombosis   even though it lacks FDA approval to make any such claim, (SOF ¶ 36), is not a basis for assuming that ▮ of Bard's customers would have agreed.

5. Actual customer preference evidence as to product reputation (including AngioDynamics' recalls, *see* (SOF ¶¶ 17, 38, 46), Bard's superior training and clinical support (*e.g.*, (SOF ¶ 17)), Bard's wider breadth of product line (*e.g.*, SOF ¶¶ 17, 38), and the effect on purchasing decisions of GPO and integrated delivery network ("IDN") contracts (*e.g.*, SOF

¶ 17)).

One needs at least *some* factual predicate for disregarding these factors and assuming away all conflating causes for customers' decisions to purchase Bard's PICCs instead of AngioDynamics'. By design, Dr. Frankel never even grappled with that decision.

Unsurprisingly, courts reject the type of unprincipled approach to antitrust causation that AngioDynamics and Dr. Frankel adopted here. Judge Friendly's opinion in *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 909 (2d Cir. 1962), explains why. There, Schwabe, the plaintiff manufacturer and distributor of industrial "clicking" machines, alleged that defendant United Shoe monopolized the market for clicking machines used in shoe manufacturing. *Id.* at 910-911. Schwabe's theory of causation and injury, like AngioDynamics', was that United "unlawfully deprived it of business it might otherwise have secured." *Id.* at 910. The plaintiff's economist, like Dr. Frankel, offered a "benchmark" or "yardstick" in support of that theory. *Id.* at 911. He calculated Schwabe's share of the market for clicking machines *not* used for making shoes, and then applied that share to United's sales of 24 different types of clicking machines used in manufacturing shoes. *Id.*

The Court of Appeals affirmed the entry of judgment as a matter of law and the exclusion of the expert's testimony. *Id.* The expert did not establish any basis for his assumption that but for United's exclusionary conduct, Schwabe would have matched its non-shoe share of sales in the monopolized shoe segment of the market. *Id.* at 911. There was no evidence that "but for United's unlawful efforts in the [shoe market], Schwabe would have made the same efforts, or would have had the same ability, to penetrate the shoe market that it had in the non-shoe market." *Id.* The court reasoned that the "lack of evidence was the more serious because" of United's undisputed and lawful advantages in the shoe segment   including superior quality and

lower-cost shoe equipment—and the fact that Schwabe never even competed as to all 24 types of machines for which it was claiming lost sales. *Id.* Judge Friendly explained that "the leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take," and invoked "[m]any decisions [that] rejected evidence of injury and damages comparable in weight with that submitted." *Id.* at 912. *Accord, St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 863 (8th Cir. 1998) (holding that expert economist's testimony was "insufficient to create a jury question on the issue of causation" where he "rested his conclusions on economic theory . . . . [w]ithout evidence tending to show that [the] economic model actually applied" to the market in question).

Like the expert in *Schwabe*, Dr. Frankel's causation opinion rests on the assumption that AngioDynamics would have achieved the same success with Bard's customers that it did in other market segments. And like the expert in *Schwabe*, Dr. Frankel performed no analysis to test that assumption, even in the face of ample record evidence calling his theory into doubt. *See infra* at pp. 25-26. Similarly, Dr. Frankel ignored or was instructed by AngioDynamics to ignore facts undercutting his contention that the TLS policy caused *any* lost sales. Just as Schwabe's expert never demonstrated that it "competed, or . . . but for United's unlawful acts . . . would have competed" to sell each of the 24 types of United clicking machines for which Schwabe was claiming injury, Dr. Frankel never demonstrated that AngioDynamics sold (or but for the TLS policy would have sold) each type of Bard PICC for which it claims an injury. *See Schwabe*, 297 F.2d at 911. Dr. Frankel admitted as much at his deposition. He agreed that there are Bard customers who require a type of PICC that AngioDynamics simply does not make (called an FT PICC), that AngioDynamics—regardless of the TLS policy—would not "get [those sales] because of that reason," and that he had done nothing to weed out that population of PICC

products from his lost sales estimates. Moss Decl. Ex. 18 at 140:2-142:5; *see Bowen v. New York News, Inc.*, 522 F.2d 1242, 1255 (2d Cir. 1975) (affirming entry of judgment for failure to show antitrust injury where "no loss suffered by the plaintiffs could be attributed to" the allegedly unlawful conduct).

Finally, Dr. Frankel's disregard of regulatory barriers to alleged lost sales is even more egregious than the deficient analysis that Judge Friendly rejected in *Schwabe*. It is "beyond fair dispute" that a "regulatory or legislative bar can break the chain of causation in an antitrust case." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017); *see In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 206 (E.D.N.Y. 2003) (same). Here, Bard sought and received permission from the Food and Drug Administration to use its stylets on a standalone basis with *non-valved*, polyurethane PICCs with a certain inner lumen diameter. (SOF ¶ 71.) Bard did *not* obtain approval from the FDA to offer its stylets on a standalone basis with *valved* PICCs. (*Id.*) Of AngioDynamics' sales from May 2013 through 2018   the relevant damages period   ███████ were valved PICCs. (SOF ¶ 73.) During that same time period, █████ of Bard's sales were of valved PICCs. (*Id.*) The absence of FDA approval to use Bard's TLS with valved AngioDynamics PICCs would have precluded AngioDynamics from making sales of valved PICCs to Bard's TLS customers, regardless of the impact of TLS policy. Even AngioDynamics' own witness so testified. (SOF ¶ 72.) No hospital suggested it would engage in such off-label use.

Dr. Frankel testified that he did *not* take this into account. Moss Decl. Ex. 18 at 123:4-8. Instead, Dr. Frankel assumed   on AngioDynamics' lawyers' instruction   that the absence of FDA approval would not have been an impediment to the shift of Bard valved-PICC customers to AngioDynamics PICCs. *Id.* at 123:8-13; 124:7-10. He speculated that AngioDynamics could

have applied for FDA approval on Bard's behalf, or that hospitals would have used Bard stylets "off-label" and without FDA approval, but made clear that he was "assuming for purposes of [his] work that . . . there would be no impediment, regulatory impediment or the like." *Id.* at 122:8-124:15.[11] AngioDynamics and Dr. Frankel offer no answer as to (1) when AngioDynamics would have applied for FDA approval, (2) when the FDA would have rendered a decision, and (3) whether the FDA would have approved the use of Bard's standalone stylet with valved PICCs. Instead, AngioDynamics proposes to allow the jury to speculate as to those questions, each of which is integral to its theory of causation   that nothing cut the causal chain between the TLS policy and AngioDynamics' allegedly lost sales throughout the entire period for which it claims injury and damages. *See City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 267-68 (3d Cir. 1998) ("The presence of the regulatory scheme and need for approval in connection with th[at scheme] . . . cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise."); *In re Ciprofloxacin*, 261 F. Supp. 2d at 206 (holding that because "neither [defendant] had the legal capacity to market" the relevant product, and because "any inference that [they] would seek FDA approval . . . is mere conjecture and unsupported by any facts," the plaintiff could not show any causal injury stemming from their failure to enter the relevant market).

### C.   The Antitrust Laws Do Not Provide a Vehicle for AngioDynamics to Shift Its Competitive Losses to Bard.

Even if it could draw a causal connection between the TLS policy and any lost sales,

---

[11] Of course, although it was free to do so, AngioDynamics never sought FDA approval to use Bard's stylet with valved PICCs. *See In re Ciprofloxacin*, 261 F. Supp. 2d at 206 (holding post-hoc argument that defendants would have sought FDA approval "mere conjecture and unsupported by any facts"); *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 2020 WL 901967, at *3-5 (D.N.J. Feb. 25, 2020) (finding that plaintiff's failure to seek FDA approval to market a generic drug rendered any argument as to subsequent market exclusion and antitrust injury fatally speculative).

AngioDynamics cannot carry its burden to demonstrate an injury "stem[ming] from a
**competition-reducing** aspect or effect of [Bard's] behavior." *See Atl. Richfield Co. v. USA
Petroleum Co.*, 495 U.S. 328, 344 (1990). Firms routinely adopt practices that interfere with their
competitors' ability to make sales: bundled discounts, exclusive deals, and most-favored nation
provisions, for example. A plaintiff suffers antitrust injury only when its individualized harm
from one of those practices derives from a concomitant injury to competition. *See Spectrum
Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("The purpose of the [Sherman] Act is not to
protect businesses from the working of the market; it is to protect the public from the failure of
the market. The law directs itself not against conduct which is competitive, even severely so, but
against conduct which unfairly tends to destroy competition itself."). It is for that reason that
"[i]nterference with customer choice is not itself the concern of tying law; rather, the relevant
interference is the one that results from an **anticompetitive effect in the tied market**." Phillip E.
Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their
Application* § 1726c (2020 Supp.).[12]

The Tenth Circuit recently applied that very principle to affirm the grant of summary
judgment in a tying case on antitrust injury grounds. *Suture Express, Inc. v. Owens & Minor
Distribution, Inc.*, 851 F.3d 1029, 1044 (10th Cir. 2017). Suture Express, the plaintiff in that
case, alleged that the defendant medical equipment distributors unlawfully tied sales of a broad
category of medical-and-surgical supplies to a specific category of supplies: sutures and
endomechanical equipment ("suture-endo," for short). *Id.* at 1033-36. Suture Express only

---

[12] Not only is the requirement to show anticompetitive effects a key feature of antitrust injury
analysis, it is also a substantive element of AngioDynamics' tying claim. *Kaufman v. Time
Warner*, 836 F.3d 137, 141 (2d Cir. 2016) ("To state a valid tying claim under the Sherman Act,
a plaintiff must allege facts plausibly showing that: . . . the tie-in has anticompetitive effects in
the tied market . . . .").

manufactured a single category of products—suture-endo—but like AngioDynamics, competed against firms offering a much broader product lineup. *Id.* In support of Suture Express' claim to antitrust injury, its expert actually performed an analysis of the prices that consumers in that market, hospitals, paid for suture-endo equipment. *Id.* at 1044. He found that the defendants' bundling arrangements caused hospitals to overpay for suture-endo by $36 million. *Id.*

The court took issue with that showing for two key reasons. First, it held that "comparing average price and mark-ups between the three competitors," as the expert had done, "fail[ed] to show that competition itself was harmed across the market." *Id.* at 1045. Second, it held that the expert's analysis could not be reconciled with "the real-world market that actually existed," in which profit margins were plunging, revenues were growing, and buyers were consolidating and exercising significant purchasing power. *Id.* at 1045. The court held that the "evidence . . . reveals a med-surg market that is becoming more, not less, competitive. There is simply not enough probative evidence for a jury to find that [the defendants'] bundling practices constitute an injury of the kind the antitrust laws are intended to prevent." *Id.* at 1045.

In contrast to Suture Express, AngioDynamics never even attempted to demonstrate that Bard's TLS policy damaged competition for PICC sales. Its liability expert, George Hay, admitted that he did not perform any analysis of whether Bard's PICC pricing was supracompetitive or its output too low, and agreed that his work on harm to competition reduced to the assertion that consumers could not pair Bard's TLS with AngioDynamics' PICCs. Moss Decl. Ex. 61 (Transcript of Deposition of Dr. George A. Hay) at 357:1-360:7; *see Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 547 (2d Cir 1993) ("[Plaintiff's] position is simply that it has been harmed as an individual competitor. It has not shown that defendants' activities have had any adverse impact on price, quality, or output of

medical services offered to consumers in the relevant market."); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 442-43 (2d Cir. 2005) (holding that plaintiffs failed to demonstrate antitrust injury where their "economic expert conceded that he had performed no analysis of the consumer effect of defendants' purportedly anticompetitive conduct.").

That AngioDynamics could not adduce proof of anticompetitive effects in the allegedly tied PICC market is neither surprising nor excusable. Bard's PICCs are less expensive than AngioDynamics' on average, (SOF ¶¶ 39-42, 77), its product lineup is broader, (SOF ¶ 38), it has never had an entire line of PICCs recalled (unlike AngioDynamics), (SOF ¶¶ 23, 38, 45-47), and the crux of AngioDynamics' grievance is that Bard produces and sells too many PICCs. As in *Suture Express*, AngioDynamics' "formulation as presented raises questions about the 'but-for world' it models compared to the real-world market that actually existed    and whether it was really competition that was harmed instead of simply one competitor." *See Suture Express*, 851 F.3d at 1045. Because the Sherman Act does not require Bard "to moderate [these] competitive advantages" and allow its competitors "to exploit [its] commercial success" to market their own less popular products, AngioDynamics cannot carry its burden to establish an injury of the kind the antitrust laws are intended to prevent. *See Union Cosmetic Castle, Inc., v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 73 (E.D.N.Y. 2006).

## II.    AngioDynamics Offers No Basis on Which a Jury Could Make a Reasonable and Non-Speculative Damages Estimate.

Because of the overlap in Dr. Frankel's damages and causation opinions, AngioDynamics' damages proof fails for the same reasons set forth above. Among other things, Dr. Frankel's failure to disentangle lost sales attributable to independent causes    including lack of FDA approval for use of Bard's standalone stylet with **valved** PICCs; hospital preference for specific Bard PICCs that AngioDynamics did not manufacture, such as the Bard FT PICC; and

hospital unwillingness to pay a premium for the BioFlo PICC, particularly absent clinical proof of BioFlo's superiority renders his damages approach fatally flawed. *See U.S. Football League*, 842 F.2d at 1379 (a paradigmatic case of "a plaintiff improperly attribut[ing] all losses to a defendant's [allegedly] illegal acts, despite the presence of significant other factors.") (quoting *MCI Communications Corp. v. A T & T Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983)).[13] Furthermore Dr. Frankel used improper benchmarking methodology, including defective benchmarks, that would lead the jury into guesswork and are inadmissible. We address these defects in detail in the accompanying motion to bar Dr. Frankel's testimony, to which we refer the Court. Since AngioDynamics offers no evidence of any damages other than through Dr. Frankel, the exclusion of his testimony means that AngioDynamics cannot create a triable issue as to damages.

## CONCLUSION

For the foregoing reasons, summary judgment dismissing all claims in the Complaint should be granted.

---

[13] *Accord*, *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) ("In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.").

Dated: July 24, 2020
New York, NY

/s/ *Edward N. Moss*

Andrew Frackman
Edward N. Moss
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Tel: 212-728-2000
Fax: 212-326-2017
afrackman@omm.com
emoss@omm.com

James P. Nonkes
Philip G. Spellane
HARRIS BEACH PLLC
99 Garnsey Road
Pittsford, N.Y.  14534
Tel: (585) 419-8611
Fax: (585) 419-8811

*Attorneys for Defendants C. R. Bard, Inc.
and Bard Access Systems, Inc.*