**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ANGIODYNAMICS, INC.,

                                        Plaintiff,                    1:17-cv-598 (BKS/CFH)

v.

C.R. BARD, INC. and BARD ACCESS SYSTEMS, INC.,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Philip J. Iovieno
Helen M. Maher
Amanda L. Devereux
Kristen J. McAhren
Mark A. Singer
Justin Arborn
Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281

*For Defendants:*
Andrew J. Frackman
Mark Racanelli
Pamela A. Miller
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Sergei Zaslavsky
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Robert A. Atkins
Jacqueline P. Rubin
William B. Michael
Daniel A. Crane
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas

New York, NY 10019

James P. Nonkes
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff AngioDynamics, Inc. brings this antitrust action against Defendants C.R. Bard,

Inc. and Bard Access Systems, Inc. (collectively, "Bard"), asserting a claim of illegal tying in

violation of Section 1 of the Sherman Act (codified at 15 U.S.C. § 1) under "per se" and "rule of

reason" theories of liability. (Dkt. No. 1); *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F.

Supp. 3d 273 (N.D.N.Y. 2021) (summary judgment decision). The case is set for trial to begin on

September 19, 2022. Presently before the Court are the parties' motions in limine (Dkt. Nos. 255,

260, 262–68, 270–74, 277, 279, 280) and motions to seal (Dkt. Nos. 281, 282, 305, 308, 318,

324). The Court heard oral argument on the motions at the final pretrial conference on July 6,

2022. For the following reasons, the parties' motions are granted in part and denied in part.

## II.     STANDARD OF REVIEW FOR EXPERT TESTIMONY

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a

"gatekeeping" obligation with respect to expert testimony: the trial judge must ensure "that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if: (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or

data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). While courts liberally construe the expert qualifications requirement, an expert is "reasonably confined to his subject of expertise." *Bunt v. Altec Indus., Inc.*, 962 F. Supp. 313, 317 (N.D.N.Y. 1997) (citation omitted).

"Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Restivo v. Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017) (internal quotation marks and citation omitted). The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). When applying the gatekeeping obligation to non-scientific testimony, a district court may choose to utilize some or all of the above *Daubert* factors, or it may look to other indicia of reliability. *Id.*

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* In other

words, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Frequently, though, 'gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the weight of the evidence, not to its admissibility.'" *Restivo*, 846 F.3d at 577 (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).

Ultimately, a district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire, Ltd.*, 526 U.S. at 142 (citing *Gen Elec. Co.*, 522 U.S. at 143). Moreover, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. With this framework in mind, the Court addresses the parties' arguments for exclusion of certain expert opinions.

## III.   ANGIODYNAMICS'S MOTIONS IN LIMINE

### A.   Sandra C. Sucy

Sandra C. Sucy, R.N., M.S.N., VA-BC, is a registered nurse who has more than 25 years of experience in placing peripherally inserted central catheters ("PICCs") in a clinical setting and who has worked for Bard full-time since 2008. (Dkt. No. 136-3, ¶¶ 1, 8; *see generally* Dkt. No. 136-3 (Sucy expert report)). Ms. Sucy opines in her expert report dated February 14, 2020 that pairing Bard's Tip Location System ("TLS") stylets with AngioDynamics's BioFlo PICCs would be "sub-optimal" because such an approach (1) "creates a risk of breaking sterility," (2) "creates a risk of damaging the Bard TLS stylet," and (3) "compromises the Bard Clinical Specialist's ability to provide guidance to the clinician placing the PICC." (*Id.* ¶ 55). At her deposition on April 21, 2022, Ms. Sucy testified that the risk of damaging a stylet would be "even greater if the clinician were attempting to load a Bard TLS Stylet into a valved PICC." (Dkt. No. 255-3, at 8).

She explained that a valve is a "danger to the stylet" because it is a hard surface, enclosed in the lumen, that the clinician cannot see. (*Id.* ("I'm just going in there blindly pecking at it.")). When questioned about whether this was based on her personal experience, Ms. Sucy stated that two days prior to her deposition she attempted to pair a Bard TLS stylet with a valved BioFlo PICC, her first such attempt. (*Id.* at 8–9; *see id.* at 9 (testifying that she had placed a stylet into a valved *Bard* PICC at the time she wrote her report)). AngioDynamics moves to preclude Ms. Sucy from testifying about her attempt to pair a Bard TLS stylet and a BioFlo PICC and about non-Bard products more generally. (Dkt. No. 255-1). Bard generally responds that Ms. Sucy is qualified to opine on the risks of loading a Bard TLS stylet bedside into any PICC and that none of her opinions depends on which company manufactures the PICC. (Dkt. No. 292, at 5–8).[1]

### 1.   Pairing Attempt

AngioDynamics first argues that Federal Rule of Civil Procedure 37(c)(1) precludes Ms. Sucy from testifying regarding her attempt to insert a Bard TLS stylet into a valved non-Bard PICC because that topic was not included in her February 14, 2020 expert report as required by Rule 26(a)(2)(B) and the failure to include it was not substantially justified or harmless. (Dkt. No. 255-1, at 11–14). Bard responds that the disclosure standard applicable to Ms. Sucy is the lower standard found in Rule 26(a)(2)(C), and that her report therefore is not deficient. (Dkt. No. 292, at 8–9 & n.17).

Federal Rule of Civil Procedure 26(a)(2)(B) governs disclosure of an expert witness "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P.

---

[1] Unlike Bard, the Court does not read AngioDynamics's motion as seeking to limit Ms. Sucy's testimony "to the narrow subject matter of the 'use of Bard's Sherlock 3CG stylets pre-loaded with Bard's PICCs.'" (Dkt. No. 292, at 4 (quoting Dkt. No. 255-1, at 9)).

26(a)(2)(B). A party's disclosure of such witnesses must be accompanied by a written expert

report which contains, among other things, "(i) a complete statement of all opinions the witness

will express and the basis and reasons for them; [and] (ii) the facts or data considered by the

witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). However, if the witness is "not

required to provide a written report," the party's disclosure must state "(i) the subject matter on

which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or

705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii); *see also King v. Wang*, No. 14-cv-7694, 2021 WL 5232454, at

*17–18, 2021 U.S. Dist. LEXIS 218243, at *51–54 (S.D.N.Y. Nov. 9, 2021) (discussing the

distinction between expert witnesses who are "retained or specially employed to provide expert

testimony in the case or . . . whose duties as the party's employee regularly involve giving expert

testimony" and those who are not). Here, Bard argues, and the Court agrees, that its disclosure

regarding Ms. Sucy was governed by the standard set forth in Rule 26(a)(2)(C). *See Bank of

China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 n.13 (2d Cir. 2004) ("Because Huang was

not specially retained to provide expert testimony, and his duties as an employee of Bank of

China do not regularly include giving expert testimony, Rule 26(a)(2)(B) does not apply."). Ms.

Sucy was not "specially employed" to provide expert testimony in this case; she has been

employed by Bard full-time since 2008, and there is no indication that her duties as a Bard

employee "regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B); (*see* Dkt. No.

136-3, at 31–34 (Sucy curriculum vitae indicating no prior expert work)).

Bard argues that Ms. Sucy's report is not deficient under Rule 26(a)(2)(C) because her

report "reflects the basis for her concerns about bedside loading of a stylet," and she testified that

her attempt to insert a Bard TLS stylet into a valved BioFlo PICC had no bearing on any of her

opinions. (Dkt. No. 292, at 8–9).[2] The Court agrees. Accordingly, the Court concludes that Bard

complied with its disclosure requirements with respect to Ms. Sucy under Rule 26(a)(2)(C) and

that Rule 37(c)(1) therefore does not preclude Ms. Sucy's testimony regarding her attempt to pair

a Bard TLS stylet with a valved BioFlo PICC.

### 2. Non-Bard Products

AngioDynamics argues that Ms. Sucy should be precluded from testifying more generally

about non-Bard products under Federal Rules of Evidence 702, 602 and 701, and 403. (Dkt. No.

255-1, at 14–19).

AngioDynamics argues that Federal Rule of Evidence 702 precludes Ms. Sucy's

testimony regarding non-Bard products because Ms. Sucy admits that "she has no personal

knowledge or experience with non-Bard PICCs or non-Bard TLS stylets" and therefore any such

testimony would be "unreliable and speculative." (Dkt. No. 255-1, at 15–16). Ms. Sucy's report

does not describe any personal experience with non-Bard products or cite any studies or data

about non-Bard products. (*See generally* Dkt. No. 136-3). Ms. Sucy states that she is "completely

unfamiliar with [certain] considerations in the insertion of other manufacturer[s'] PICCs" and

"would not be familiar with or adept at using the components" of a non-Bard PICC kit. (*Id.*

¶¶ 65–66). At her deposition, Ms. Sucy confirmed that, apart from one citation to an article

regarding central line associated blood stream infections, her report is based on her personal

experience. (Dkt. No. 255-3, at 4). Ms. Sucy stated that she is not familiar with non-Bard

products. (*See, e.g.*, *id.* at 6 ("I'm here to give my expert opinion on my experience and my

experience with the Bard PICC and stylet, not to investigate or give my opinion of other

---

[2] Ms. Sucy testified at her deposition that she does not intend to "offer an expert conclusion based on [her] experience . . . of trying to load a Bard TLS Stylet into a Bioflow PICC" and that her "opinion was already formed." (Dkt. No. 255-3, at 9).

companies that I have not worked with."), 8 ("I have no knowledge of the Teleflex Stylet."), 11

(disclaiming any observation of the loading of a Bard 3CG stylet into a BioFlo PICC at the

Cleveland Clinic), 13 ("I don't know a thing about the Bioflo[] PICC.")). Accordingly, the Court

concludes that testimony offered by Ms. Sucy about non-Bard products would not be based on

"sufficient facts or data" and is therefore inadmissible under Federal Rule of Evidence 702 and

for lack of personal knowledge under Rule 601.

However, the Court agrees with Bard that Ms. Sucy's lack of experience with non-Bard

products does not render the opinions contained in her report about the risks of pairing a Bard

TLS stylet with a PICC at the bedside inadmissible. Ms. Sucy's experience as a clinical nurse

who has implanted many PICCs and educated other nurses on PICC insertion provides a reliable

basis for her to testify about general best practices for and risks associated with bedside PICC

insertion. AngioDynamics may cross-examine Ms. Sucy and object to specific statements for

lack of personal knowledge. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence.").

Accordingly, the Court grants in part and denies in part AngioDynamics's motion to

preclude certain testimony of Ms. Sucy as set forth above.

### B.      Dr. David W. Feigal, Jr.

David W. Feigal, Jr., M.D. is a board-certified physician in internal medicine who

formerly worked for the United States Food and Drug Administration ("FDA"), including as

Director of the FDA's Center for Devices and Radiological Health. (Dkt. No. 260-4, at 5–8). Dr.

Feigal was retained by counsel for Bard to respond to AngioDynamics's FDA expert "and to

review FDA Submissions and correspondence relating to both the Bard Sherlock Standalone

Stylet . . . and AngioDynamics' BioFlo PICC." (*Id.* at 9; *see generally* Dkt. No. 260-4 (Feigal

expert report)). AngioDynamics moves to preclude Dr. Feigal from testifying about the "narrative" in his report about Bard's sale of the 3CG stylet to the Cleveland Clinic and his conclusion that "Bard's decision not to sell its 3CG stylet to any hospital other than Cleveland Clinic was based on 'sound business decisions.'" (Dkt. No. 260-1, at 5).

Dr. Feigal opines in his report that Bard "is not required to sell the Bard Stylet just because it received FDA 510(k) clearance to do so" and that, even after receiving 510(k) clearance, Bard is "required to monitor the safety of the Bard Stylet, and should not market the Bard Stylet if it determines that there are unacceptable risks compared to the benefits for the intended use." (Dkt. No. 260-4, at 9).[3] Later in his report, Dr. Feigal states that the record shows the "Bard Stylet presented several possible safety risks," including the risks of breakage, nurses of various skill levels loading the stylet, and compromising the sterile field, and that "Bard, therefore, had sound business reasons for not selling it." (*Id.* at 31). With regard to the sale of the TLS stylet to the Cleveland Clinic, Dr. Feigal cites the deposition testimony of Head PICC Nurse Maria Kertesz, who stated that the stylet would "flip over when it came out" of the packaging and "could fall on the non-sterile portion of the sterile field." (*Id.* at 32). Dr. Feigal concludes that, "[i]n light of the considerations above, it would have been irresponsible for Bard to continue the sale of the Bard stylet for bedside loading deployment." (*Id.*). Dr. Feigal further states that the potential for off-label use of the stylet "further supports Bard's business decision to not sell the Bard Stylet broadly to any hospital in the country" and that Bard's "conduct was, and is, what [he] would expect from a reputable and responsible company." (*Id.* at 33–34).

AngioDynamics seeks to preclude Dr. Feigal's "Cleveland Clinic narrative" on the grounds that it is unreliable and contradicted by other undisputed evidence in the record. (Dkt.

---

[3] AngioDynamics does not challenge these opinions.

No. 260-1, at 17–19). AngioDynamics also argues that Dr. Feigal's narrative is unnecessary to his opinions and inadmissible under Federal Rule of Evidence 403. (*Id.* at 20–21). Bard responds that Dr. Feigal may properly rely on facts and state them in his report and that his testimony as to "whether Bard had reason to be concerned about reported safety issues with its product" and "ultimately the reasonableness of not releasing the product to the full market" are "well within" his expertise on post-market surveillance obligations for medical devices. (Dkt. No. 293, at 5–7).

The Court concludes that Dr. Feigal is qualified to and may reliably opine on post-market obligations and the considerations a reasonable medical device manufacturer would take into account in meeting those obligations. Dr. Feigal may also opine that certain risks, if present, would be a sufficient reason to stop selling a product. Given that AngioDynamics argues that Bard could not reasonably have had safety concerns "about a product for which it received 510(k) clearance," (*see* Dkt. No. 293, at 6), such testimony is plainly relevant and not substantially outweighed by a danger of confusing the issues or misleading the jury, Fed. R. Evid. 403.

However, Dr. Feigal may not opine or speculate as to the actual reason or motivation behind Bard's decision not to market the stylet to the full market.[4] Expert opinions "on the intent, motives, or states of mind of corporations" have "no basis in any relevant body of knowledge or expertise." *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 442 (E.D.N.Y. 2011) (citation omitted). Such expert opinions also improperly invade the province of the jury, which is capable of deciding matters such as a company's intent and motivations without the help of an expert. *See Ocasio v. C.R. Bard, Inc.*, No. 13-cv-1962, 2015 WL 2062611, at *4, 2015

---

[4] Bard represents that "Dr. Feigal does not purport to resolve the question of whether safety concerns were Bard's only or even primary motivation for deciding not to launch the standalone stylet to the full market." (Dkt. No. 293, at 6).

U.S. Dist. LEXIS 58163, at *11 (M.D. Fla. May 4, 2015) (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)). Thus, Dr. Feigal may not opine that Bard made a "sound business decision" not to sell its stylet separately or that Bard "felt the risks of [such a sale] outweighed the benefits of providing it in a preloaded form." (Dkt. No. 260-1, at 8, 17 (quoting Dkt. No. 260-5, at 8–9 (Dr. Feigal deposition testimony))).

Accordingly, the Court grants in part and denies in part AngioDynamics's motion to preclude certain testimony of Dr. Feigal as set forth above.

### C.    Professor Fiona Scott Morton

Fiona M. Scott Morton, Ph.D. is a Professor of Economics at Yale University School of Management who was asked to "consider the economic implications of AngioDynamics's allegation" that Bard's tying policy "thwart[s] competition in the market for PICCs and violat[es] the antitrust laws of the United States." (Dkt. No. 138-25, at 4–5; *see generally* Dkt. No. 138-25 (Scott Morton expert report)). Dr. Scott Morton opines, among other things, that (1) the "most appropriate relevant antitrust market for considering Bard's actions is the US market for differentiated PICCs," (2) "[t]here is limited demand from hospitals for a separate Bard 3CG stylet," and (3) "[g]iven the limited demand for a separate 3CG stylet, and given the various costs Bard faces if it provides a separate 3CG stylet, it makes economic sense and is efficient for Bard to refuse to offer its 3CG stylet separately." (*Id.* at 5–6). AngioDynamics moves to preclude Dr. Scott Morton's opinion that "it is unlikely that hospitals would be willing to buy enough separate 3CG stylets as a standalone product at a price that would cover Bard's costs to offer a separate 3CG stylet" (the "Price/Cost Conclusion"). (*See generally* Dkt. No. 263-1 (citing Dkt. No. 138-25, at 24)).

In her report, Dr. Scott Morton provides examples of the "additional increased costs" Bard would incur "if it sold the stylet separately to other hospitals," including the costs to create

sales material, train its staff, train its customers, "certify the product's safety," and "insure against liability and the loss of reputation due to potential misuse or failure of the stylet." (Dkt. No. 138-25, at 28, 31–32; *see also id.* at 9–10 (identifying as additional costs and risks the additional time it takes to load a separate stylet into a PICC at the bedside, the risk of a stylet "flipping" and coming into contact with a non-sterile surface, the risk of infection, and the risk of breakage)). She opines that Bard would also incur an opportunity cost and potential freeloading by rivals if it were to sell its 3CG stylet separately. (*Id.* at 32–33).

AngioDynamics argues that Dr. Scott Morton's Price/Cost Conclusion is unreliable and speculative because Dr. Scott Morton does not analyze or quantify the prices hospitals would likely pay for a standalone Bard TLS stylet or the costs that Bard would incur if it were to sell the stylet separately. (Dkt. No. 263-1, at 11–14). AngioDynamics asserts that information was available which Dr. Scott Morton could have used to analyze likely prices and to quantify "tangible monetary costs," such as training, and that "economic and accounting techniques do exist for purposes of quantifying a company's risk of liability attributable to a product." (*Id.* at 12–13). Bard responds that Dr. Scott Morton properly rested her opinion both on economic principles and on her conclusion that the evidence in this case is consistent with what those principles suggest, and that Dr. Scott Morton was not required to "calculate and quantify" prices and costs. (Dkt. No. 298, at 9–10, 14–18).[5]

The Court agrees with Bard that Dr. Scott Morton's Price/Cost Conclusion is sufficiently reliable under *Daubert* to be admissible. Dr. Scott Morton begins her analysis by explaining the "single monopoly profit theory," which posits that a monopolist of one product cannot increase

---

[5] The Court does not address Bard's argument that AngioDynamics seeks to "re-litigate an issue this Court already decided against AngioDynamics at summary judgment." (Dkt. No. 298, at 11–12).

its profits in the near term by tying that product to a product in which it does not have a monopoly. (Dkt. No. 138-25, at 24–27); *see also E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29–30 (2d Cir. 2006) (noting that "a vertically structured monopoly can take only one monopoly profit" (citation omitted)); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 36 (1984) (O'Connor, J., concurring) ("The existence of a tied product normally does not increase the profit that the seller with market power can extract from sales of the *tying* product."), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006). She then explains, based on her review of documents and deposition testimony, why the costs to offer a standalone 3CG stylet are not the same as the costs Bard incurs to offer a preloaded PICC. (Dkt. No. 138-25, at 26–34). Courts have allowed expert economists to testify based on qualitative analyses and do not always require quantitative analysis, as AngioDynamics would require. *See Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-cv-220, 2018 WL 6615050, at *3, 2018 U.S. Dist. LEXIS 212243, at *16 (N.D. Cal. Dec. 17, 2018) (noting that "district courts have rejected attempts to exclude expert economic testimony because the testimony relied on 'qualitative factors,'" such as "business models, market characteristics, and the like" (citations omitted)); *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-1370, 2020 WL 533006, at *11, 2020 U.S. Dist. LEXIS 17253, at *35 (N.D. Cal. Feb. 3, 2020) ("That [an expert economist's] opinions have a foundation in qualitative data . . . is enough to establish their admissibility.").

Nor is the Court persuaded by AngioDynamics's argument that Dr. Scott Morton's conclusion that the costs Bard would incur are "significant" or "substantial" lacks a reliable foundation. (Dkt. No. 263-1, at 14–22). As discussed, the fact that Dr. Scott Morton did not perform a quantitative analysis is not sufficient to render her opinion inadmissible. Nor is the fact that the evidence on which she relied did not use the term "significant" or "substantial" to

describe the costs associated with selling a standalone stylet.[6] AngioDynamics does not seek to preclude Dr. Scott Morton's opinion that there is "limited demand from hospitals for a separate Bard 3CG stylet," (*see* Dkt. No. 138-25, at 6), and, as Dr. Scott Morton testified, "it doesn't take much, by way of cost, to overwhelm no demand," (Dkt. No. 263-3, at 21). AngioDynamics's criticisms of Dr. Scott Morton's opinion are proper grounds for cross-examination.

Finally, the Court concludes that Dr. Scott Morton's Price/Cost Conclusion is not subject to exclusion under Federal Rule of Evidence 403. Although AngioDynamics argues that allowing Dr. Scott Morton to testify about her Price/Cost Conclusion would be unfairly prejudicial because she would "lend her expert credentials to Bard's interpretation of the facts," (Dkt. No. 263-1, at 22–23), the Court concludes that this general risk does not substantially outweigh the probative value of her opinion, especially given that AngioDynamics will be presenting its own economics expert to offer a competing opinion. *Nielsen Audio, Inc. v. Clem*, No. 15-cv-2435, 2017 WL 1483353, at *3, 2017 U.S. Dist. LEXIS 61935, at *9 (M.D. Fla. Apr. 24, 2017) (noting that "a risk that the jury may accord greater weight to [the expert's] opinion simply because he is testifying as an expert can be addressed and mitigated through cross examination and the testimony of a rebuttal expert").

Accordingly, the Court denies AngioDynamics's motion to partially preclude the testimony of Dr. Scott Morton.

---

[6] AngioDynamics also faults Dr. Scott Morton for failing to consider that Bard's submissions to the FDA "addressed" some of the safety and health risks associated with selling the 3CG stylet separately. (Dkt. No. 263-1, at 15–16). The fact that Bard received FDA clearance to market the 3CG stylet separately, however, is not determinative of what costs are associated with selling the stylet separately and any failure on Dr. Scott Morton's part to consider Bard's statements to the FDA does not necessarily render Dr. Scott Morton's opinion unreliable.

### D.       Reasons for Bringing Lawsuit

AngioDynamics moves to exclude evidence or argument concerning its reasons for

bringing this litigation. (Dkt. No. 264). Specifically, it takes issue with two exhibits in Bard's

exhibit list: (1) DX-29, an email chain from November 8–9, 2016 among AngioDynamics

employees Chad Campbell, Scott Centea, Brad Chartrand, and Stephanie Pitts with the subject

line "RE: Bard Open Architecture," and attaching a document titled "Open Architecture," and

(2) DX-149, an email from Mr. Campbell to Mr. Chartrand on November 15, 2016 with the

subject line "Freedom to Choose" and attaching documents titled "Open Architecture" and

"Market Summary," (Dkt. No. 264-1, at 5), and the deposition testimony of these

AngioDynamics employees, during which Bard questioned them about the reasons for bringing

the litigation. AngioDynamics argues that its reasons for bringing the lawsuit are irrelevant to its

tying claims, and even if such evidence were relevant, it would be prejudicial because DX-29

and DX-149 do not reflect AngioDynamics's decision-making process, noting that the relevant

AngioDynamics employees were not "attorneys, board members, or top-level executives at the

company" or "involved in the actual decision-making process," and DX-149 is a "brainstorming

document" and not a "final document." (*Id.* at 9–11). Bard responds that AngioDynamics's

reasons for bringing this lawsuit, which it characterizes as a "business strategy," are relevant to

antitrust injury, causation, anticompetitive effects, and mitigation of damages. (Dkt. No. 306, at

4).

The evidence at issue suggests that AngioDynamics stood to gain a substantial sum in

new business if it acquired navigation-enabled TLS Celerity. (Dkt. No. 306, at 6 (first citing Dkt.

No. 307-1, at 14 (FY17–19 Strategic Plan); and then citing Dkt. No. 307-5, at 56–57 (Campbell

deposition))). Following Teleflex Incorporated's acquisition of Celerity, AngioDynamics

employees developed a plan referred to as "open architecture," or "freedom to choose," which

involved pursuing litigation, "[t]hrough [which], the court rules in favor of Bard opening up their platform." (Dkt. No. 307-3, at 4). As an "outcome" of this litigation strategy, the employees predicted that AngioDynamics would gain access to a substantial sum of catheter sales. (*Id.*).

First, the Court rejects Bard's argument that evidence of AngioDynamics's reasons for bringing this litigation is relevant to the antitrust injury, causation, or anti-competitive effects issues in this case. *Cf. Samsung Elecs. Co., Ltd. v. NVIDIA Corp.*, No. 14-cv-757, 2016 WL 754547, at *2, 2016 U.S. Dist. LEXIS 22799, at *6–7 (E.D. Va. Feb. 24, 2016) (noting the "general rule" that "a plaintiff's motive for bringing suit is irrelevant, except in the face of certain equitable defenses, bad faith, or questions of witness bias" and collecting cases). Bard asserts that the evidence at issue helps to demonstrate that AngioDynamics pursued litigation "to force Bard to provide it a TLS rather than investing and developing its own TLS to compete in the marketplace," and that the jury should be able to consider "evidence that any lost sales . . . were not the result of Bard's TLS policy but, rather, AngioDynamics' own actions, namely . . . the decision to not pursue developing its own TLS and instead litigate." (Dkt. No. 306, at 8). Moreover, Bard asserts that the evidence will show that AngioDynamics's choice to pursue litigation rather than developing or acquiring its own TLS negatively affected its sales and refutes AngioDynamics's contention that there are "high barriers in this market." (*Id.* at 9–10 ("AngioDynamics would have its own TLS today if it had made different business decisions.")). As discussed below, the Court declines to exclude evidence of AngioDynamics's efforts to develop or acquire TLS technology, which is relevant to market power, anticompetitive effects, causation, and damages. *Infra* Section III.E. While Bard may present some evidence and argument regarding AngioDynamics's decision not to pursue its own TLS technology, the Court concludes that AngioDynamics's decision to pursue litigation, given its decision not to pursue its

16

own TLS, is not relevant to the issues at trial. Bard cites cases in which courts dismissed antitrust cases when the plaintiff's injuries "stemmed from [its] own business decisions," (Dkt. No. 306, at 8–9 (citing *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 43–45 (2d Cir. 1986); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495–96 (8th Cir. 1992); *Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd.*, No. 12-cv-3824, 2015 WL 1736957, at *13, 2015 U.S. Dist. LEXIS 50026, at *36–37 (E.D. Pa. Apr. 16, 2015))), but these cases are inapposite, as none involved a plaintiff's decision to pursue *litigation*.

Even assuming that AngioDynamics's reasons for bringing this lawsuit are relevant, any probative value is substantially outweighed by the dangers of confusing the issues, distracting the jury from the central issues in this case, and wasting time on the disputed issue of what role, if any, the sales and marketing employees who designed the "freedom to choose" plan had in the decision to pursue this lawsuit. *See, e.g.*, *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, 257 F. Supp. 2d 768, 773 (S.D.N.Y. 2003) (granting motion in limine to exclude evidence of plaintiffs' motivations in bringing the lawsuit, noting that the "evidence would be distracting to the jury, focusing them on the irrelevant issue of why the Plaintiffs may have filed the lawsuit," and the probative value was substantially outweighed by Rule 403 concerns). AngioDynamics's motion to exclude evidence concerning its reasons for bringing this lawsuit is therefore granted.[7]

### E.    Efforts to Develop TLS

AngioDynamics seeks to preclude evidence concerning its efforts to develop a TLS system, apart from a stipulation of that fact. (*See generally* Dkt. No. 273-1). AngioDynamics argues that such evidence is irrelevant because a "foreclosed competitor" is not required to

---

[7] Since AngioDynamics's reasons for bringing this lawsuit are inadmissible, the Court rejects Bard's suggestion that evidence of AngioDynamics's strategy is necessary to refute an assertion by AngioDynamics that its motivations were altruistic.

"develop or even attempt to develop" its own product in the tying market, and that such evidence would also be inadmissible under Federal Rule of Evidence 403. (*Id.* at 8–15). AngioDynamics asserts that Bard has "approximately 75 documents on this issue alone in their trial exhibit list,"[8] and that Bard seeks to present "cumulative evidence and unnecessary argument" on the issue. (*Id.* at 4, 13). Bard responds that such evidence is relevant to the issues of causation, market power, anticompetitive effects, and mitigation of damages. (*See generally* Dkt. No. 290). At oral argument, counsel for Bard noted AngioDynamics *did* develop a TLS with navigation and enter the tying market. Bard seeks to introduce evidence regarding AngioDynamics's failure to purchase the Celerity system technology—which AngioDynamics "developed into a working tip confirmation technology" and sought approval to sell as a product including navigation—when it was outbid by Teleflex. (*Id.* at 5).

The Court agrees with Bard. Although AngioDynamics may not be required to "beat a defendant at its own tie," (Dkt. No. 273-1, at 9), this evidence of AngioDynamics's efforts to develop a TLS system in the relevant time period, or its opportunity to acquire such technology, are relevant to multiple issues in this case, including Bard's market power in the relevant market, *AngioDynamics*, 537 F. Supp. 3d at 313–14 (finding factual questions regarding the significance of the barriers to entry in a TLS market, in part because of evidence that "Bard's competitors have developed TLS products in the past"), anticompetitive effects, *id.* at 317, causation, *id.* at 322 (noting that, while an antitrust plaintiff need not prove that the defendant's conduct was the *sole* cause of the alleged injury, the plaintiff must demonstrate that the defendant's conduct was a "substantial or materially contributing factor" such that the injuries would not have occurred but

---

[8] At the final pretrial conference, AngioDynamics stated that there are 116 documents on Bard's exhibit list on this issue.

for the antitrust violation), and the amount of AngioDynamics's damages, *e.g.*, *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785 n.47 (2d Cir. 1983) ("An antitrust plaintiff has a duty to mitigate damages." (citations omitted)).[9] Given the probative value of this evidence concerning AngioDynamics's efforts to develop a TLS system to multiple issues in the case, the Court finds it is not excludable under Rule 403. However, to the extent that Bard is seeking to introduce evidence regarding AngioDynamics's reasons for bringing this lawsuit, as discussed above, that evidence is not admissible. And to the extent that Bard seeks to introduce evidence that is needlessly cumulative, time-wasting, or likely to mislead the jury, the Court will consider objections under Rule 403 at trial. Given the number of documents on Bard's exhibit list that are addressed to this issue, the parties are directed to meet and confer regarding a possible stipulation of the relevant facts and/or to limit the amount of evidence that they will seek to introduce on this issue.

Accordingly, the Court denies AngioDynamics's motion to preclude this evidence regarding its efforts to develop a TLS system.

### F.     Certain Irrelevant and Unfairly Prejudicial Evidence

AngioDynamics moves to preclude the admission of "certain irrelevant and unfairly prejudicial evidence." (Dkt. No. 277). Specifically, AngioDynamics seeks to preclude evidence regarding its Morpheus line of PICCs and its voluntary recall of those PICCs in 2015, apart from a stipulation to that fact. (Dkt. No. 277-1, at 4, 10–11). AngioDynamics argues that Morpheus PICCs "were overwhelmingly used in the IR suite, which [is] not part of AngioDynamics'

---

[9] AngioDynamics also argues that Bard's expert Dr. Bell should be "precluded from speculating regarding the counterfactual situation" in which AngioDynamics had developed a navigation-enabled TLS because Dr. Bell's calculation was exclusively based on Dr. Frankel's Benchmark 1 analysis, which this Court has excluded. (Dkt. No. 273-1, at 15). However, while Dr. Bell only performed his mitigation calculation as to Dr. Frankel's Benchmark 1 analysis, he expressly "reserve[d] the right to calculate reduction in damages based on mitigation for other Indicators or measures of damages." (Dkt. No. 290-13, ¶¶ 141–43 & n.261).

damages claim"; that "Dr. Frankel's damages model completely accounts for any effect the Morpheus recall may have had because it is based on AngioDynamics' actual experience in the market post-recall"; and that any argument that AngioDynamics lost sales due to "alleged reputational issues" would be "based on mere speculation." (*Id.*). Bard responds that evidence regarding the Morpheus PICC, its quality problems, and recall are relevant to causation and damages, arguing that there is evidence that "many AngioDynamics PICC customers stopped doing business with AngioDynamics entirely as a result of the problems with Morpheus" and that such lost sales "persisted after the recall in 2015." (Dkt. No. 291, at 3–7). Bard has pointed to evidence which indicates that the Morpheus recall had a negative impact on AngioDynamics sales of PICCs during the relevant damages period. (*See id.* at 4–7 (citing, *e.g.*, Dkt. No. 291-8, at 5 (internal AngioDynamics email dated July 16, 2014 noting that the company had "lost the picc business at St. Luke's Hospital due to 10 morpheus hub failures over the past month" and that the hospital was "moving to Bard"); Dkt. No. 291-12, at 3 (May 2015 email stating: "Morpheus is a disaster that will stick with us all year next year")). Evidence regarding the Morpheus PICC, its recall, and its potential impact on sales has "clear probative value" relating to causation and damages. Given that the issues of causation and damages are core elements of AngioDynamics's claim, the Court concludes that its probative value is not substantially outweighed by Rule 403 concerns. The parties are directed to meet and confer regarding a stipulation of the basic facts related to the Morpheus recall and the admissible evidence on this issue.

AngioDynamics also seeks to preclude evidence regarding AngioDynamics sales and products "for the period prior to May 2013," with the exception of evidence concerning the development of Bard's TLS and witnesses' background and experience, asserting that such

evidence is irrelevant because May 2013 is the earliest date for which AngioDynamics seeks damages. (Dkt. No. 277-1, at 4, 11–12). Bard responds that pre-May 2013 evidence is relevant because "PICC purchasing decisions made *after* May 2013 were undoubtedly shaped by actions taken by AngioDynamics and Bard *before* 2013," including AngioDynamics's "missed opportunities to develop its own tip location system." (Dkt. No. 291, at 8–9). The Court agrees with Bard that some evidence from before May 2013 may be relevant to causation and damages, and therefore will not categorically preclude such evidence at this time.

Accordingly, the Court denies AngioDynamics's motion to exclude certain irrelevant and unfairly prejudicial evidence.

### G.    PICC Superiority

AngioDynamics moves to preclude evidence and argument regarding whether AngioDynamics has established the technological superiority of its BioFlo PICCs. (Dkt. No. 280). AngioDynamics argues that its claim is not predicated "on the objective technological superiority of BioFlo or any other PICC" and that evidence that the BioFlo PICC "does not provide a clinical benefit or is somehow [inferior] to Bard's PICC" is irrelevant. (*See generally* Dkt. No. 280-1).[10] Bard responds that evidence of whether AngioDynamics's PICCs "offer potential benefits relative to Bard's PICCs" is relevant to causation and damages. (Dkt. No. 296, at 4–5).

Because the parties' papers indicated that the parties might be able to reach a stipulation on the issue of PICC superiority, (*see* Dkt. No. 280-1, at 13 & n.6; Dkt. No. 296, at 10), the Court asked the parties to meet and confer, (Dkt. No. 322). Although the parties were unable to

---

[10] AngioDynamics does not seek to preclude evidence which is "tethered to actual customer-based experience in the PICC market," such as evidence of a particular hospital's reliance on clinical evidence in connection with its purchasing decision. (Dkt. No. 280-1, at 5 & n.2).

agree on a stipulation, (Dkt. No. 334), it appears that they likely could agree to the following proposed language: "The parties stipulate that there is no clinical evidence that establishes the superiority of BioFlo PICCs." (*See* Dkt. No. 336, at 2). However, the parties were unable to agree about evidence that Bard seeks to introduce in response to AngioDynamics's evidence of individual hospitals' subjective experience with and preference for BioFlo.[11] Bard argues that it should be permitted to respond with objective evidence about the clinical performance of BioFlo; AngioDynamics argues that any such evidence from Bard should only be permitted if it specifically refutes the evidence of subjective preference. At the final pretrial conference Bard proposed that the trial proceed with the proposed stipulation, and that any ruling on the admissibility of its proposed evidence regarding the clinical performance of BioFlo await trial.

In light of the above, the Court encourages the parties to finalize a stipulation along the lines of: "there is no clinical evidence that establishes the superiority of BioFlo PICCs." The parties are directed to meet and confer regarding the evidence AngioDynamics will seek to admit concerning individual hospitals' subjective experience with and preference for BioFlo and the evidence Bard will seek to admit in response, to determine if they can reach any resolution regarding that issue. The Court will make additional, more specific rulings after hearing back from the parties on this issue.[12]

## IV.    BARD'S MOTIONS IN LIMINE

### A.    Hospital Evidence Not Previously Identified by Interrogatory Responses

On October 14, 2019, AngioDynamics provided supplemental responses to certain of Bard's interrogatories. (*See* Dkt. No. 262-3). In response to interrogatories seeking identification

---

[11] At oral argument, counsel for AngioDynamics represented that AngioDynamics does not intend to call Stephanie Pitts to testify regarding particular hospitals' experience with BioFlo.

[12] Accordingly, the Court does not rule on the admissibility of Ms. Rissler's opinions regarding clinical evidence and testing at this time. *See infra* Section IV.G.

of customers from which AngioDynamics allegedly "lost a potential sale of a PICC because of the conduct alleged in the Complaint" or which "requested that Bard sell its stylets single sterile," AngioDynamics identified 39 hospitals or entities. (*Id.* at 5–12). Bard now moves under Federal Rule of Civil Procedure 37(c) to preclude AngioDynamics from offering evidence, whether in the form of live testimony, exhibits, or deposition testimony, of lost sales, causation, and antitrust injury relating to any hospitals beyond the 39 entities AngioDynamics identified in its interrogatory responses. (*See* Dkt. Nos. 262, 323). Bard argues that it has relied on AngioDynamics's interrogatory responses during discovery, that AngioDynamics never supplemented its interrogatory responses, and that it would be prejudiced by the introduction of "surprise evidence." (Dkt. No. 262-1, at 2; Dkt. No. 323, at 1–5). AngioDynamics responds that (1) it is not required to prove each and every lost sale and (2) it was not required to supplement its interrogatory responses because all of the documents on its exhibit list were produced in a timely manner. (*See* Dkt. Nos. 297, 331).

Under Rule 26(e), a party who has responded to an interrogatory must "supplement or correct" its response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or "as ordered by the court." Fed. R. Civ. P. 26(e)(1). A party's failure "to provide information or identify a witness as required by Rule 26(a) or (e)" may preclude the party from using "that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The purpose of the rule is "to prevent the practice of 'sandbagging' an adversary with new evidence." *Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999) (citation omitted). But preclusion is a "harsh

remedy." *Cates v. Trs. of Columbia Univ. in City of New York*, 330 F.R.D. 369, 373 (S.D.N.Y. 2019) (collecting cases). In determining whether to exclude evidence under Rule 37(c)(1), courts must consider: (1) the party's explanation for the failure to comply with its disclosure obligations; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new information; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

Here, in response to the Court's directive that Bard identify "exactly what hospital evidence" it seeks to exclude, (Dkt. No. 321), Bard identified six exhibits on AngioDynamics's exhibit list which AngioDynamics "might use to show lost sales from hospitals not identified in its interrogatory responses." (Dkt. No. 323, at 2–3). Bard also seeks to exclude unidentified deposition testimony "in which AngioDynamics' witnesses purport to assert lost sales from hospitals not included in its interrogatory responses." (*Id.* at 3). The Court concludes that preclusion of these six exhibits and unidentified deposition testimony is not warranted. First, it is not clear that AngioDynamics was required to supplement its interrogatory responses under Rule 26(e) to identify additional hospitals for which it allegedly lost sales as a result of Bard's tying policy. AngioDynamics's supplemental interrogatory response stated that "the parties have agreed that Plaintiff will provide *examples* from which it potentially lost sales" and that it was setting forth a "*non-exhaustive* list of entities from which it potentially lost sales." (Dkt. No. 262-3, at 8 (emphases added)). Thus, it is not clear that AngioDynamics learned that its response was "in some material respect" "incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Bard also was on notice that AngioDynamics could potentially argue that it lost sales from entities beyond the 39 specifically identified, and AngioDynamics has consistently maintained the position that it does not need to prove "each and every customer lost." (Dkt. No. 331, at 1 n.2); *cf. Loral Fairchild*

*Corp. v. Victor Co. of Japan, Ltd.*, 911 F. Supp. 76, 79–80 (E.D.N.Y. 1996) (precluding party from arguing a "new theory of liability").[13]

With regard to the specific exhibits Bard has identified:

- Exhibit P-11 (Dkt. No. 323-2) is an internal Bard document which Bard itself produced. While it lists many entities, it also discusses some of the 39 entities identified by AngioDynamics;

- Exhibits P-305 and P-227 (Dkt. Nos. 323-3, 323-4) are emails which AngioDynamics produced more than two years ago. (*See* Dkt. No. 331, at 2); and

- Exhibits P-432, P-435, and P-438 (Dkt. Nos. 323-5, 323-6, 323-7) are documents which AngioDynamics produced "prior to Bard's deposition of fact witnesses Chris Davis and Jeremy Wilmington in May 2022," which occurred pursuant to the parties' agreement. (Dkt. No. 331, at 2; *see also* Dkt. No. 297, at 9).[14]

Thus, none of these six exhibits appears to be surprise evidence which AngioDynamics failed to disclose to Bard. On this record, the Court does not find that the extreme sanction of preclusion warrants a sweeping limiting order that would preclude all evidence relating to entities other than the 39 specifically identified. Even if there were a failure under Rule 26(e), with respect to this motion, Bard has not established prejudice with respect to these six documents or unidentified deposition testimony. *See Patterson*, 440 F.3d at 117.

Accordingly, the Court denies Bard's motion to preclude hospital evidence not previously identified in AngioDynamics's supplemental interrogatory response.[15]

---

[13] Although Bard cites the deposition testimony of Scott Centea (AngioDynamics's 30(b)(6) deponent) as "confirming that the interrogatory response was the universe of hospitals in dispute in this case," (Dkt. No. 323, at 4), Mr. Centea testified that he was "sure there are other customers" from which AngioDynamics lost sales "that are not listed on [the supplemental interrogatory response]," but that he could not "name them," (Dkt. No. 323-8, at 4–5).

[14] The Court notes that Bard has included Exhibits P-435 and P-438 on its own exhibit list as Exhibits D-570 and D-581, respectively. (*See* Dkt. No. 319-1, at 30).

[15] To the extent Bard has a more specifically-tailored request under Rules 26 and 37, the Court will consider that at trial.

### B.    Hospital Statements as Inadmissible Hearsay

Bard moves to preclude "hearsay statements from hospital employees on which AngioDynamics seeks to rely." (Dkt. No. 265-1, at 4). While Bard attaches to its motion and discusses certain examples of statements it believes are inadmissible, Bard notes that "there could be as many as 160 documents" on AngioDynamics's exhibit list that "incorporate customer hearsay." (*Id.* at 8 n.1). Bard argues that much of this evidence cannot fairly be construed as reflecting a hospital's motive for not using AngioDynamics's PICCs and suffers from multiple layers of hearsay and/or insufficiently identified declarants. (*See generally* Dkt. No. 265-1). AngioDynamics responds that the customer statements at issue are fairly construed as evidence of customers' motives, that it is not required to identify specific declarants, and that it can establish a hearsay exception for each level of hearsay. (*See generally* Dkt. No. 304). While the Court does not have sufficient information to rule on all of the documents Bard has attached to its motion, the Court sets forth the following principles of law.

### 1.    Rule 803(3): Then-Existing State of Mind

As the Court noted in its summary judgment decision, "under Fed. R. Evid. 803(3), 'statements of a customer as to his reasons for not dealing with a supplier are admissible for the limited purpose' of demonstrating the customer's motive, 'although not as evidence of the facts recited as furnishing the motives.'" *AngioDynamics*, 537 F. Supp. 3d at 319 (quoting *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 914 (2d Cir. 1962)) (brackets omitted).

Bard now argues that the hospital statements are inadmissible because they are improperly being offered to prove the fact of lost sales, and that they may not be offered to prove customers' motivations without "independent evidence" of lost sales. (Dkt. No. 265-1, at 8–9 (citing *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-cv-7844, 2008 WL 4560707, at *1, 2008

26

U.S. Dist. LEXIS 80801, at *4–5 (S.D.N.Y. Oct. 9, 2008))). Bard also argues that AngioDynamics must prove lost sales for each hospital for which it seeks to introduce hearsay evidence. (*Id.* at 9). AngioDynamics responds that (1) the fact that certain evidence may be admissible for one purpose (to prove customer motivations) but not another (to prove lost sales) does not warrant exclusion of the evidence and (2) it will "proffer independent evidence sufficient to establish the fact of actual lost sales for each hospital for which it intends to introduce out-of-court customer statements under Rule 803(3)." (Dkt. No. 304, at 15–18). The Court agrees with AngioDynamics that hospital statements, if admissible, will be admissible only for the limited purpose of proving customers' motivations and reasons for particular purchasing decisions; they will not be admissible to prove the fact of lost sales. Evidence of such motivations, together with evidence of lost sales, constitutes "evidence of the fact of damage." *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 253 (3d Cir. 1999). Bard may request a limiting instruction as appropriate. Moreover, given AngioDynamics's representation that it will present independent proof of lost sales, the Court concludes that Bard's argument that AngioDynamics is required to do so does not warrant categorical exclusion of the hospital statements at this juncture.[16] *See Discover Fin. Servs.*, 2008 WL 4560707, at *1, 2008 U.S. Dist. LEXIS 80801, at *4 ("[T]estimony concerning the motivation of customers for ceasing to deal with a business is admissible under the 'state of mind' exception to the hearsay rule, provided that there is otherwise admissible proof that business was lost." (internal citation omitted)); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 204 (2d Cir. 2015) (holding that customer statement was admissible "for the limited purpose of the customer's belief that the . . .

---

[16] AngioDynamics will have to make a pretrial proffer of lost sales as part of laying the foundation for the admission of such statements.

merchandise sold by Sleepy's was inferior" and to show that Sleepy's was harmed by the defendant's conduct "if it had other evidence to demonstrate that the customer's belief was attributable" to the defendant); *Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 447 (S.D.N.Y. 2007) (finding testimony regarding customer motivations admissible under the state of mind exception "provided that there is otherwise admissible proof that business was lost").

Bard also argues that courts are "reluctant" to admit hearsay statements where the declarant is unknown. (Dkt. No. 265-1, at 14–15 (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 91-cv-780, 1999 WL 958608, at *5 n.3, 1999 U.S. Dist. LEXIS 16077, at *15 n.3 (D. Conn. Oct. 14, 1999))). AngioDynamics responds that it is not required to identify by name every declarant. (Dkt. No. 304, at 21–23). The Court concludes that the failure to identify a specific declarant by name goes to the weight of any hearsay statement allowed under Rule 803(3), provided there is evidence regarding the declarant's role in the decision-making process at the declarant's respective hospital, and the statements can be fairly construed as a reflection of the hospital's "then-existing state of mind." *See AngioDynamics*, 537 F. Supp. 3d at 320 (finding "factual questions as to the roles the hospital employee speakers" played in the decision-making processes at their hospitals "and whether their statements can be fairly construed" as reflecting the hospitals' state of mind); *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 91 (1st Cir. 2017) (allowing testimony regarding statements of intent from unnamed declarants where the "witnesses knew the declarants and testified that all declarants were decision-makers at their respective refineries"); *see also Celebrity Cruises*, 478 F. Supp. 2d at 447 (holding that the failure to identify the travel agent declarants who told Celebrity executives that a drop in demand was the result of the incident went "to the weight of the evidence, not its admissibility");

*Callahan*, 182 F.3d at 252 n.11 ("The relevance of their statements depends only on the fact that they were the plaintiffs' customers, not their particular identities.").

Finally, the Court notes that, while certain evidence may be admissible at trial under Rule 803(3) for the purpose of showing AngioDynamics's customers' motivations in declining to purchase its PICCs, AngioDynamics, as the proponent of such evidence, will have to lay a foundation that the statements at issue "truly reflect a hospital customer's 'then-existing state of mind' as opposed to merely a statement of the speaker's 'memory or belief to prove the fact remembered or believed.'" *AngioDynamics*, 537 F. Supp. 3d at 321 (quoting Fed. R. Evid. 803(3)). The exception under Rule 803(3) incorporates an element of contemporaneity. *See United States v. Cardascia*, 951 F.2d 474, 487–88 (2d Cir. 1991) (noting that the "reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation"). While such evidence has been allowed in antitrust cases to prove customers' motives, *e.g.*, *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, No. 93-cv-5148, 2012 WL 3544771, at *7 n.14, 2012 U.S. Dist. LEXIS 115882, at *24 n.14 (E.D.N.Y. Aug. 16, 2012); *United States v. Visa U.S.A., Inc.*, No. 98-cv-7076, 2007 WL 1741885, at *9, 2007 U.S. Dist. LEXIS 42131, at *39–40 (S.D.N.Y. June 15, 2007), it must be evidence of the customers' then-existing motive and not merely an assertion of fact or past belief.

For example, in one internal AngioDynamics email, employee William Millar writes: "We just got notice [that] Baycare in Tampa is moving all PICCS to Bard due to tip location need." (Dkt. No. 265-9, at 3). Provided that AngioDynamics lays a foundation that the declarant from which Mr. Millar received this information played a sufficient role in the decision-making process, (*see* Dkt. No. 304-2, at 3 (Mr. Millar testifying that he communicated supply chain

staff)), such statement would not be excludable for lack of contemporaneity. On the other hand, Bard points to an email written by a Bard employee stating: "Issues continue to surface in accounts converting from pasv to solo. The issues are always related to clotting." (Dkt. No. 265-5, at 2). Bard argues that descriptions of "purported problems that a hospital experienced while using Bard's PICCs" or "alleged positive results a hospital experienced using AngioDynamics' products" do not "show the hospital's state of mind or motive" in its purchasing decisions. (Dkt. No. 265-1, at 10–11; *see also, e.g.*, Dkt. No. 265-8, at 2 (internal Bard email recounting results from BioFlo trial at the University of Colorado, including that "[i]nitial data is showing a reduction in DVTs!!")). The Court agrees that such statements do not elucidate any particular customer's "then-existing state of mind" but rather relate "fact[s] remembered or believed" and, as such, would not fall within the exception in Rule 803(3). *See Amerisource Corp. v. RxUSA Int'l Inc.*, No. 02-cv-2514, 2009 WL 235648, at *2, 2009 U.S. Dist. LEXIS 6864, at *4 (E.D.N.Y. Jan. 30, 2009) (excluding salespersons' statements which were their "belief or memory as to the intention of the actual decision-maker"). Similarly, an internal AngioDynamics email from December 2016 recounting that a nurse at the Cleveland Clinic "claims th[e] need for Navigation/Tip Location was the sole reason for switching to BARD PICCS," (Dkt. No. 265-18, at 3), is not admissible as a then-existing state of mind as the Cleveland Clinic began using Bard PICCs as its primary PICC product in late 2015 or early 2016, *AngioDynamics*, 537 F. Supp. 3d at 299.

Finally, the Court recognizes that it has "some discretion in view of the risk of insincerity in a potential customer's statement why products were not being ordered," *Sleepy's*, 779 F.3d at 204 n.13 (quoting *Herman Schwabe, Inc.*, 297 F.2d at 914 n.10), and will take that into account in making its rulings.

### 2.      Other Evidentiary Issues

The Court next addresses other evidentiary issues relating to Bard's motion.

### a.      Questions

First, the Court notes that not everything Bard seeks to exclude is hearsay, which is a defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). For example, Bard argues that "[i]nquiries from a hospital employee about whether Bard sells its TLS stylets on a standalone basis do not reflect state of mind and plainly fall beyond the limited state of mind exception." (Dkt. No. 265-1, at 10). However, "questions are not 'assertions' within the meaning of Rule 801" and therefore are not hearsay which must be subject to an exception to be admissible. *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (citation omitted). For example, Bard points to an email sent between two Bard employees in which one writes that a hospital "contacted Chris and I about pulling a separate 3CG wire with the Bioflo PICC line." (Dkt. No. 265-4, at 2). Such an inquiry, about the possibility of purchasing a standalone stylet from Bard, is not an assertion of fact and is therefore not hearsay.

On the other hand, a Swedish Hospital employee's statement to AngioDynamics sales personnel that Swedish Hospital "asked Bard for a single sterile stylet" is not a question. (*See* Dkt. No. 265-17, at 5). While the hospital's inquiry of *Bard* likely is a question, the employee's statement that the hospital *had* asked Bard about a standalone stylet is an assertion of fact which it appears is offered to prove the truth of the matter asserted and therefore must fall within an exception to the rule against hearsay to be admissible.[17]

---

[17] The deposition testimony of Scott Centea, who is on AngioDynamics's witness list, further indicates that "Matt Taylor told [Mr. Centea] that Brian [Williams] told [Mr. Taylor] that somebody at Swedish told him that Swedish had

### b.    Rule 801(d)(2): Opposing Party Statements

AngioDynamics argues that some of the documents and statements identified by Bard are email chains involving Bard employees, and that statements by Bard employees are not hearsay under Federal Rule of Evidence 801(d)(2)(D). (Dkt. No. 304, at 12–13). Under Rule 801(d)(2)(D), a statement that is offered against an opposing party and which "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. Fed. R. Evid. 801(d)(2)(D). To establish a "sufficient foundation to support the introduction of vicarious admissions" under Rule 801(d)(2)(D), a party must establish "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-cv-2362, 2012 WL 6738402, at *4, 2012 U.S. Dist. LEXIS 182975, at *9–10 (E.D.N.Y. Dec. 29, 2012) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). The statements themselves "are not alone sufficient" to establish these foundational predicates. *See id.* However, "admissibility under this rule should be granted freely." *Pappas*, 963 F.2d at 537. Accordingly, to the extent AngioDynamics lays a sufficient foundation, statements by Bard employees made during the course of their employment and relating to a matter within the scope of their employment relationship are not hearsay under Rule 801(d)(2)(D).[18] The Court notes, however, that while the statements of Bard employees may fall

---

[18] told Bard that they asked Bard for a single sterile stylet." (Dkt. No. 265-17, at 5). While AngioDynamics posits that Mr. Williams's and Mr. Taylor's statements are business records which fall within the exception against hearsay in Rule 803(6), it is far from clear that that is the case. AngioDynamics has not indicated what "records" contain their statements, or if the statements were merely verbal reports.

[18] AngioDynamics also argues that such statements are admissible as non-hearsay under Rule 801(d)(2)(C), without explaining how that rule applies here. (Dkt. No. 304, at 13). Rule 801(d)(2)(C) provides that a statement is not hearsay if it is offered against an opposing party and "was made by a person whom the party authorized to make a statement on the subject." Fed. R. Evid. 801(d)(2)(C). The "relevant inquiry" under this rule is "whether the person making the statements had the authority to speak on a particular subject on behalf of the party the admission is to be used against." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 260 (S.D.N.Y. 2003) (citations omitted). For Rule 801(d)(2)(C), the individual "must have had specific permission to speak on a

within an exclusion to the hearsay rule, any additional layers of hearsay must also fall within an exception for the statements to be admissible.

### c.       Rule 803(6): Business Records

AngioDynamics argues that statements made by Bard or AngioDynamics employees in company emails are also admissible because they fall under the hearsay exception in Rule 803(6). (Dkt. No. 304, at 13, 26–27). Under the "business records exception," a record is not excluded by the rule against hearsay if:

> (a) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (b) the record was kept in the course of a regularly conducted activity; (c) making the record was a regular practice of that activity; (d) the custodian certifies the record; and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir. 2016) (citing Fed. R. Evid. 803(6)(a–e)); *cf.*

*Amerisource Corp.*, 2009 WL 235648, at *3, 2009 U.S. Dist. LEXIS 6864, at *8–9 (finding notes did not meet the criteria for the business records exception where the notes were taken "well after the conversations" recorded and the defendant failed to establish that the employee "was under any obligation to make the notes or that the notes were made in the regular course of [the defendant's] business activity"). An email "created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) (citation omitted). Thus, courts apply a similar approach to emails as they do to other business records, such as letters, memos, or notes. *See Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 187 (E.D.N.Y. 2011). To lay a proper

---

subject," in contrast to Rule 801(d)(2)(D), where the individual "only had to have general authority of the business area." *Id.*

foundation for a business record, "a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) (citation, internal quotation markets, and brackets omitted).

### 3.    Conclusion

With the foregoing principles in mind, the parties are directed to meet and confer in an attempt to resolve any remaining issues relating to the hospital statements AngioDynamics seeks to introduce at trial. A hearing is set for August 25, 2022 at 9:30 am to address any remaining objections.

### C.    Professor George Alan Hay

George Alan Hay, Ph.D. is a Professor of Law and Professor of Economics at Cornell University with expertise in antitrust economics who was asked by counsel for AngioDynamics to "evaluate a number of competitive economic issues" related to AngioDynamics's claim. (Dkt. No. 136-9, ¶¶ 4, 6; *see generally* Dkt. No. 136-9 (Hay expert report)). Bard moves to preclude Dr. Hay from opining that Bard's tying policy "foreclosed a not insubstantial amount of commerce in the market for PICCs" and opining about anticompetitive effects and causation. (Dkt. No. 268-1, at 4).

### 1.    Foreclosure of a Not Insubstantial Amount of Commerce

Dr. Hay opines in his report that "Bard foreclosed a not insubstantial amount of commerce in the market for PICCs." (Dkt. No. 136-9, ¶¶ 107–09). To arrive at this conclusion, Dr. Hay multiplied the "number of Bard PICCs sold with either a TLS or 3CG navigation-enabled stylet" by (1) "the average price of AngioDynamics nursing PICCS" and, separately, (2) "the average price of a Bard non-preloaded nursing PICC." (*Id.* ¶ 108). At summary judgment, the Court held that, to satisfy this element, the relevant metric was the "amount of sales that

34

Bard's competitors actually were foreclosed from as a result of Bard's conduct."
*AngioDynamics*, 537 F. Supp. 3d at 315. Because Dr. Hay provided only a "valuation of the total
volume of Bard's sales of PICCs preloaded with its TLS" which likely "overstate[d]" the amount
of commerce foreclosed by Bard's policy, the Court denied AngioDynamics's motion for
summary judgment as to this liability element. *Id.* at 315–16.

Given the Court's ruling, Bard now seeks to preclude Dr. Hay from "testifying that
Bard's conduct 'foreclosed' a not insubstantial volume of interstate commerce." (Dkt. No. 268-1,
at 7–8). Bard argues that Dr. Hay's valuation of Bard's sales volume has no relevance and that,
even if it did, it could be introduced through a lay witness or stipulation. (*Id.* at 8).
AngioDynamics states that, in light of this ruling, Dr. Hay will not opine that "Bard's total
volume of tied sales, standing alone, proves the 'not insubstantial amount' of tied sales liability
element." (Dkt. No. 317, at 4). AngioDynamics, however, asserts that the "total volume of
Bard's tied sales" is relevant to the ultimate determination of whether a not insubstantial amount
of commerce was foreclosed, as well as to market power. (*Id.* at 10–11).

In light of the Court's summary judgment ruling, the Court agrees with Bard that Dr. Hay
may not offer the opinion that "Bard foreclosed a not insubstantial amount of commerce in the
market for PICCs." At oral argument, the parties agreed to stipulate to the volume-of-commerce
calculations.

### 2.    Anticompetitive Effects

Bard seeks to preclude Dr. Hay from opining about "anticompetitive effects." (Dkt. No.
268-1, at 9–11). Although Dr. Hay was not retained to offer an opinion about this element of
AngioDynamics's claim, his report states: "As a result of Bard's tie, consumers did not have the
benefit of competition on the merits in the tied product market, i.e., the market for PICCs, which
represents harm to competition." (Dkt. No. 136-9, ¶ 110). Bard argues that Dr. Hay has no basis

to opine on anticompetitive effects because he did not analyze the effect of Bard's conduct on "prices, output, quality, or innovation" or on other competitors, and argues that Dr. Hay's deposition testimony about "harm to consumer choice" does not, alone, amount to harm to competition. (Dkt. No. 268-1, at 9–11).[19] AngioDynamics responds that Dr. Hay's expert opinion is helpful to the jury in "understanding the economic framework of antitrust violations as well as the economic inferences that can be drawn from record evidence" and that "reduced consumer choice can constitute harm to competition." (Dkt. No. 317, at 12–15 (citing, inter alia, *MacDermid*, 833 F.3d at 186)).

The Court concludes that Dr. Hay is qualified to and may reliably testify about the effect of Bard's tying policy on consumer choice. (*See, e.g.*, Dkt. No. 268-4, at 3–5, 7–8 (explaining that "in the part of the market that's not constrained by Bard's tie-in," customers "show a much stronger desire to buy Angio PICCS," leading Dr. Hay to believe that "a number of customers would want to pair the Bard TLS with the Angio PICCs, and the fact that "[s]ome consumers" cannot get "the Angio quality" is "a harm to consumer choice")); *see MacDermid*, 833 F.3d at 186 (noting that "reduced consumer choice can constitute harm to competition").[20] However, Dr.

---

[19] Bard also argues that Dr. Hay cannot rely on emails purportedly demonstrating customers' interest in pairing AngioDynamics's PICCs with Bard's TLS because "isolated statements of preference are not a sufficient empirical demonstration concerning the adverse effect of the defendants' arrangement on price or quality." (Dkt. No. 268-1, at 11 (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 128 (2d Cir. 1995) (brackets omitted))). However, demonstrating an adverse effect on price or quality is not the only way to prove anticompetitive effects. *See MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182–84 (2d Cir. 2016) (noting that "a plaintiff may demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition"). And, as discussed below, Dr. Hay may reliably opine on the effect of Bard's tying policy on consumer choice.

[20] Bard argued for the first time at oral argument that Dr. Hay's testimony regarding consumer choice is the same opinion that the Court already excluded from Dr. Frankel. The Court precluded Dr. Frankel's testimony (concerning his damages calculations based on his Indicators 2, 4, and 6) in part due to his failure to conduct any analysis establishing that "either the [interventional radiology] or non-navigation nursing market segments are sufficiently comparable to the navigation nursing market segment to serve as valid comparators." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-598, 2021 WL 2403107 at *6, 2021 U.S. Dist. LEXIS 109621, at *16–17 (N.D.N.Y. June 11, 2021). Putting aside that Dr. Hay's testimony concerns consumer choice in a market, not the calculation of AngioDynamics's

Hay may not offer an overall opinion on whether Bard's tying policy has anticompetitive effects in the tied market, as Dr. Hay did not disclose any such opinion in his reports. Therefore, while Dr. Hay may testify about the effect of Bard's policy on consumer choice based on his expertise as an economics and antitrust expert, he may not offer an overall opinion about the anticompetitive effects of Bard's conduct.

### 3.      Causation

Finally, Bard argues that Dr. Hay should be precluded from opining about causation because any such testimony was undisclosed and that AngioDynamics may not use Dr. Hay to introduce Dr. Frankel's causation opinion which the Court already excluded. (Dkt. No. 268-1, at 11–12). AngioDynamics represents that Dr. Hay will not offer a causation opinion. The Court therefore denies this portion of Bard's motion as moot.

### D.      Dr. Alan S. Frankel

Bard moves to limit the testimony of AngioDynamics's damages expert, Dr. Alan Frankel. (Dkt. No. 266).[21] Specifically, Bard seeks to preclude Dr. Frankel from testifying regarding (1) "a market-wide damages figure untethered from AngioDynamics' causation evidence," (2) damages resulting from lost sales of midline catheters, and (3) damages based on Bard's "valved and unique Bard PICCs." (*See generally* Dkt. No. 266-1).

### 1.      Market-Wide Damages Figure

Bard first argues that Dr. Frankel should not be allowed to offer a "market-wide damages opinion that has no connection to AngioDynamics' hospital-specific causation evidence." (Dkt.

---

damages, the Court notes that Dr. Hay also considered, as part of the unconstrained market, the market using Teleflex's TLS. (*E.g.*, Dkt. No. 268-4, at 3).

[21] The Court assumes familiarity with the factual background of this matter in general, and Dr. Frankel's opinions in particular, as set forth in the Court's prior rulings. *AngioDynamics*, 537 F. Supp. 3d 273 (summary judgment ruling); *see also AngioDynamics*, 2021 WL 2403107, 2021 U.S. Dist. LEXIS 109621; (Dkt. No. 219). The Court discusses only those portions of Dr. Frankel's opinions that are directly relevant to the instant motion.

No. 266-1, at 5). In other words, Bard argues that Dr. Frankel can only multiply his Indicator 7 benchmark, which this Court previously ruled was admissible, *AngioDynamics*, 2021 WL 2403107, 2021 U.S. Dist. LEXIS 109621, to the number of Bard's PICC sales "at the specific hospitals for which AngioDynamics purports to have causation evidence," not to Bard's market-wide sales, (Dkt. No. 266-1, at 6–11). AngioDynamics responds that it is not required to prove "each and every lost sale" to recover damages and that Dr. Frankel's opinion provides a "just and reasonable estimate of the damage." (Dkt. No. 301, at 10–16).

The Court agrees with AngioDynamics. The antitrust laws only require plaintiffs to prove "some damage flowing from the unlawful [conduct]," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969), and, if that fact of damage is proven, to provide a basis for a jury to determine a "just and reasonable estimate of the damage based upon relevant data," *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 424 (S.D.N.Y. 2007) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). Bard has not cited caselaw suggesting that an antitrust plaintiff must prove causation with respect to each customer and/or lost sale, and courts have held to the contrary. *See, e.g.*, *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F. Supp. 491, 507 (D.N.H. 1996) (rejecting argument that the plaintiffs must "identify, on a one-for-one basis, each and every sale lost to defendants that otherwise would have been a sale to plaintiffs but for the impermissible conduct alleged" and noting that any reduction in damages awarded was a matter for the defendants to persuasively argue to the jury); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 486 (D.N.J. 2009) (noting that proof of diverted sales "requires only evidentiary showing of some diverted sales from which more can reasonably be extrapolated" (citation and internal quotation marks omitted)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-2542,

2020 WL 6290584, at *5, 2020 U.S. Dist. LEXIS 199859, at *29 (S.D.N.Y. Oct. 27, 2020) (recognizing, "in light of the inherent difficulty of estimating the volume of lost sales, that courts may engage in some degree of speculation in computing the amount of damages" and holding that the plaintiff was not required to provide "all factual bases and Documents for each lost customer" (citations and internal quotation marks omitted)).

Importantly, it does not appear to be the case that AngioDynamics will "present no causation evidence whatsoever" as to hospitals beyond the 39 specifically identified, as Bard argues. (Dkt. No. 266-1, at 10). AngioDynamics states that it intends to offer at trial evidence of its "much greater degree of success on a market-wide basis in selling to those segments of the PICC market in which TLS is not a factor." (Dkt. No. 301, at 14 n.2). Although the Court excluded Dr. Frankel's opinion on causation, it did so because Dr. Frankel's causation opinion did "little more than summarize record evidence (including sales and market share data and documents produced in this litigation) and lend Dr. Frankel's expert credentials" to AngioDynamics's interpretation of that evidence. *AngioDynamics*, 537 F. Supp. 3d at 333. The Court held that a fact-finder could draw the same inferences "from merely examining the evidence itself" and draw the same causation conclusion as Dr. Frankel. *Id.* Therefore, the exclusion of Dr. Frankel's causation opinion does not mean there is "no causation evidence" from which the jury could reasonably conclude that AngioDynamics suffered an antitrust injury beyond the specifically-identified hospitals.

In sum, because AngioDynamics is not required to prove causation with respect to each particular customer or lost sale, the Court concludes that Dr. Frankel's market-wide damages estimate is sufficiently reliable to be admissible. Bard is free to present contrary evidence and

argue before the jury reasons for discrediting Dr. Frankel's analysis or awarding a lower amount of damages than his analysis specifies.

## 2.   Lost Midline Sales[22]

Bard next seeks to preclude Dr. Frankel from opining that AngioDynamics suffered damages in the form of lost sales of midline catheters on the ground that Dr. Frankel's analysis in this regard is based on an unsubstantiated assumption and unsupported by economic analysis. (Dkt. No. 266-1, at 11–14). AngioDynamics responds that Dr. Frankel's analysis of lost midline sales is properly supported by documentary evidence and conversations with AngioDynamics personnel and that Bard's criticisms of his methodology go to the weight, not admissibility, of his analysis. (Dkt. No. 301, at 16–20).

In his report, Dr. Frankel notes that, "[i]n some cases," customers "make joint purchasing decisions for PICCs and other vascular access devices." (Dkt. No. 132-5, ¶ 48). He further notes that "AngioDynamics personnel believe Bard's PICC tying policy has affected the company's ability to sell midline catheters," which AngioDynamics began offering in 2015, and that "AngioDynamics documents support this contention." (*Id.* ¶ 49 (citing AngioDynamics emails discussing the loss of a midline account due to "Bard contracting and standardization because of Bard['s] navigation" and another customer's decision to "go with Bard Midlines" for "overall savings package with PICCS"); *see* Dkt. Nos. 301-2, 301-3). Dr. Frankel therefore analyzed AngioDynamics sales data and, if a customer's "first purchases" of an AngioDynamics PICC and AngioDynamics midline "occurred within 90 days of one another, "assume[d] the purchase

---

[22] On August 30, 2021, the Court permitted Bard to file a motion in limine with respect to whether Dr. Frankel's "benchmark can only be applied to PICC sales to the 39 hospitals which Plaintiff has identified as having potentially lost sales," (Dkt. No. 216), and Bard has not raised the issues of lost midline sales or valved and unique PICCs in any of the multiple rounds of briefing regarding Dr. Frankel's opinions. Although Bard's challenges could have been raised much earlier, because the Court had not set a cutoff date for *Daubert* motions and in the interest of justice, the Court has considered Bard's arguments.

decisions were effectively jointly made." (Dkt. No. 132-5, ¶ 73). Based on this assumption, Dr.

Frankel estimated AngioDynamics's damages from lost midline sales as a result of Bard's tying

policy. (*See* Dkt. No. 132-5, at 51).

       The Court concludes that there is a sufficiently reliable basis for Dr. Frankel's estimation

of damages from lost midline sales. Dr. Frankel relied on two emails appearing to indicate that

AngioDynamics lost midline sales because the customer opted to purchase both PICCs and

midlines from Bard, as well as telephone interviews with AngioDynamics personnel Scott

Centea and Mark Girard. (*Id.* ¶ 49). Dr. Frankel acknowledged that it is possible that some

customers who purchased both products from AngioDynamics would have purchased

AngioDynamics midlines even if they did not purchase AngioDynamics PICCs. (Dkt. No. 266-7,

at 5). When asked whether he did anything to "test" his assumption, Dr. Frankel responded that

he discussed the issue with AngioDynamics personnel. (*Id.* at 4–5, 6 (testifying that

AngioDynamics personnel confirmed that Dr. Frankel was making a "reasonable interpretation"

of sales data)). Because there is some basis for Dr. Frankel's assumption, the Court concludes

that exclusion of this portion of Dr. Frankel's analysis is not warranted. *See Crockford v.*

*Spencer*, No. 10-cv-813, 2012 WL 2129356, at *1 (D. Conn. June 11, 2012)[23] (noting that any

"debatable assumptions" go to the weight of the expert's testimony); *Joffe v. King & Spaulding*

*LLP*, No. 17-cv-3392, 2019 WL 4673554, at *8, 2019 U.S. Dist. LEXIS 163671, at *26

(S.D.N.Y. Sept. 24, 2019) (allowing expert testimony where expert's assumptions were "not

entirely baseless"); *see also SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-1468, 2014

WL 1319361, at *3, 2014 U.S. Dist. LEXIS 45273, at *8 (D. Colo. Apr. 2, 2014) (noting that

economic expert is "free to make certain assumptions, and then testify about the effect those

---

[23] No Lexis cite available.

assumptions would have on any economic issues" and that assumptions underlying an expert opinion "go to the weight that should be afforded such opinion" (citations omitted)). The Court therefore denies Bard's motion to exclude this portion of Dr. Frankel's opinion.

### 3.    Valved and Unique Bard PICCs

Finally, Bard argues that Dr. Frankel should be barred from presenting a damages opinion based on Bard's "valved and unique" PICCs because (1) Bard's TLS stylet was not cleared for use with valved AngioDynamics PICCs by the FDA and (2) AngioDynamics could not have competed for "unique Bard PICCs" with certain features that AngioDynamics did not offer. (Dkt. No. 266-1, at 15–18). AngioDynamics responds that Dr. Frankel addressed these points in his reports and "concluded that adjustments were not warranted," that Dr. Frankel has always calculated damages based on the total number of PICCs sold by Bard using Bard's TLS devices, and that Indicator 7 already accounts for the uniqueness of and differences among different PICCs. (Dkt. No. 301, at 20–22).

The Court concludes that neither of Bard's arguments is sufficient to warrant the exclusion of Dr. Frankel's damages calculations based on Indicator 7. First, Dr. Frankel stated in his rebuttal report that he "understand[s] that AngioDynamics could have sought" FDA approval to sell its valved PICCs with Bard's TLS stylets and that AngioDynamics had "conducted tests which it believes demonstrate that Bard's stylet is compatible with AngioDynamics valved PICCs." (Dkt. No. 132-6, ¶ 14). Dr. Frankel "assume[d]" for purposes of his analysis that customers would have been free to pair Bard TLS stylets with both valved and non-valved AngioDynamics PICCs. (*Id.* ¶ 15). While Bard is free to argue that the lack of FDA approval breaks the chain of causation between its tying policy and any lost sales, (Dkt. No. 266-1, at 16), the Court concludes that Dr. Frankel's assumption does not render his damages analysis so unreliable as to be inadmissible.

42

Second, the unique nature of Bard's and AngioDynamics's PICCs is accounted for, at least to some degree, in Indicator 7. Indicator 7—AngioDynamics's share of total sales of PICCs that are paired with Teleflex's TLS devices—is "based on AngioDynamics' real-world experience with Teleflex," which offers different PICCs than AngioDynamics. (Dkt. No. 301, at 22). In ruling that Dr. Frankel may present a damages analysis based on his alternative calculation for Indicator 7, the Court also found that Dr. Frankel's use of Teleflex as a comparator was sufficiently reliable, noting that "comparability questions are issues of weight, rather than admissibility." *AngioDynamics*, 2021 WL 2403107, at *7, 2021 U.S. Dist. LEXIS 109621, at *24. Similarly, here, Bard will be free to argue that Dr. Frankel's damages analysis should be discounted due to Bard's unique PICC offerings, but given the relaxed standard antitrust plaintiffs enjoy in proving the amount of damages and the liberal standard applicable to comparators, the Court will not ex ante preclude Dr. Frankel from presenting a damages analysis based on all of Bard's PICC sales paired with Bard TLS stylets.

### E.   "Duty to Deal"

Bard seeks to preclude AngioDynamics from arguing or presenting any evidence that Bard has a "duty to deal" with AngioDynamics "by undertaking to preload Board's TLS into AngioDynamics' PICCs." (Dkt. No. 267-1, at 4). Bard argues that antitrust law imposes no duty to cooperate with a competitor, and any argument the Bard "should have collaborated" with AngioDynamics is inadmissible under Federal Rules of Evidence 401, 402, and 403. (*Id.*). In response, AngioDynamics states that it "did not—and does not intend to—assert a refusal to deal claim against Bard." (Dkt. No. 303, at 7). The Court therefore denies Bard's motion to preclude evidence that it has a duty to deal as moot.

AngioDynamics nonetheless argues that evidence of the technological and/or legal feasibility of preloading a Bard TLS stylet into an AngioDynamics PICC is relevant under

Federal Rule of Evidence 401 to whether it was possible for Bard to sell its TLS stylet separately from its PICCs and to rebut Bard's assertion that "it cannot easily and safely sell its stylets separately to be used with any manufacturer's PICCs at a patient's bedside." (*See id.* at 4–11).[24] Bard responds that such evidence would imply to the jury that Bard had a duty to deal. At this point, in the absence of a better understanding of the relevant markets and how duty-to-deal principles apply in the context of a tying claim, the Court defers ruling on Bard's request to preclude evidence of the technological feasibility of preloading a Bard TLS stylet into an AngioDynamics PICC.

###    F.    Theresa Paliobeis

Bard seeks to exclude the testimony of Theresa Paliobeis, an individual who has needed PICCs "on a continuous basis" since 2010, and who found that when she began using the BioFlo PICC in 2014, she "stopped having the allergic reactions and infections that plagued her while using other PICCs." (Dkt. No. 270; Dkt. No. 294, at 6). Bard asserts that evidence of one patient's "rare allergy experience" is irrelevant, and that Ms. Paliobeis "cannot speak to any issue related to hospitals' requirements for purchasing PICCs, how much they were willing to pay, or whether any hospital would have switched from purchasing Bard's preloaded PICCs to AngioDynamics' BioFlo PICCs absent Bard's tip location system-policy." (Dkt. No. 270-1, at 5, 7). Bard further argues that allowing her testimony would open the door to a mini-trial, with testimony from other patients who have had negative experiences with BioFlo, and that the evidence should be excluded under Rule 403 because it "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case." (*Id.* at 8 (citation

---

[24] AngioDynamics also argues that such evidence is relevant to the fashioning of appropriate equitable relief in the event the jury finds Bard liable for an illegal tying arrangement. (*Id.* at 8–9). At oral argument, the parties agreed that this issue need not be decided now.

omitted)). AngioDynamics asserts that this testimony is relevant to show that there is a demand "for BioFlo, and PICCs generally, totally separate and apart" from Bard's TLS and to show that the tie has caused anticompetitive effects in the market. (Dkt. No. 294, at 4–5, 8–11).

The Court agrees with Bard that Ms. Paliobeis's testimony is not relevant to the issues before the Court. Ms. Paliobeis is one patient, whose apparent allergic reaction to PICCs other than AngioDynamics's BioFlo was unusual. (*See, e.g.*, Dkt. No. 270-3, at 6–8 (Ms. Paliobeis's testimony that her doctors had never seen anything like her allergic reaction to PICCs); Dkt. No. 270-7, at 3 (Dr. Boris Alexander Karamin interview, in which he states that he had never seen a reaction like Ms. Paliobeis's "unusual reaction" to a standard tunneled PICC line in 31 years)). Moreover, Ms. Paliobeis cannot testify as to what brand of TLS was used with her BioFlo PICC. (Dkt. No. 270-3, at 17–18 (testifying that she knew "that they used a [TLS]," but "didn't know what brand . . . it was")). The unusual experience of one patient with BioFlo is not probative of consumer demand for TLSs and PICCs. Nor is it probative of anticompetitive effects in the PICC market as a whole.

Moreover, even if there were some minimal relevance to Ms. Paliobeis's testimony, the Court agrees with Bard that any such minimal probative value is substantially outweighed by the dangers of unfair prejudice, wasting time, and confusing the issues under Rule 403. As the Court noted at summary judgment, AngioDynamics has "strong evidence that consumer demand exists for TLSs as a separate product from PICCs." *AngioDynamics*, 537 F. Supp. 3d at 308. Ms. Paliobeis's testimony would be cumulative to that evidence and waste time. Further, the introduction of Ms. Paliobeis's testimony presents the risk of a "trial within a trial" about her experience with different PICCs, her medical history, her credibility, and the uniqueness of her experience. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1255–56 (E.D.N.Y.

1985) ("Exclusion of evidence of low probative value is particularly appropriate when admission would result in expenditure of substantial trial time and jury confusion. . . . The waste-of-time ground for exclusion is particularly persuasive when detailed rebuttal testimony would be necessary to establish that the proffered evidence lacks probative worth.").

Therefore, Bard's motion to exclude the testimony of Theresa Paliobeis is granted.

### G.    Amy Anderson Rissler

Amy Anderson Rissler, R.N., B.S.N., VA-BC, is a registered nurse who has experience working as a PICC nurse and who currently serves as Manager of Scientific and Clinical Affairs at AngioDynamics. (Dkt. No. 279-3, ¶¶ 5–11; Dkt. No. 279-4, at 14). Ms. Rissler prepared an expert report to rebut the expert reports of Bard's experts Dr. Marcia Ryder and Sandra Sucy. (*See generally* Dkt. No. 279-3 (Rissler expert report)). Bard moves to exclude Ms. Rissler's opinion regarding record evidence relating to the risks of loading a standalone stylet into a PICC at bedside. (*See generally* Dkt. No. 279-1). Specifically, Bard seeks to exclude Ms. Rissler's "opinions regarding the risks of loading a stylet into a PICC at bedside" on the ground that such opinions are merely a summary of the record evidence. (*Id.* at 16–17; *see* Dkt. No. 279-3, ¶¶ 66 ("In my experience and the experience of others at AngioDynamics, loading a stylet bedside does not create an increased risk to sterility."), 68 ("In my opinion, the risk of damaging the stylet is comparable whether retracting and advancing a preloaded stylet or loading the stylet bedside. Testimony from others at AngioDynamics also supports the conclusion."), 70 (citing "Sherlock TLS Wire Passage Tests" to evaluate compatibility of the Sherlock stylet with certain PICCs)). Bard also challenges Ms. Rissler's reliance on "R&D reports" such as the "Sherlock TLS Wire Passage Tests." (Dkt. No. 279-1, at 16–17 & n.48). AngioDynamics responds that Ms. Rissler's opinions are a proper rebuttal to those of Ms. Sucy, and that Ms. Rissler properly relied on record and other evidence in forming her opinions. (Dkt. No. 300, at 20–21).

The Court concludes that Ms. Rissler may offer an opinion regarding the risks of loading a standalone stylet based on her own personal experience and the experience of others at AngioDynamics, and that such opinions are a proper rebuttal to Ms. Sucy. Because Ms. Rissler's opinion is based in part on her own experience and expertise,[25] it is not an improper summary of other evidence or improper bolstering of other witnesses. *Cf. In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 170–72 (S.D.N.Y. 2018) (barring expert testimony that "only" served to "bolster the credibility" of other witnesses). The Court will consider objections as to whether Ms. Rissler can consider the Sherlock TLS Wire Passage Tests at trial after hearing what foundation is laid.[26]

Accordingly, the Court denies this portion of Bard's motion to limit the testimony of Ms. Rissler.

### H.     Heather S. Rosecrans

Heather S. Rosecrans is an FDA "regulatory affairs consultant" with past experience working in public health and medical device regulation at the FDA. (Dkt. No. 271-4, at 5). Ms. Rosecrans offers opinions related to the FDA's 510(k) review process and Bard's 510(k) submission and clearance for the standalone TLS stylet in 2014. (*See generally* Dkt. No. 271-4 (Rosecrans expert report)). Bard moves to exclude Ms. Rosecrans's testimony. (Dkt. No. 271).

Bard first argues that Ms. Rosecrans's opinions related to Bard's 510(k) submissions are simply a summary of "publicly available information concerning Bard's historical regulatory submissions involving PICCs and tip location systems" and a recitation of the "510(k)

---

[25] At oral argument, counsel for Bard argued that Ms. Rissler has never placed a PICC using TLS technology. (*See also* Dkt. No. 300-2 at 114–15). AngioDynamics responded that Ms. Rissler nonetheless has experience manipulating guidewires found in PICCs, and also noted that she supervises the other AngioDynamics employees on whose testimony she relies.

[26] The Court notes that AngioDynamics has not responded to Bard's suggestion that the Sherlock TLS Wire Passage Tests documents may not have been produced. (*See* Dkt. No. 279-1, at 17 n.48).

submission itself and Bard's correspondence with the FDA." (Dkt. No. 271-1, at 7–9). Bard

argues that Ms. Rosecrans adds no technical analysis or expertise to her summary of the evidence

and that she should not be allowed to present a "narrative of select regulatory events." (*Id.* at 8–9

(quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009))).

AngioDynamics responds that "expert explanation of the FDA's regulatory scheme, FDA

practices and procedures, and [related] evidence" is admissible and helpful to a jury. (Dkt. No.

295, at 9–10). The Court agrees with AngioDynamics. Courts have found that expert

explanations of the FDA's regulatory framework and how evidence fits into that framework is

helpful to juries. *E.g.*, *Lyman v. Pfizer, Inc.*, No. 09-cv-262, 2012 WL 2971550, at *6, 2012 U.S.

Dist. LEXIS 101150, at *20 (D. Vt. July 20, 2012) (finding that expert's "knowledge of the

FDA's regulatory requirements will assist the jury to understand the evidence pertaining to drug

approval and drug labeling requirements"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp.

3d 396, 467–68 (S.D.N.Y. 2016) (finding that expert's opinions about "the complicated

regulatory framework of the FDA, the process by which the FDA approves a pharmaceutical

product's label, and the adequacy of the [device] label, would be helpful to a jury"). Ms.

Rosecrans is not merely "regurgitat[ing]" the factual record, (Dkt. No. 271-1, at 9), but opining

on specific steps of the FDA's 510(k) approval process.

The Court also rejects Bard's argument that Ms. Rosecrans "purports to link Bard's

510(k) submission materials and the FDA's determination of 'Substantial Equivalence' to the

'safety and effectiveness' of the standalone stylet." (*Id.* at 9). Ms. Rosecrans opines that Bard

"represented to the FDA, and FDA agreed, that it was at least as safe and effective" to use the

standalone stylet with any PICC that met specific dimensions as it was to use its previously-

cleared stylet with Bard PICCs. (Dkt. No. 271-4, at 35–38). Ms. Rosecrans's opinion is based on

the facts that Bard submitted a 510(k) application and the FDA subsequently cleared the standalone stylet for use, and the significance of those facts under FDA regulations. (*Id.*). She does not opine on the actual safety and effectiveness of the standalone stylet.

Bard next argues that Ms. Rosecrans's opinions should be excluded because they are premised on "unhelpful" or "demonstrably false" factual assertions about what data Bard submitted to the FDA as part of its 510(k) submission. (Dkt. No. 271-1, at 9–11). The Court concludes that Ms. Rosecrans's opinions—that the FDA agreed that the standalone stylet was at least as safe and effective as its predicate device and that "FDA's conversion of the 510(k) from a Special 510(k) to a Traditional 510(k)" meant that Bard was required by regulation to submit "actual" performance data, (Dkt. No. 271-4, at 35, 40)—are sufficiently reliable and do not depend on what data was in fact submitted to the FDA.[27]

Finally, Bard challenges Ms. Rosecrans's opinion that ███████████████████ ████████████████████████████████████████████████████████████ (Dkt. No. 271-4, at 41), on the ground that she bases her opinion, in part, on an internal Bard design review document showing that there "would not be a 'learning curve'" for the clinicians using the standalone stylet. (Dkt. No. 271-1, at 12–13). Although the parties dispute whether the record reflects whether or not this internal document was ever provided to the FDA, (Dkt. No. 271-1, at 13; Dkt. No. 295, at 13), the Court concludes that the fact that the document may not have been provided to the FDA is grounds for cross-examination and goes to the weight of Ms. Rosecrans's opinion. Ms. Rosecrans opines that Bard's ████████████████████

---

[27] The Court therefore does not address the parties' dispute about what evidence was provided to the FDA. Bard is free to explore this area with Ms. Rosecrans on cross-examination.

██████████████████████, and that opinion does not depend on whether the internal document she cites was in fact provided to the FDA.

Accordingly, the Court denies Bard's request to exclude Ms. Rosecrans from testifying at trial.

## I.      Bard's Sales Practices

Bard moves to preclude AngioDynamics from offering "speculative testimony related to Bard's sales practices." (Dkt. No. 272). Bard argues that witness testimony that Bard engaged in allegedly unethical sales practices is irrelevant, constitutes speculation based on hearsay, and would be unduly prejudicial. (Dkt. No. 272-1). Bard's motion is in response to the deposition testimony of Stephanie Pitts, a former AngioDynamics clinician, and cites four specific statements Ms. Pitts made. (*Id.* at 4–5; *see, e.g.*, Dkt. No. 272-3, at 6 (suggesting that Bard was "[b]uying clinicians to use products")).

In response, AngioDynamics states that it does not oppose Bard's motion "to the extent that it is related to the specific Stephanie Pitts testimony quoted." (Dkt. No. 299, at 4). AngioDynamics also "agrees not to offer witness testimony . . . 'suggesting that Bard was paying doctors and nurses to purchase its PICCs.'" (*Id.* quoting Dkt. No. 272-1, at 7)). However, AngioDynamics contends that Bard's request to exclude testimony about "unethical sales practices" is too vague and reserves its rights with regard to the admissibility of other evidence Bard may argue constitutes unethical sales practices. (*Id.*). At oral argument, Bard was unable to point to specific testimony or evidence it wishes to preclude.

In light of the above, the Court denies, at this time, Bard's motion to bar speculative testimony related to its sales practices. The Court will entertain any specific evidentiary objections at trial.

**J.      Bard's Size and Merger**

Bard moves to exclude evidence relating to (1) its merger with Becton, Dickinson and Company ("BD") in December 2017, (2) Bard's and BD's "absolute size, revenue, or profits," and (3) AngioDynamics as a "local company" and Bard as an "out-of-towner" which manufactures certain products in Mexico. (Dkt. No. 274-1, at 2).

First, Bard argues that the merger has "no probative value," and creates a "substantial risk of unfair prejudice" because jurors may conflate Bard with BD. (*Id.*). Bard requests that "the parties and their witnesses should not refer to Bard as 'BD,'" and that AngioDynamics be precluded from introducing evidence or comment related to the merger. (*Id.*). AngioDynamics responds that this case only involves three parties, and juror confusion is in fact more likely to result if Bard's motion is granted, because some witnesses are employees of BD. (Dkt. No. 302, at 8). The Court finds that limited testimony regarding the merger may be admitted as background information to, for example, explain where witnesses currently work and that, as such, the probative value is not substantially outweighed by the danger of confusing the issues or unfair prejudice.

Second, Bard argues that AngioDynamics should not be permitted to present evidence or argument relating to Bard's and BD's "absolute size, revenue, or profits" other than Bard's "share of a properly defined market." (Dkt. No. 274-1, at 2). AngioDynamics responds that it does not plan to "introduce evidence of BD's relative size, revenue, or profits untethered from its relationship with Bard." (Dkt. No. 302, at 7).[28] Counsel for AngioDynamics also represents that AngioDynamics only intends to introduce evidence of size and profits that is focused on the

---

[28] Counsel for AngioDynamics noted at oral argument that some documents reference Bard as "BD."

relevant markets, and not evidence of absolute size and profits. The Court therefore denies this portion of Bard's motion as moot.

Third, Bard requests that "AngioDynamics should not be permitted to introduce evidence and argument casting AngioDynamics as a local, upstate New York company while Bard is an 'out-of-towner,'" without citing to any specific evidence it seeks to exclude. (Dkt. No. 274-1, at 3–4). AngioDynamics responds that the "location and nature of [the parties'] operations" is relevant to provide the jury with "context and understanding of the parties." (Dkt. No. 302, at 9). The Court agrees that the locations of the parties is relevant background information and, in and of itself, not likely to be prejudicial, and may be admitted. The Court, however, will not permit the evidence to be used inappropriately. *See, e.g.*, *White v. Ford Motor Co.*, No. 95-cv-0279, 2003 WL 23353600, at *14, 2003 U.S. Dist. LEXIS 29352, at *32–33 (D. Nev. Dec. 30, 2003) (excluding arguments that were "more like appeals to regional and anti-corporate prejudice than arguments based on evidence presented in the case," and at the "boundary between permissible and impermissible argument"); *ABS Global, Inc. v. Inguran, LLC*, 14-cv-503, 2019 WL 3812520, at *25–26, 2019 U.S. Dist. LEXIS 136850, at *83–84 (W.D. Wis. Aug. 14, 2019) (finding that witnesses could mention the location of the plaintiff "without stressing that" the plaintiff or witnesses were "local"); *Hopkins v. Integon Gen. Ins. Co.*, No. 18-cv-1723, 2020 WL 3888253, at *3, 2020 U.S. Dist. LEXIS 121886, at *7–8 (W.D. Wash. July 10, 2020) (parties agreed that arguments emphasizing that the defendant was not "from here" were excluded).

Finally, Bard requests that the Court exclude evidence and argument regarding the fact that Bard manufactures certain products in Mexico. (Dkt. No. 274-1, at 2–4). At oral argument, counsel for AngioDynamics stated that AngioDynamics does not intend to introduce any

evidence of Bard's manufacturing locations. The Court therefore denies this portion of Bard's motion as moot.

## V.    MOTIONS TO SEAL

Both parties have filed motions seeking to maintain under seal certain limited portions of their motions in limine submissions. (Dkt. Nos. 281, 282, 305, 308, 318, 324). In prior sealing orders in this matter, the Court has approved sealing of the same or similar information. (Dkt. Nos. 171, 177, 186, 190, 201, 212). The Court incorporates its prior sealing decisions into this decision. *See, e.g.*, *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-cv-598, 2021 WL 776701, 2021 U.S. Dist. LEXIS 37234 (N.D.N.Y. Mar. 1, 2021); *AngioDynamics*, 2021 WL 2403107, 2021 U.S. Dist. LEXIS 109621 (N.D.N.Y. June 11, 2021).  Applying the standards set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), as described in the Court's prior sealing decisions, the Court finds that the parties' proposed redactions are sufficiently limited, narrowly tailored, and necessary to protect an individual's medical information and the parties' and Teleflex's confidential, competitively sensitive business information in which the Court has previously found that they have privacy interests that outweigh the strong presumption of public access, with the exceptions outlined below.

### A.    Bard's Motion to Seal (Dkt. No. 281)

The Court grants Bard's motion to seal the damages calculations that Dr. Frankel derived from confidential sales information. The Court has approved the sealing of the same or similar information in prior orders in this matter. *See AngioDynamics*, 2021 WL 2403107, at *1, 2021 U.S. Dist. LEXIS 109621, at *3–4. Specifically, the Court approves Bard's proposed redactions in the following documents as sufficiently limited and narrowly tailored: Dkt. Nos. 278, 266-1, 266-3, 266-5, 266-9, 268-3, 268-6.

Bard also seeks to maintain under seal "[c]ommercially sensitive information related to the parties' confidential research and development plans, including information related to product performance testing, product specifications, and strategic decisions about how products are presented in regulatory filings." (Dkt. No. 281-1, at 2–3). The Court grants this portion of Bard's motion and approves the proposed redactions in Dkt. Nos. 271-1, 271-3, 271-4, 271-5, and 279-3. The Court has approved the sealing of the same or similar information in prior orders, *see AngioDynamics*, 2021 WL 776701, at *5, 2021 U.S. Dist. LEXIS 37234, at *12–14, and it will also allow Bard's 510(k) submission to the FDA and related information to remain under seal, *cf. Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-cv-7092, 2022 WL 1307111, at *3, 2022 U.S. Dist. LEXIS 79011, at *8 (N.D. Ill. May 2, 2022) (allowing "private 510(k) submissions to the FDA" to remain under seal).

Bard seeks to seal the personal medical information of third-party Theresa Paliobeis, proposing limited redactions to Dkt. Nos. 270-1 and 270-3. (Dkt. No. 281-1, at 3). Courts regularly allow medical records and information to be filed under seal, "finding that parties have a strong privacy interest in their medical information." *Spring v. Allegany-Limestone Cent. Sch. Dist.*, No. 14-cv-476, 2021 WL 4166628, at *1, 2021 U.S. Dist. LEXIS 173846, at *4–5 (W.D.N.Y. Sept. 14, 2021) (collecting cases); *Robinson v. De Niro*, No. 19-cv-9156, 2022 WL 274677, at *4, 2022 U.S. Dist. LEXIS 14384, at *12–13 (S.D.N.Y. Jan. 26, 2022) (approving the sealing of "portions of the deposition transcript to the extent the deposition transcript discusses medical-related issues" of the parties). The Court finds that the proposed redactions are sufficiently narrowly tailored to protect Ms. Paliobeis's privacy interest in her medical

information which she has not otherwise publicly disclosed. Therefore, these documents may remain under seal to the extent currently proposed by Bard.[29]

### B.   AngioDynamics's Motion to Seal (Dkt. No. 282)

The Court grants AngioDynamics's motion to seal Dkt. No. 277-20, which contains confidential information relating to sales and marketing strategies. However, the Court denies AngioDynamics's motion to seal Dkt. Nos. 264-3, 277-5, 277-6, 277-7, 277-10, 277-17, 277-18, 277-20, and 280-6 in their entirety. While these documents do appear to contain confidential information relating to research and development, pricing, and sales and marketing, they also appear to contain information that cannot meet the *Lugosch* standard. Further, portions of many of these documents are quoted publicly elsewhere in the record, suggesting that maintaining these documents entirely under seal is not justified. For example, portions of Dkt. Nos. 277-5, 277-6, and 277-7 are quoted in Dkt. No. 147-13, at page 47. Similarly, the "Open Architecture" document filed at Dkt. No. 264-3 is filed publicly, with limited redactions, at Dkt. Nos. 296-8 and 307-2. And, while AngioDynamics seeks to maintain Dkt. No. 277-6 under seal on the ground that it contains confidential pricing information, the Court does not see any reference to pricing in the document. The Court therefore denies AngioDynamics's sealing request with respect to these documents. To the extent AngioDynamics wishes to renew its sealing motion with respect to these documents, it should propose narrowly tailored redactions that satisfy the sealing standard articulated in *Lugosch* and explain the basis for those redactions. *See, e.g.*, *Rensselaer Polytechnic Inst. v. Amazon.com, Inc.*, No. 18-cv-00549, 2019 WL 2918026, at *3, 2019 U.S. Dist. LEXIS 116674, at *9 (N.D.N.Y. June 18, 2019) (denying requests to wholesale

---

[29] The Court notes that Bard has redacted one page of Ms. Paliobeis's deposition transcript, (Dkt. No. 270-3, at 13), and that AngioDynamics has submitted the same page unredacted, (Dkt. No. 294-3, at 20). The Court has approved Bard's redaction because the page contains Ms. Paliobeis's medical information; AngioDynamics is directed to respond to this issue in connection with a renewed motion to seal. *Infra* Section V.B.

seal exhibits where "part of [the exhibits] might satisfy the sealing standard" but "the request for sealing is not narrowly tailored," and holding that "the parties must identify the specific parts they wish to redact and the basis for those redactions"). Any renewed motion to seal must be filed within two weeks of the date of this decision.[30]

### C.      AngioDynamics's Motions to Seal (Dkt. Nos. 305, 318)

The Court grants AngioDynamics's motion to maintain under seal the limited and narrowly tailored redactions it proposed to Dkt. Nos. 295 and 302, (Dkt. No. 305), because these documents contain confidential information relating to the parties' research and development plans and market shares. The Court also grants AngioDynamics's motion to maintain under seal the limited redactions it proposed to Dkt. No. 317. (Dkt. No. 318). The redactions cite to or quote from portions of Dr. Hay's reports which this Court has previously held may remain under seal and which relate to confidential sales information provided by Teleflex.

### D.      Bard's Motion to Seal (Dkt. No. 308)

The Court grants Bard's motion to seal limited portions of the following documents: Dkt. Nos. 290, 290-2, 290-13, 291, 291-2, 291-6, 291-8, 291-11, 291-12, 292-2, 296, 296-8, 296-11, 296-12, 298, 306, 307-1, 307-2, 307-3, 307-6, 307-7, 307-4, and 307-5. (*See* Dkt. No. 308-1, at 1–3). However, the Court denies Bard's motion to seal limited portions of Dkt. No. 291-15 only with regard to paragraph 76 of Dr. Scott Morton's report, which is filed publicly at Dkt. No. 172-17.

---

[30] Bard redacted "sales numbers found in AngioDynamics' documents attached to Bard's Motion *In Limine* to Exclude Hospital Statements as Inadmissible Hearsay" (Dkt. No. 265) and in Exhibit 8 to Bard's opposition to AngioDynamics's motion to preclude evidence regarding its efforts to develop its own TLS (Dkt. No. 290-9) out of "an abundance of caution" but does not seek to seal those numbers. (Dkt. No. 281-1, at 4 n.4; Dkt. No. 308-1, at 3 n.1). AngioDynamics should address whether it seeks to maintain these numbers under seal in its renewed motion to seal.

E.     **Bard's Motion to Seal (Dkt. No. 324)**

The Court grants Bard's motion to seal limited portions of the following documents in connection with its supplemental letter in further support of its motion in limine to exclude hospital evidence not previously identified by AngioDynamics's interrogatory responses (Dkt. No. 324): Dkt. Nos. 323-2, 323-4, 323-5, 323-6, and 323-7. Bard proposes limited redactions to these documents that redact only specific pricing, sales, and revenue figures, and the Court finds that these redactions are sufficiently narrowly tailored to protect the parties' competitively sensitive pricing, sales, and revenue information. *See, e.g.*, *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-cv-7378, 2020 WL 2190708, at *3, 2020 U.S. Dist. LEXIS 79448, at *10–11 (S.D.N.Y. May 5, 2020) (finding that "[d]isclosure of the specifics of [a party's active business units'] pricing, costs, revenue, and profit information could result in significant harm to [the party] without providing much value in the monitoring of the federal courts," and that the party's "proposed redactions covering this information are narrowly tailored to protect these specific financial metrics").

VI.    **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the parties' motions in limine (Dkt. Nos. 255, 260, 262–68, 270–74, 277, 279, 280) are **GRANTED in part and DENIED in part** as set forth above; and it is further

**ORDERED** that the motions to seal (Dkt. Nos. 281, 282, 305, 308, 318, 324) are **GRANTED in part and DENIED in part** as set forth above. Any renewed motion to seal must be filed within two weeks of the date of this decision.

**IT IS SO ORDERED.**

Dated: <u>July 8, 2022</u>
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge