UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ANGIODYNAMICS, INC.,

                                Plaintiff,                      1:17-cv-598 (BKS/CFH)

v.

C.R. BARD, INC. and BARD ACCESS SYSTEMS, INC.,

                                Defendants.

---

**Appearances:**

*For Plaintiff:*
Philip J. Iovieno
Helen M. Maher
Amanda L. Devereux
Kristen J. McAhren
Mark A. Singer
Justin Arborn
Sean F. O'Shea
Michael E. Petrella
Audrey S. Curtis
Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281

*For Defendants:*
Andrew J. Frackman
Mark Racanelli
Pamela A. Miller
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Sergei Zaslavsky
Emily Murphy
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Robert A. Atkins
Jacqueline P. Rubin

William B. Michael
Daniel A. Crane
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

James P. Nonkes
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

Plaintiff AngioDynamics, Inc. brings this antitrust action against Defendants C.R. Bard, Inc. and Bard Access Systems, Inc. (collectively, "Bard"), asserting a claim of illegal tying in violation of Section 1 of the Sherman Act (codified at 15 U.S.C. § 1) under "per se" and "rule of reason" theories of liability. (Dkt. No. 1); *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273 (N.D.N.Y. 2021) (summary judgment decision); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-cv-598, 2022 WL 2643583, 2022 U.S. Dist. LEXIS 120384 (N.D.N.Y. July 8, 2022) (motions in limine decision). The case is set for trial to begin on September 19, 2022. In this decision, the Court considers outstanding evidentiary issues presented to it at a conference held on August 25, 2022, and in subsequent submissions from the parties (Dkt. Nos. 404, 410).[1]

## II.  EVIDENCE REGARDING OBJECTIVE PICC SUPERIORITY

Bard's exhibit list contains scientific papers which are relevant to the objective superiority of different peripherally inserted central catheters ("PICCs"). (Dkt. No. 411, at 9–10). AngioDynamics has objected to scientific papers as, inter alia, irrelevant and prejudicial. (*Id.*).

---

[1] The Court will issue a separate ruling on the dispute regarding AngioDynamics's proffer of lost sales. (Dkt. Nos. 400, 402).

Bard proffers that such evidence is admissible and relevant to rebut any evidence AngioDynamics introduces regarding a particular hospital or customer's subjective experience with the BioFlo PICC. While the Court will consider specific evidence at trial, the Court does not see the relevance of broad-based, scientific evidence regarding the objective merits of a given PICC in response to evidence regarding a particular hospital's *actual* experience with a PICC and given the parties' stipulation that "there is no clinical evidence that establishes the superiority of BioFlo PICCs." Furthermore, it would appear that any possible probative value of such evidence is substantially outweighed by a danger of confusing the issues, misleading the jury, and/or wasting time. Fed. R. Evid. 403.

### III.     EXHIBIT P-269

At the August 25, 2022 conference, the Court heard oral argument regarding the admissibility of a representative sample of exhibits identified by the parties. Exhibit P-269 is a Bard email chain in which Bard employee Amy Westfall reports "Significant Events" occurring with her customer accounts. Bard objects to this exhibit on hearsay, foundation, and relevance grounds. As an initial matter, the Bard emails are not hearsay if a proper foundation is laid under Federal Rule of Evidence 802(d)(2)(D). However, Ms. Westfall's August 28, 2012 email contains another level of hearsay when she recounts what customers have reported to her. AngioDynamics seeks to introduce the statement that the "Albany Med PICC team" "wanted . . . for Sapiens to work with NON-Bard PICCs." The Court concludes that this statement is more like an assertion of fact being offered for the truth of the matter (that the PICC team wanted Bard's 3CG technology to work with other manufacturers' PICCs) rather than a question or inquiry about the possibility of that compatibility. Thus, because no exception to the rule against hearsay is readily apparent for this statement, it is not admissible. Similarly, Ms. Westfall's

report that "Albany Med mentioned there was a study . . . " is not admissible because it is another level of hearsay for which no exception is readily apparent.

## IV. ANGIODYNAMICS'S LETTER BRIEF

### A. Business Records Exception

AngioDynamics requests that the Court overrule Bard's objections on hearsay and lack of foundation grounds to Exhibits P-433, P-85, and Bard monthly reports. (Dkt. No. 404, at 2–5). As set out more specifically below, AngioDynamics argues that it can lay a foundation that these documents fall under the hearsay exception in Rule 803(6). (*Id.*). Bard asserts that AngioDynamics cannot lay a foundation for the admission of its own emails about alleged lost business as business records, and that these emails are "not the type of unusually reliable documents the business record exception was intended to apply to." (Dkt. No. 410, at 1–5).

As the Court has previously stated, under the "business records exception," a record is not excluded by the rule against hearsay if:

> (a) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (b) the record was kept in the course of a regularly conducted activity; (c) making the record was a regular practice of that activity; (d) the custodian certifies the record; and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir. 2016) (citing Fed. R. Evid. 803(6)(a–e)). To lay a proper foundation for a business record, "a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) (citation, internal quotation markets, and brackets omitted).

As an initial matter, AngioDynamics notes that Bard has objected to certain exhibits on the ground that the trial witness who will lay the foundation for the business records exception is

not on the email chain or otherwise personally involved in the matter discussed in the document. (*See* Dkt. No. 404, at 4). AngioDynamics argues that a witness need not have personal knowledge of the creation of a particular document to be a "qualified witness" who can lay the proper foundation. (*Id.*) The Court agrees. Rule 803(6) requires the foundation to be laid by a "custodian or another qualified witness." Fed. R. Evid. 803(6). The custodian "need not have personal knowledge of the actual creation of the document to lay a proper foundation." *Komasa*, 767 F.3d at 156 (internal quotation marks and citation omitted); *see also United States v. El Gammal*, 831 F. App'x 539, 543 (2d Cir. 2020) (summary order) (noting that the term "custodian or other qualified witness" is "generally given a very broad interpretation" and that a "witness need not be a custodian or have personal knowledge of the actual creation of the document to be 'qualified' within the meaning of Rule 803(6)" (citations omitted)). All that is required is that the witness "is familiar with the record keeping procedures of the organization." *El Gammal*, 831 F. App'x at 543 n.11 (citations omitted).

### 1. Internal Emails Documenting Loss of Customer: Exhibit P-433

Exhibit P-433 is an internal AngioDynamics email in which Todd Mirasola reports that he "just got off a call" with Heather and Jennifer from Sunrise Hospital "where [he] learned that they would be moving away from BF valve 5 french dual piccs and going to Bard due to Navigation." The email also states that Heather and Jennifer were on the committee that was "in on the decision." AngioDynamics asserts that this email falls within the business records exception to the rule against hearsay because it was a "regular business practice at AngioDynamics" to send internal emails regarding the loss of a customer. (Dkt. No. 404, at 2–3). AngioDynamics relies on the deposition testimony of Scott Centea, AngioDynamics's 30(b)(6) designee. Mr. Centea testified that, as a corporate account manager, he "remain[ed] very close to the sales representatives." (Dkt. No. 404-1, at 3–4). He stated: "It's never fun when we lose an

5

account. And so they were always typically brought to my attention, or someone within the organization's attention, to better understand what we could have done differently to potentially save the business." (*Id.* at 4; *see also* Dkt. No. 404-2, at 3 (testifying that "there is always kind of a postmortem discussion internally after . . . a customer decides to move away from our PICCs")). Bard responds that the emails at issue are too "informal" to constitute business records, and that Mr. Centea's deposition testimony is insufficient to lay a foundation because he "does not even mention email at all" and has not had a "role in the sales department since 2017." (Dkt. No. 410, at 2–3).

    The Court concludes that the cited portions of Mr. Centea's testimony are insufficient to lay a foundation that it was "the producing [party's] regular practice to send or receive emails that record the type of event(s) documented in the email" and that there was a policy of using email "to make certain types of reports or to send certain sorts of communications." *Cf. Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-cv-258, 2015 WL 12733388, at *7–8, 2015 U.S. Dist. LEXIS 194378, at *22–23 (N.D.N.Y. Oct. 22, 2015) (quoting *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, No. MDL 2179, 2012 WL 85447, at *3, 2012 U.S. Dist. LEXIS 3406, at *12–16 (E.D. La. Jan. 11, 2012)). As Bard points out, Mr. Centea's deposition testimony does not mention emails at all, much less that it was a regular practice to send an internal email recording lost business. *Compare Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 187–88 (E.D.N.Y. 2011) (emphasizing requirement that it be the company's "regular practice to keep these records"), *with New World Trading Co. Ltd. v. 2 Feet Productions, Inc.*, No. 11-cv-6219, 2014 WL 988475, at *1, 2014 U.S. Dist. LEXIS 37865, at *2 (S.D.N.Y. Mar. 13, 2014) (finding emails feel outside the business records exception because they "contain[ed] unique and sporadic communications" and were not created "as a record of any

'regularly conducted business activity'"). Because it appears that Mr. Centea will testify at trial, AngioDynamics will have an opportunity to lay a proper foundation at trial. Furthermore, assuming AngioDynamics also makes a pretrial proffer that AngioDynamics lost sales from Sunrise Hospital and pursuant to the discussion at the August 25 conference, the Court rules that Heather and Jennifer's statement that they were switching to Bard "due to Navigation" is a statement of the customer's then-existing motivation and therefore admissible under the exception in Rule 803(3).

### 2. Emails to Customer After Loss of Business: Exhibit P-85

Exhibit P-85 is an email from Scott Centea at AngioDynamics to Tom Chickerella at Hillcrest dated November 4, 2015, regarding AngioDynamics's loss of Hillcrest's PICC business. AngioDynamics asserts that "testimony at trial will confirm that reaching out to the customer directly around the time of a lost sale to record the reasons for the lost sale and discuss transition was a regular business practice of AngioDynamics." (Dkt. No. 404, at 3).

While the Court agrees with AngioDynamics that a document need not be an internal document to fall within the business records exception, *see, e.g.*, *Penberg*, 823 F. Supp. 2d at 188–89 (finding a sufficient foundation under the business records exception for an email sent by a company employee to a client where it was a "regular business practice" to "email clients with information such as that included in the email"), AngioDynamics's reference to unspecified "testimony at trial" is insufficient to lay a foundation that reaching out to a customer around the time the business was lost by email was a regular business practice of AngioDynamics. Because it appears that Mr. Centea, who wrote the email in question in Exhibit P-85, will testify at trial, AngioDynamics will have an opportunity to lay a proper foundation at trial which also addresses Bard's concern that the email at issue in P-85 is "self-serving." (Dkt. No. 410, at 4).

### 3.  Exhibit P-435

Bard argues that some of the emails AngioDynamics seeks to introduce fail the business records exception's "threshold requirement" that the record be "made at or near the time" of the act or event being recorded. (Dkt. No. 410, at 4). Bard points to Exhibit P-435, an October 2019 email from Jeff Smith to Jeremy Wilmington at AngioDynamics. Mr. Smith's email indicates that he is responding to Mr. Wilmington's "request" and summarizes "PICC loss due to the lack of Tip Location/Navigation" since 2009. This is email does not satisfy the business records exception for at least two reasons. First, as Bard points out, Mr. Smith is recording events that took place as much as ten years prior to the writing of the email, and the email therefore was not made "at or near the time" of the subject matter recorded.

Second, on its face P-435 is an email which does not appear to be a record "kept in the course of a regularly conducted [business] activity" or the making of which was a "regular practice" of any such activity. Fed. R. Evid. 803(6). Rather, Mr. Smith is responding to a specific and targeted request to account for PICC sale losses over a number of years apparently in response to this litigation. *See United States v. James*, 712 F.3d 79, 89 (2d Cir. 2013) (noting that "records created in anticipation of litigation do not fall within [the] definition" of the business records exception (citation omitted)).

### 4.  Bard Monthly Reports

AngioDynamics asserts that Bard's "monthly reports" fall within the business records exception, pointing to the deposition testimony of Bard employees indicating that creating such reports was part of their regular duties. (Dkt. No. 404, at 4; *see* Dkt. No. 404-3, at 3 ("Throughout a good portion of my career, it was my responsibility to write a report at the end of the month, mainly directed towards my boss, to inform him of what was going on in my department."); Dkt. No. 404-4, at 3 (explaining that managers would write "significant events"

or "monthly" reports on "the happenings within their districts over the last month to communicate . . . to people above them"); Dkt. No. 404-5, at 3 ("As a district manager, I was required to write a monthly report on what were called significant events.")). Bard does not respond to this portion of AngioDynamics's letter brief.

   The Court agrees that the deposition testimony cited by AngioDynamics is sufficient to lay a foundation that these monthly reports fall within the business records exception in Rule 803(6). *Cf. Zeneca Inc. v. Eli Lilly & Co.*, No. 99-cv-1452, 1999 WL 509471, at *2, 1999 U.S. Dist. LEXIS 10852, at *6–7 (S.D.N.Y. July 19, 1999) (holding that sales representatives' call notes satisfied the business records exception). However, as discussed at the August 25 conference, any additional layers of hearsay contained within the monthly reports need to fall within an exception to be admissible or will need to be redacted.

   **B.**  **Opposing Party Statements**

   AngioDynamics argues that Bard's hearsay objection to Exhibit P-177 should be overruled. (Dkt. No. 404, at 5). AngioDynamics argues that Exhibit P-177 is an internal Bard email and therefore a non-hearsay opposing party statement under Rule 801(d)(2)(D). (*Id.*). As AngioDynamics notes, Rule 801(d)(2)(D) does not require that the opposing party's statement "have been made by an employee who will appear as a trial witness." (*Id.*). Thus, any objection by Bard that party opponent statements require a foundation by someone with personal knowledge of the statement is without merit.

   However, the Court notes that the party opponent statement sought to be admitted "must be considered but *does not by itself* establish . . . the existence or scope of the [employment] relationship" under Rule 801(d)(2)(D). Fed. R. Evid. 801(d)(2) (emphasis added); *see Leser v. U.S. Bank Nat'l Ass'n*, No. 09-cv-2362, 2012 WL 6738402, at *4, 2012 U.S. Dist. LEXIS 182975, at *9–10 (E.D.N.Y. Dec. 29, 2012) (noting that the statements themselves "are not alone

9

sufficient" to establish the foundational predicates (citation omitted)).[2] And any additional layers of hearsay contained within a party opponent's statement must be accounted for or will need to be redacted.

### C. Then-Existing State of Mind under Fed. R. Evid. 803(3)

AngioDynamics seeks to admit under Rule 803(3) "customer statements of their belief regarding their perceived success with BioFlo" or regarding the "reason they asked for Bard's stylet on a standalone basis." (Dkt. No. 404, at 5–7). AngioDynamics argues that such statements provide context for inquiries and other admissible statements and are relevant to customer demand and whether PICCs and tip location system ("TLS") are separate products. (*Id.*). AngioDynamics illustrates its argument using Exhibits P-110 and P-124.[3] Bard responds that such statements are assertions of fact and that a limiting instruction to the jury that such statements are not being offered for their truth will not be effective and will only confuse the jury. (Dkt. No. 410, at 7–9).

First, Exhibit P-110 is an email chain among Bard employees in which Bard employee Nikki Rae summarizes information regarding the University of Colorado's evaluation of the BioFlo PICC. Bard objects to the exhibit on hearsay grounds. (Dkt. No. 412, at 9). The Bard emails are statements of a party opponent and therefore not hearsay under Federal Rule of Evidence 801(d)(2)(D) if a proper foundation is laid. However, the email from Karen Wheeler of the University of Colorado at the start of the email chain is hearsay for which there is no exception. If AngioDynamics proffered evidence that the University of Colorado was never

---

[2] In its letter brief, Bard argues that the deposition testimony of Kelly Powers is insufficient to establish that the statements by Bard employees Anthony Decheek, Paul Morgan, and Ashley Boitnott are party opponent statements under Rule 801(d)(2)(D). (Dkt. No. 410, at 6–7). Given Bard's representations, the Court agrees that the testimony cited is not sufficient to lay the foundation. (*See* Dkt. No. 410-10).

[3] Although AngioDynamics also mentions P-278, it does not develop any argument with regard to this particular exhibit, and the Court does not know which statement(s) are at issue.

converted to be an AngioDynamics PICC customer as well as a foundation that Ms. Wheeler was sufficiently involved in the University of Colorado's purchasing decision-making, the Court concludes that the statements that Ms. Wheeler "doesn't want to switch [to BioFlo]" and "can't see going back to not using 3CG, and really doesn't want to use vasanova" are admissible under Rule 803(3) as a statement of the declarant's then-existing state of mind. AngioDynamics now also seeks to admit the portions of Ms. Rae's February 1, 2013 email which summarize Ms. Wheeler's statements regarding the University of Colorado's evaluation of BioFlo, including that "their DVT rate" was reduced "from 17% to 6.6%." The Court concludes that this statement is not hearsay, as it is being admitted not for the truth of the matter (i.e., to prove a reduction in DVT rates at this hospital), but rather to demonstrate why the University of Colorado was considering switching from Bard to Angio PICCs.[4]

Second, Exhibit P-124 is an email chain between Dr. David Croteau of Henry Ford Hospital and representatives at Bard and Cook Medical, who manufactures PICCs. Bard objects to this exhibit on hearsay grounds. The following portions of Dr. Croteau's email are not hearsay because they are either inquiries or statements which do not contain any assertion: "Remember the Reese's Peanut Butter commercial??? Can't we evaluate the possibility of marrying (for lack of a better word) both technologies?" and "Let's try to get it together and make a step in the right direction for the patient." Although Bard argues that Dr. Croteau is referencing Cook Medical's antimicrobial PICCs, and not AngioDynamics's antithrombogenic PICCs, (*see* Dkt. No. 410, at 8–9), these portions are relevant to whether the TLS and PICC are separate products. AngioDynamics also seeks to introduce Dr. Croteau's statements evincing his "reason" for

---

[4] The Court will consider a proposed limiting instruction to the jury for this and any other non-hearsay use of evidence. *See United States v. Snype*, 441 F.3d 119, 129–30 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions." (collecting cases)).

11

making this inquiry, such as his statement that "the company with the antimicrobial catheter doesn't have guidance, and the company with the guidance doesn't have the antimicrobial catheter." The Court concludes that this statement is not hearsay because it is better conceptualized as part of the inquiry and/or because it is being introduced to illustrate why Dr. Croteau was inquiring about the compatibility of the two technologies, not for the truth of the matter asserted.[5]

## V.   CONCLUSION

The Court reminds the parties that all exhibits must be redacted of any hearsay which does not fall into an exception. The evidentiary rulings cited above are hereby

**SO ORDERED.**

Dated: September 13, 2022
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[5] The reply email from a Cook Medical employee is hearsay which does not fall within an exception.