**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANGIODYNAMICS, INC.,

                                        Plaintiff,                    1:17-cv-598 (BKS/CFH)

v.

C.R. BARD, INC. and BARD ACCESS SYSTEMS, INC.,

                                        Defendants.

**Appearances:**

*For Plaintiff:*
Philip J. Iovieno
Helen M. Maher
Amanda L. Devereux
Kristen J. McAhren
Mark A. Singer
Justin Arborn
Sean F. O'Shea
Michael E. Petrella
Audrey S. Curtis
Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281

*For Defendants:*
Andrew J. Frackman
Mark Racanelli
Pamela A. Miller
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Sergei Zaslavsky
Emily Murphy
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Robert A. Atkins
Jacqueline P. Rubin

William B. Michael
Daniel A. Crane
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

James P. Nonkes
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff AngioDynamics, Inc. brings this antitrust action against Defendants C.R. Bard, Inc. and Bard Access Systems, Inc. (collectively, "Bard"), asserting a claim of illegal tying in violation of Section 1 of the Sherman Act (codified at 15 U.S.C. § 1) under "per se" and "rule of reason" theories of liability. (Dkt. No. 1); *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273 (N.D.N.Y. 2021) (summary judgment decision); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-cv-598, 2022 WL 2643583, 2022 U.S. Dist. LEXIS 120384 (N.D.N.Y. July 8, 2022) (motions in limine decision). The case is set for trial to begin on September 19, 2022. In this decision, the Court considers AngioDynamics's proffer of evidence of lost sales relating to customer statements which it seeks to introduce under Federal Rule of Evidence 803(3). (*See* Dkt. Nos. 400, 402, 419, 424, 427).

## II.     BACKGROUND

AngioDynamics seeks to introduce certain hearsay statements of customers under the exception in Federal Rule of Evidence 803(3), under which "'statements of a customer as to his reasons for not dealing with a supplier are admissible for the limited purpose' of demonstrating the customer's motive, 'although not as evidence of the facts recited as furnishing the motives.'"

*AngioDynamics*, 537 F. Supp. 3d at 319 (quoting *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 914 (2d Cir. 1962)) (brackets omitted). The Court directed AngioDynamics to make a pretrial proffer of lost sales from the relevant entities "as part of laying the foundation for the admission of such statements." *AngioDynamics*, 2022 WL 2643583, at *13 n.16, 2022 U.S. Dist. LEXIS 120384, at *39 n.16; *see also, e.g.*, *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-cv-7844, 2008 WL 4560707, at *1, 2008 U.S. Dist. LEXIS 80801, at *4 (S.D.N.Y. Oct. 9, 2008) ("[T]estimony concerning the motivation of customers for ceasing to deal with a business is admissible under the 'state of mind' exception to the hearsay rule, provided that there is otherwise admissible proof that business was lost." (internal citation omitted)); *Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 447 (S.D.N.Y. 2007) (finding testimony regarding customer motivations admissible under the state of mind exception "provided that there is otherwise admissible proof that business was lost").

AngioDynamics submitted an original proffer of lost sales, (Dkt. No. 400), to which Bard responded, (Dkt. No. 402). Presently before the Court is AngioDynamics's revised proffer which includes greater detail for each entity, (Dkt. No. 419); a subsequent submission identifying the Rule 803(3) statements at issue for each entity, (Dkt. No. 424); and Bard's response, (Dkt. No. 427).

## III.   DISCUSSION

AngioDynamics has made a proffer of lost sales and identified Rule 803(3) statements for 32 different entities.[1] The Court addresses certain overarching issues before proceeding to consider specific entities.

---

[1] AngioDynamics's original proffer (Dkt. No. 400) included a total of 37 entities. AngioDynamics now represents that it "does not intend to present testimony related to lost sales" at five of those original entities. (Dkt. No. 419, at 3, 6, 8, 9; Dkt. No. 424, at 17).

A. **Sales Data**

AngioDynamics's supplemental proffer (Dkt. No. 419) cites to Exhibits D-230 (AngioDynamics sales data) and D-390 (Bard sales data). Both D-230 and D-390 are large spreadsheets and, due to their nature, the Court is unable to assess the representations AngioDynamics makes regarding what these exhibits show. Moreover, there is a dispute about how AngioDynamics derived the figures it cites to the Court and whether they constitute undisclosed expert opinions. (*See* Dkt. No. 424, at 1 n.1; Dkt. No. 427, at 1 n.1). The Court therefore does not consider the representations AngioDynamics has made regarding what D-230 and D-390 show in considering the sufficiency of its proffer.

B. **Scott Centea Testimony[2]**

AngioDynamics seeks to elicit live testimony from Scott Centea, AngioDynamics's Senior Director of Global Marketing. *AngioDynamics*, 537 F. Supp. 3d at 295. Mr. Centea was deposed both as a corporate representative of AngioDynamics under Federal Rule of Civil Procedure 30(b)(6) and in his individual capacity under Federal Rule of Civil Procedure 30(b)(1). (Dkt. No. 424-2; Dkt. No. 424-3). AngioDynamics argues that Mr. Centea "may . . . testify at trial as to the corporation's collective knowledge consistent with his preparation on the noticed 30(b)(6) deposition topics, which included lost sales." (Dkt. No. 419, at 1–2). Bard argues that Mr. Centea can only testify at trial based on his personal knowledge. (Dkt. No. 427, at 2–4).

Federal Rule of Civil Procedure 30(b)(6) allows for deposition testimony from a corporate representative on topics outside the representative's personal knowledge but within the

---

[2] The Court notes the AngioDynamics has repeatedly asserted that it has "additional non-hearsay relevant evidence regarding an inquiry concerning the availability of Bard' standalone stylet," relying on Mr. Centea's testimony that he had conversations with individuals who indicated that they had made such inquiries of Bard. (*E.g.*, Dkt. No. 424, at 3 n.3; Dkt. No. 419, at 6). While the inquiry *of Bard* is not hearsay, AngioDynamics fails to account for the layer of hearsay arising when a particular individual tells Mr. Centea *about* that inquiry.

corporation's collective knowledge. *See Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (citations omitted). While Federal Rule of Evidence 602 generally limits a witness's trial testimony to matters within that witness's personal knowledge, an *adverse party* may use another party's Rule 30(b)(6) deposition testimony for "any purpose." Fed. R. Civ. P. 32(a)(3); *see also Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907 (5th Cir. 2010) (citing *Brazos River*, 469 F.3d at 434); *Abbott Lab'ys v. Feinberg*, No. 18-cv-8468, 2020 WL 7706571, at *1–2, 2020 U.S. Dist. LEXIS 191417, at *4 (S.D.N.Y. Oct. 15, 2020) ("Defendants may designate portions of [Plaintiff's Rule 30(b)(6) deponent's] 30(b)(6) deposition testimony."). The issue here, however, is whether the party who designated the Rule 30(b)(6) corporate representative may call that corporate representative at trial and elicit testimony on information outside the representative's personal knowledge but within the corporation's collective knowledge.

Courts are divided and the Second Circuit has not yet ruled on the issue. But the Court is persuaded that the Federal Rules do not allow such a circumvention of the rule against hearsay as is suggested by AngioDynamics, and the cases AngioDynamics cites in in support of its position are distinguishable or unpersuasive. The only cited decision from a court within the Second Circuit, *Abbott Laboratories v. Feinberg*, ordered that the defendant could designate Rule 30(b)(6) deposition testimony from the plaintiff's Rule 30(b)(6) corporate representative and allowed related direct- and cross-examination of the live witness. 2020 WL 7706571, at *1–2, 2020 U.S. Dist. LEXIS 191417, at *4. AngioDynamics also cites a case that deals only with the designation of portions of a third-party Rule 30(b)(6) corporate representative. *See Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 502–04 (N.D. Ill. 2011) (allowing limited designation of a non-party Rule 30(b)(6) corporate representative's deposition testimony but noting the

importance of balancing "against the real dangers of hearsay"). The Court is similarly

unpersuaded by *University Healthsystem Consortium v. UnitedHealth Group, Inc.*, which

involved a Rule 30(b)(6) corporate representative's affidavit in support of a motion for summary

judgement. 68 F. Supp. 3d 917, 921–22 (N.D. Ill. 2014).

Therefore, to the extent AngioDynamics seeks to elicit testimony from Mr. Centea on

information related to lost sales or lost opportunities that is outside his personal knowledge,

including topics from his Rule 30(b)(6) deposition, the material upon which he relied must not be

hearsay or must fall within a hearsay exception. *See Union Pump*, 404 F. App'x at 907–08 ("[A]

corporate representative may not testify [at trial] to matters outside his own personal knowledge

'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'"

(quoting *Brazos River*, 469 F.3d at 435)); *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F.

Supp. 2d 206, 215 n.5 (S.D.N.Y. 2007) (holding that hearsay statements from Rule 30(b)(6)

depositions must be supported by admissible evidence to be considered for summary judgment

purposes), *aff'd* 354 Fed. App'x 496 (2d Cir. 2009); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No.

02-cv-9144, 2006 WL 988143, at *2, 2006 U.S. Dist. LEXIS 19686, at *8 (S.D.N.Y. Apr. 13,

2006) ("[A]t trial, [Plaintiff] may only offer testimony from [Plaintiff's Rule 30(b)(6) designee]

as a fact witness based on his personal knowledge and in compliance with Federal Rule of

Evidence 701."). That is, if AngioDynamics is unable to establish that the sources used to

educate Mr. Centea on matters of "collective corporate knowledge"—matters not within Mr.

Centea's personal knowledge—are otherwise admissible evidence, Mr. Centea's testimony on

such matters will not be allowed. *See* 7 James W. Moore et al., *Moore's Federal Practice—Civil*

§ 30.25 (2022) ("An entity may not call its own 30(b)(6) witness to testify at trial to hearsay and other matters outside the witness's personal knowledge.").[3]

Furthermore, to the extent that AngioDynamics seeks to elicit testimony from Mr. Centea on information related to lost sales or lost opportunities that is purportedly within his personal knowledge, including topics from his Rule 30(b)(1) deposition, AngioDynamics must introduce evidence "sufficient to support a finding that [Mr. Centea] has personal knowledge of the matter." Fed. R. Evid. 602.[4]

## C.    Hearsay Evidence of Lost Opportunities Under Rule 803(3)

Bard argues that AngioDynamics's proffer related to lost *opportunities* to convert a customer—as opposed to lost sales—is flawed because AngioDynamics has not proffered "independent evidence that the hospitals would have switched." (Dkt. No. 427, at 4–5). Bard argues that AngioDynamics "uses the same hearsay statements to try to establish the *fact* that

---

[3] In its letter brief related to its lost sales proffer, AngioDynamics puts forth Rule 30(b)(6) deposition testimony from Mr. Centea as support for lost sales or lost opportunities at Christus St. Patrick; Florida Hospital; Indiana University; Manatee Memorial Hospital; Parkview Health; Premier; and University Hospitals of Cleveland and notes that Mr. Centea is expected to provide live testimony at trial consistent with his prior statements. (Dkt. No. 424). Without demonstrating that the sources of information Mr. Centea consulted with regard to these entities are otherwise admissible, such trial testimony will not be allowed. Furthermore, the Court notes that, to the extent Mr. Centea's testimony recounts hearsay within hearsay, each level of hearsay must fall within an exception. For example, AngioDynamics proffer indicates that Mr. Centea "educated himself on Manatee Memorial Hospital by speaking with AngioDynamics' Michael DeCarlo." (Dkt. No. 424, at 10). For such testimony to be admissible at trial, any statement made by Manatee Memorial Hospital representatives to Mr. DeCarlo must not be hearsay or must fall within a hearsay exception *and* any statement made by Mr. DeCarlo to Mr. Centea must not be hearsay or must fall within a hearsay exception.

[4] In its letter brief related to its lost sales proffer, AngioDynamics puts forth Rule 30(b)(1) deposition testimony from Mr. Centea as support for lost sales or lost opportunities at Mercy Hospitals Fort Smith; Mercy Hospitals Northwest Arkansas; Omnicare; Premier; St. Vincent's; Summerlin; Torrance Hospital; University Hospital of Cleveland; University of California San Francisco Medical Center; and University of Kansas and notes that Mr. Centea is expected to provide live testimony at trial consistent with his prior statements. (Dkt. No. 424). The relevant Rule 30(b)(1) deposition testimony on which AngioDynamics relies consists of Mr. Centea selecting entity names that he believes represent lost sales or lost opportunities from a list. (Dkt. No. 424-3). The cited deposition testimony alone is insufficient to establish Mr. Centea's personal knowledge of the specific lost sales or lost opportunities.

they lost the business that they suggest show the *reasons* that they lost business" and therefore that there is "no non-hearsay evidence" establishing the fact of a lost opportunity. (*Id.* at 4).

The Court agrees. As the Court has previously explained, certain customer statements are admissible to prove the customer's then-existing motivation for a purchasing decision only if there is independent evidence of lost sales. *See, e.g.*, *Discover Fin. Servs.*, 2008 WL 4560707, at *1, 2008 U.S. Dist. LEXIS 80801, at *4 ("[T]estimony concerning the motivation of customers for ceasing to deal with a business is admissible under the 'state of mind' exception to the hearsay rule, provided that there is otherwise admissible proof that business was lost." (internal citation omitted)); *Celebrity Cruises Inc.*, 478 F. Supp. 2d at 447 (finding testimony regarding customer motivations admissible under the state of mind exception "provided that there is otherwise admissible proof that business was lost"). AngioDynamics "agrees with Bard" that its proffer of lost sales "must be based on 'non-hearsay evidence.'" (Dkt. No. 419, at 1). Thus, AngioDynamics may not rely on hearsay evidence to prove the fact of a lost opportunity.

Having reviewed AngioDynamics's submissions, the Court concludes that AngioDynamics has not proffered independent, non-hearsay evidence that the following fourteen entities would have switched to AngioDynamics: (1) Beaumont; (2) Biloxi; (3) Christus Cabrini St. Frances; (4) Christus St. Patrick;[5] (5) Community Health Systems; (6) Henry Ford; (7) Indiana University; (8) Omnicare; (9) Singing River; (10) St. Dominic's; (11) Summerlin; (12) University Hospitals of Cleveland; (13) University of California San Francisco Medical Center; and (14) University of Kansas. Indeed, AngioDynamics's proffer of lost sales for these entities is often identical to the very hearsay statements of customer motivation which it seeks to introduce

---

[5] AngioDynamics also relies on Exhibit P-73, but AngioDynamics has not laid a foundation that this internal AngioDynamics email chain is a business record. In any event, the relevant portions of this email would still not constitute independent, non-hearsay evidence of a lost opportunity.

under Rule 803(3). (*See, e.g.*, Dkt. No. 419, at 3 (relying, as a proffer of lost sales, on the deposition testimony of William Millar that Christus Cabrini was "interested in the BioFlo technology" but would not pursue a BioFlo trial without a standalone Bard stylet); Dkt. No. 424, at 4 (relying on the same testimony as evidence of customer motive and seeking to admit it under Rule 803(3))).

Furthermore, to the extent AngioDynamics is able to proffer non-hearsay evidence of the fact of a lost opportunity, (*see, e.g.*, Dkt. No. 419, at 8 (pointing to William Millar's testimony that AngioDynamics was "trying to win the nursing business at Singing River" but was unsuccessful); Dkt. No. 424, at 5–6 (pointing to Scott Centea's testimony that Community Health Systems had a contract which was "terminated" or "not fully realized")), the Court notes that the hearsay customer statements which AngioDynamics seeks to introduce under Rule 803(3) are not sufficiently reliable for admission under that exception. (*See, e.g.*, Dkt. No. 419, at 8 (William Millar's testimony that Singing River "would have purchased AngioDynamics' PICCs if Bard had standalone stylets available"); Dkt. No. 424, at 5 (Scott Centea's testimony that Community Health Systems' "comfort level with the 3CG system" made it "difficult to convert" their systems to BioFlo)); *see also AngioDynamics*, 2022 WL 2643583, at *15, 2022 U.S. Dist. LEXIS 120384, at *43 (recognizing that the Court has "some discretion in view of the risk of insincerity in a potential customer's statement why products were not being ordered" and that it would "take that into account" (quoting *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 204 n.13 (2d Cir. 2015))). The hearsay statements to AngioDynamics sales representatives that a particular customer would purchase AngioDynamics's peripherally inserted central catheters ("PICCs") if Bard's tip location system ("TLS") technology were

available as a standalone stylet constitute self-serving testimony, and Bard has had no opportunity to cross-examine any of the relevant representatives from these hospitals.

Accordingly, because AngioDynamics has not proffered independent, non-hearsay evidence to establish the fact of lost opportunities for the above fourteen entities, AngioDynamics may not introduce the hearsay statements of customer motivation under Rule 803(3).

### D.      Role of Rule 803(3) Declarant

Bard argues that AngioDynamics has "ignore[d] a core feature of the 803(3) test" that any statement of customer motive must have been made by a declarant with a sufficient role in the hospital's PICC purchasing decision-making process. (Dkt. No. 427, at 6). The Court agrees. Thus, unless otherwise expressly stated below, for any Rule 803(3) statement the Court finds otherwise admissible, AngioDynamics must lay a foundation at trial regarding the declarant's role in the decision to switch PICC manufacturers.

### E.      Specific Entities

#### 1.      Baycare System

##### a.      December 2012

AngioDynamics has proffered evidence that four facilities within Baycare System converted from AngioDynamics to Bard PICCs and 3CG technology in December 2012. (*See* P-237 (internal Bard emails recounting that four facilities at Bayare have "officially eliminated x-ray" and "kicked their Navilysts PICCS to the curb," resulting in a "conver[sion]" of close to one million dollars "in new business from Navilyst")). However, the Court does not read P-237 as containing any statements of customer motivation for switching to Bard which might be admissible under Rule 803(3). AngioDynamics also points to P-507, an internal Bard email chain from August 2013, in which Timothy Creamer recounts that the trial at "Baycare's Morton Plant

Mease" was "about catheter tip position confirmation and eliminating X-ray" and that "[t]hey actually loved the BAS kit component upgrades . . . over current Navilyst." (P-507). However, even to the extent this statement could be read as expressing a customer motivation for switching to Bard, it is not contemporaneous with the decision to switch in December 2012; nor has AngioDynamics laid a foundation regarding the declarant.

### b.  2016

AngioDynamics also asserts that it lost business from Baycare in Tampa in 2016. The Court does not rely on AngioDynamics's representations regarding sales data or on Exhibit P-336, which consists of internal AngioDynamics emails for which AngioDynamics has not laid a foundation for admission as a business record. However, AngioDynamics also points to the deposition testimony of William Millar, who testified that "BayCare Hospital" was an AngioDynamics PICC customer who left AngioDynamics and "went to Bard" in "2017 -- between 2016 and 2018." (Dkt. No. 419-1, at 3–4). Mr. Millar testified that his knowledge of the situation comes from communications with the "PICC nurse" at the hospital while he was doing a field ride, and that verification of the loss came "when they notified us by not ordering [AngioDynamics] product and mov[ed] to Bard." (Id. at 5–6). Mr. Millar is "prepared to testify to the loss at trial." (Dkt. No. 419, at 2). The Court concludes that AngioDynamics has made a sufficient proffer of lost sales from Baycare in Tampa sometime between 2016 and 2018.

As evidence of Baycare's then-existing motivation in switching to Bard, AngioDynamics again proffers P-336, an internal AngioDynamics email chain between William Millar and Todd Mirasola. On November 2, 2016, Mr. Millar wrote: "We just got notice Baycare in Tampa is moving all PICCS to Bard due to tip location need." (P-336, at ANGIO-713149). Bard objects to P-336 on hearsay grounds. While AngioDynamics asserts that P-336 is a business record because it is a "record announcin[g] a lost AngioDynamics' sale," (Dkt. No. 424, at 2), AngioDynamics

has not laid a proper foundation for the email to be introduced as a business record under Rule 803(6). Indeed, the email chain appears to be a more informal, "unique and sporadic communication[]" which falls outside the business records exception. *Cf. New World Trading Co. Ltd. v. 2 Feet Productions, Inc.*, No. 11-cv-6219, 2014 WL 988475, at *1, 2014 U.S. Dist. LEXIS 37865, at *2 (S.D.N.Y. Mar. 13, 2014) (finding emails fell outside the business records exception because they "contain[ed] unique and sporadic communications"). Thus, it is not clear that P-336 is admissible.

However, AngioDynamics expects William Millar to testify at trial consistent with his deposition testimony. (Dkt. No. 424, at 2–3). At his deposition, Mr. Millar testified that BayCare Hospital "made the business decision to move [to] Bard PICCs and midlines from AngioDynamics because of the requirement of not being able to" "use our PICC lines with the Bard [tip location] system." (Dkt. No. 419-1, at 3–4). This knowledge came from a conversation he had with a PICC nurse and from "a communication [he] had in in-person meetings at both sides." (*Id.* at 5–6). Subject to testimony laying a foundation that the declarant was sufficiently involved in the decision-making process and that the statement was made contemporaneously with the decision to switch to Bard, the Court concludes that Mr. Millar's expected testimony that Baycare switched its business to Bard because it was unable to use AngioDynamics PICCs with Bard's TLS may be admissible under Rule 803(3).

### 2.    Deaconess

Although AngioDynamics represents that Chuck Greiner and/or Scott Centea will testify regarding lost sales from Deaconess, AngioDynamics's proffer relies on representations about sales data and a document which is not on any party's exhibit list. AngioDynamics therefore has not made a sufficient proffer of lost sales for this entity.

### 3.  Florida Hospital

AngioDynamics relies on the deposition and anticipated trial testimony of Scott Centea. (*See* Dkt. No. 419-4, at 11–12 (Centea 30(b)(6) testimony that Florida Hospital "was one of the highest PICC users in the country at the time" and was "a little over a $2 million account for us that we ended up losing almost completely")). Although the basis for Mr. Centea's testimony in this regard is unclear, it is possible that Mr. Centea may be able to testify that AngioDynamics lost Florida Hospital as a customer. However, to the extent AngioDynamics relies on testimony that AngioDynamics was unable to subsequently win back Florida Hospital's business, it has not proffered independent, non-hearsay evidence of this lost opportunity.

It is unclear from the cited portions of Mr. Centea's testimony, (*see* Dkt. No. 424, at 6–7), which statements might be admissible under Rule 803(3). AngioDynamics has not laid a sufficient foundation regarding any particular statement, including the identity and role of the declarant.

### 4.  HealthTrust

Most of the evidence discussed by AngioDynamics with respect to HealthTrust, which is a Group Purchasing Organization ("GPO"), concerns lost opportunities. (*See, e.g.*, Dkt. No. 419, at 4–5 (citing deposition testimony to the effect that AngioDynamics was "not able to convert" customers within the HealthTrust GPO)). As discussed above, AngioDynamics has not proffered independent, non-hearsay evidence to establish the fact of such lost opportunities. However, the Court separately addresses Exhibit P-437, an email chain between AngioDynamics employees and individuals at HealthTrust from April 2021. AngioDynamics seeks to introduce under Rule 803(3) Taya Porter of HealthTrust's statement that her team "really wants to have tip location and tracking instead of just tip location" and therefore "would like to switch to Bard." (P-437, at ANGIO-WD-0244675). Bard objects to this exhibit on hearsay grounds. The Court agrees that P-

437 mostly consists of hearsay, and that AngioDynamics has not laid a sufficient foundation for the introduction of AngioDynamics emails as a business record. Furthermore, to the extent Ms. Porter's statement is a statement of the customer's then-existing motivation for switching to Bard PICCs, AngioDynamics still has not proffered independent, non-hearsay evidence that it was unable to convert this business.

### 5.   Hillcrest Medical Center

AngioDynamics points to P-28, a Bard monthly report dated November 6, 2013 stating: "Hillcrest Hospital Tulsa has converted to AngioDynamics Bioflo based on superior results during long evaluation period. . . . [T]his was a solo NON tip location account which is by far our most vulnerable." (P-28, at Bard_AD_00527661). Further, an internal Bard email dated October 16, 2015 states that Bard "just w[o]n $700k of PICC business back today [from Hillcrest] with 3CG Solo PICCs." (P-200, at Bard_AD_00042181). The Court concludes that this is a sufficient proffer of evidence of lost sales from Hillcrest in October 2015.

AngioDynamics seeks to introduce under Rule 803(3) the customer's statement that AngioDynamics "cannot be surprised by the decision [to move to Bard PICCs], as currently Angiodynamics does not have similar technology." (P-125). The customer made this statement only a few days after notifying Matt Taylor at AngioDynamics of the decision to move to Bard. It appears that the customer statements may fall within the Rule 803(3) exception if a live witness lays a foundation for the customer emails.

### 6.   JFK Medical Center (FL)

As evidence of lost sales from JFK Medical Center (FL), AngioDynamics points to William Millar's deposition testimony that JFK "in South Florida" was using AngioDynamics's product and that AngioDynamics subsequently lost that business in 2016 or 2017. (Dkt. No. 419-1, at 9, 13–16). Mr. Millar is also prepared to testify to the loss at trial. The Court therefore

concludes that AngioDynamics has made a sufficient proffer of evidence that it lost sales from JFK Medical Center (FL) around 2016 or 2017.

Mr. Millar also testified at deposition that AngioDynamics lost JFK Medical Center's PICC business because it "wanted tip location." (Dkt. No. 419-1, at 14). This statement may be admissible under Rule 803(3) if a foundation is laid that (1) this statement was made to Mr. Millar contemporaneously with the decision to switch from AngioDynamics to Bard, and (2) the declarant was sufficiently involved in the decision-making process.

### 7.    Little Rock VA

As evidence that AngioDynamics lost business from Little Rock VA, AngioDynamics points to an internal AngioDynamics email dated May 15, 2014 in which William Millar states: "Lost. Bard 3CG was implemented as tip location/navigation was decided to be the requirement." (P-430). Bard objects to P-430 on hearsay grounds, and the Court agrees. AngioDynamics argues that the email is a business record "reporting a lost sale," (Dkt. No. 424, at 10), but has not laid a proper foundation for the email to be introduced as a business record under Rule 803(6). Indeed, the email chain appears to be an informal, "unique and sporadic communication[]" which falls outside the business records exception. *Cf. New World Trading*, 2014 WL 988475, at *1, 2014 U.S. Dist. LEXIS 37865, at *2.

Nevertheless, AngioDynamics asserts that Mr. Millar is prepared to testify to the loss at trial. (Dkt. No. 419, at 6). Trial testimony from Mr. Millar based on his own personal knowledge will be sufficient to establish the fact of lost sales from Little Rock VA in May 2014. To the extent Mr. Millar testifies to the effect that the switch was made to Bard because "tip location/navigation was decided to be the requirement," such a statement is admissible under Rule 803(3) if a foundation is laid that (1) this statement was made to Mr. Millar

contemporaneously with the decision to switch from AngioDynamics to Bard, and (2) the declarant was sufficiently involved in the decision-making process.

### 8.    Manatee Memorial Hospital

AngioDynamics's proffers regarding Manatee Memorial Hospital rely solely on representations made regarding the sales data in D-230 and D-390 and the Rule 30(b)(6) testimony of Scott Centea. The Court therefore does not address this entity further.

### 9.    McLaren Oakland

For its proffer of lost sales, AngioDynamics points to an internal Bard email dated May 12, 2014 in which Jordan Parrish writes that Bard "clos[ed] out a big competitive win at Mclaren Oakland" which converted "630 competitive 3CG PICC's and roughly $130,000 in new business at the expense of our friends from Angio D." (P-183). Although Bard objects to P-183 on hearsay grounds, the quoted statements are party opponent statements. (*See also* P-27, at Bard_AD_00064009 (Bard monthly report from March 2014 stating: "Mclaren Oakland- We have finalized a $120,000 PICC conversion starting May 5th" which "will knock Angio D and Bioflo out")). Thus, AngioDynamics has proffered evidence of lost sales at McLaren Oakland in May 2014.

AngioDynamics seeks to admit under Rule 803(3) the statement in P-183 that the "biggest reasons" for McLaren Oakland's conversion to Bard "are clinical buy-in and McLaren's Corporate initiative to eliminate Chest X-Ray." (P-183). While this statement appears to be a statement of the customer's then-existing motivation for the conversion, AngioDynamics will need to lay a foundation that the declarant from whom Jordan Parrish received this information was sufficiently involved in the decision-making process.

### 10.    Parkview Health

AngioDynamics points to an internal AngioDynamics email dated December 11, 2015 which states that Parkview "moved to Bard 3CG" as evidence of the fact of lost sales. (P-228). Bard objects to this exhibit on hearsay grounds, and AngioDynamics responds that it is a business record. (Dkt. No. 412, at 17; Dkt. No. 419, at 8 n.15). The email does not appear on its face to fall within the business records exception; AngioDynamics would need to lay a foundation that it was a regular practice to send and receive emails recording this sort of information. AngioDynamics otherwise only relies on sales data in D-230 and the testimony of Scott Centea, discussed above.

AngioDynamics seeks to introduce under Rule 803(3) the statement contained in P-228 that the reason Parkview moved to Bard was because "[t]hey loved Xcela PASV but hated Vasanova" and so moved to Bard "[a]s a result." (P-228). Again, however, it does not appear that this exhibit falls within the business records exception. Assuming AngioDynamics can lay such a foundation, it also needs to lay a foundation regarding the identity and role of the declarant of the statement.

### 11.    St. Vincent's

AngioDynamics proffers as evidence of lost sales from St. Vincent's Exhibit P-383, which consists of internal Bard emails and an attached monthly report from January 2015. The relevant statement from this exhibit—that St. Vincent's Medical Center "was a recent 3CG competitive conversion from Angio," (P-383, at Bard_AD_00018121)—appears to be admissible as a party opponent statement and/or a business record. However, it is unclear what statement AngioDynamics seeks to introduce under Rule 803(3) as a statement of the customer's then-existing motivation for switching. To the extent AngioDynamics points to the statement in the

monthly report that the "3CG evaluation went very well," it has not laid a sufficient foundation regarding the basis for this statement, the identity of the declarant, and contemporaneousness.

### 12.    Torrance Hospital

AngioDynamics has not made a sufficient proffer of lost sales from Torrance Hospital or a sufficient foundation for any associated Rule 803(3) statements, as AngioDynamics relies solely on sales data contained in D-230 and D-390 and the testimony of Scott Centea.

### 13.    UHS Delaware

AngioDynamics first proffers Exhibit P-242 as evidence that Bard won UHS Delaware's PICC business at the expense of AngioDynamics. P-242 is an internal Bard email dated May 2, 2014 in which Matt Henrichs writes that Bard "lock[ed] down $2M in PICC business" at UHS Delaware and that "AngioDynamics/Bioflop was once again turned away." Even if P-242, to which there is no objection, constitutes non-hearsay evidence of a lost opportunity in May 2014, AngioDynamics has not laid a sufficient foundation for the introduction of further statements in that exhibit under Rule 803(3). For example, Matt Henrichs writes that AngioDynamics was "turned away" because it "could not compete against [Bard's] clinically superior products" and "3CG technology." (P-242). However, there is no indication of the basis for Mr. Henrichs's statement, whether he was told this by the customer, or who the declarant was.

AngioDynamics also proffers Exhibit P-131 as evidence that AngioDynamics failed to win UHS Delaware's business after a trial of BioFlo in December 2015. Matt Henrichs's December 17, 2015 email is a non-hearsay statement of a party opponent and states that "UHS launched a multi site trial of AngioDynamics BioFlo and Celerity" and "the decision has been made to stay with Bard." (P-131, at Bard_AD_00078643).[6] AngioDynamics has not laid a

---

[6] The preceding email in the chain from Patricia Tyrrell of UHS Delaware is hearsay for which no exception is readily apparent.

sufficient foundation for any Rule 803(3) statements contained in Mr. Henrichs's email (e.g., noting the "significance of getting our facilities to 3CG"), including the identity and role of the declarant in the decision-making process. Finally, AngioDynamics points to a January 21, 2016 email written by Scott Centea to Ms. Tyrrell stating that the trial "ended up" being a comparison between Celerity and Sherlock, (P-431, at ANGIO-01507297), but has not laid a foundation that this email is a business record or explained the basis for Mr. Centea's statement or its contemporaneousness.

### 14.   West Allis Memorial Hospital

AngioDynamics's proffer related to West Allis Memorial Hospital is insufficient, as it relies on sales data contained in D-230 and D-309 and on unspecified anticipated testimony from Chuck Greiner and/or Scott Centea. (Dkt. No. 419, at 11; Dkt. No. 424, at 18). Nor has AngioDynamics identified a specific customer statement which it seeks to introduce under Rule 803(3). (*See* Dkt. No. 424, at 18 (citing to a Bard internal document which is not on any exhibit list)).

### 15.   Sunrise

The Court has already ruled that the statement contained in Exhibit P-433 that Sunrise Hospital was switching to Bard "due to Navigation" is admissible under Rule 803(3) provided AngioDynamics lays a sufficient foundation that the AngioDynamics email in which the statement is contained is a business record and makes a pretrial proffer that AngioDynamics lost sales from Sunrise Hospital. (Dkt. No. 416, at 5–7). AngioDynamics's proffer of lost sales from Sunrise Hospital is not sufficient: it relies on sales data in D-230 and P-432, an internal AngioDynamics email for which AngioDynamics has not laid a foundation as a business record.

## IV.    CONCLUSION

The evidentiary rulings cited above are hereby

**SO ORDERED.**

Dated: <u>September 19, 2022</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge